**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**320.0 ACRES OF LAND, MORE OR LESS IN the COUNTY OF MONROE, STATE OF FLORIDA, and Salvatore R. Ciccone, et al., Defendants-Appellants.**

No. 76–2775.

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1979.

William G. Earle, Miami, Fla., for defendants-appellants.

Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Atty., Peter R. Steenland, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, THORNBERRY and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The Just Compensation Clause of the Fifth Amendment, which provides that private property shall not be taken without just compensation, is one of the most basic constitutional guarantees that the rights of the individual will not be unfairly sacrificed in the pursuit of the common weal. In this eminent domain case, appellant landowners claim that this constitutional guarantee has been breached, that because of numerous substantive and procedural errors in the proceedings below they have not been adequately and justly compensated for the loss of their properties condemned by the Federal Government.

The public project in this case is Everglades National Park, which covers approximately 2000 square miles of the southernmost portion of the Florida peninsula. The compensation trials below involved 63 tracts (totalling approximately 788 acres) taken for inclusion within the Park. The owners of 52 of the tracts have appealed. Among the issues they present is the proper application of the "scope of the project" rule and the principle of "highest and best use." We vacate because of procedural deficiencies, but we also enunciate the legal standards of just compensation that are to guide retrial of the 52 tracts appealed, as well as literally hundreds of other properties condemned for Everglades National Park and the neighboring Big Cypress National Preserve.

Because the history of Everglades National Park is so important to a proper understanding and just resolution of this case, our opinion begins with a brief review of that history. Then, in Part I, we recount the proceedings in the District Court, including the procedural error which invalidated those proceedings almost before they began. After an overview of the basic principles of just compensation law in Part II, we turn to the important substantive issues raised by this appeal. With respect to the scope of the project rule, we first discuss the rule generally (Part IIIA), including its underlying precepts and how it has been applied in other major federal court decisions. We then review several errors in its application by the District Court to the facts of these Everglades condemnation proceedings (Part IIIB), followed by a discussion of how the rule should be applied upon remand (Part IIIC). We conclude our consideration of the rule with a discussion of the differing responsibilities it imposes upon the judge and the fact-finder in just compensation trials (Part IIID). In Part IV, we review an evidentiary ruling concerning the admissibility of certain "comparable sales" in the trials below. Important issues concerning "highest and best use" and compensation for "illegal uses" are discussed in Parts V and VI respectively. Part VII is devoted to several miscellaneous evidentiary issues that arose during the District Court trials, including the admissibility of just compensation statements sent landowners prior to the institution of eminent domain proceedings. Finally, in Part VIII, we remand the issue of just compensation in these cases for trial by a commission in lieu of trial by a jury.

### Everglades National Park And The Northwest Extension

The origins of this case trace back to 1929 when the Federal Government first began to investigate the prospects of establishing a National Park in the Everglades.[1] In 1930, the Secretary of the Interior recommended the establishment of a national park encompassing about 2000 square miles (1,280,000 acres) of the southern tip of the Florida peninsula, and in 1934 Congress took the first tentative steps toward establishment of the Park.[2] However, largely because Congress refused to authorize purchase of parklands with public money,[3] Ev-

---

1. See Act of March 1, 1929, 45 Stat. 1443.

2. It decreed that as soon as title to the entire 2000 square miles vested in the United States, the land would be "established, dedicated, and set apart as a public park for the benefit and enjoyment of the people * * *." 16 U.S.C. § 410.

3. Congress did not authorize the Secretary of the Interior to use public money to acquire parklands until 1949, and even then the autho-

erglades National Park did not become a reality until 1947, when it was established and dedicated with a nucleus of 454,000 acres granted by the State of Florida.[4] In addition to the land donations, the State of Florida made available to the Federal Government $2,000,000 with which the Department of the Interior began to acquire privately owned lands within the designated Park boundaries.[5]

After certain changes in the park boundaries declared by the Secretary of the Interior, Congress, in the Act of July 2, 1958,[6] officially redefined the park boundaries, since when the dimensions of the Park have not been changed. The 1958 Act included within the Park for the first time an area known as the Northwest Extension, in which the properties involved in this case are located. Overall, the 1958 Act increased the size of the Park to 1,390,000 acres, of which all but 197,000 acres were at that time owned by the United States. Of these 197,000 acres, some were contemplated to remain in private ownership,[7] some were to be donated to the Federal Government, and 81,000 acres—among them the 788 acres at issue in this case—were to be acquired "as appropriations become available for the purpose."[8]

The 1958 Act, however, severely limited the amount that could be appropriated for purchasing the remaining privately held lands, by putting a ceiling upon future appropriations of $2,000,000 (approximately $24 per acre).[9] Moreover, not even a fraction of the privately held lands could be purchased immediately as Congress did not appropriate *any* money for that purpose for some time. When anxious landowners inquired of the Department of the Interior concerning the status of their lands and the possibility of imminent condemnation, they were assured, in a series of letters between 1958 and 1962, that the Department would not begin its acquisition program until Congress appropriated the necessary funds, that the Department did not know when Congress would in fact appropriate the funds, but that in the meantime the landowners were completely free to sell, use, or improve their within-Park properties as they were able to and as they saw fit.[10]

As things developed, the Department of the Interior did not begin to purchase privately held lands with federal funds until 1966,[11] and when it did, the $2,000,000 authorized back in 1958 was quickly exhausted. As Congress subsequently realized, the 1958 authorization had been made without the benefit of any detailed appraisals and the errors made in the estimates were compounded by "the rapid escalation of land prices" so that the $2,000,000 was insufficient for the acquisition of at least 74,000 acres of the remaining privately owned land.[12] It was not until 1970 that Congress fully remedied its initial underestimation of the money necessary to complete its acquisition program, when it withdrew the $2,000,-000 cap and increased the authorized appropriation elevenfold to $22,000,000.[13] Congress actually appropriated most of this sum shortly thereafter and, sometime in 1971 or 1972, the Department of the Interior began the process of acquiring the re-

rization was contingent upon Congress appropriating funds for that purpose. *See* 16 U.S.C. § 410e.

4. *See* [1949] U.S.Code Cong. & Admin.News, pp. 2062–63.

5. *See id.* at 2066–68.

6. Pub.L.No. 85–482, 72 Stat. 280.

7. The restriction against the acquisition of certain described lands in Dade County without the consent of the owners was removed, however, in the Act of Sept. 26, 1970, Pub.L.No. 91–428, 84 Stat. 885.

8. [1958] U.S.Code Cong. & Admin.News, p. 2853; *see* 16 U.S.C. § 410j.

9. Pub.L.No. 85–482, § 8, 72 Stat. 286.

10. *See* note 48, *infra.*

11. *See* [1974] U.S.Code Cong. & Admin.News, p. 5573.

12. *See* [1969] U.S.Code Cong. & Admin.News, pp. 1163–64.

13. Act of Sept. 26, 1970, Pub.L.No. 91–428, 84 Stat. 885; *see* 16 U.S.C. § 410p.

maining privately held parklands, including those involved in this case.

## I. THE PROCEEDINGS BELOW

The 52 tracts of land involved in this appeal were among thousands of Everglades parcels destined for acquisition once Congress loosened the pursestrings. The acquisition of many tracts was accomplished through settlement negotiations, but hundreds more went to trial in the Southern District of Florida. Processing these hundreds of eminent domain cases, most of which involved parcels of land an acre or two in size, involved peculiar problems of judicial administration and, in turn, required somewhat unusual solutions. For most of the landowners, the costs of litigating their cases individually were prohibitive. Consequently, the "trial" in many cases—those in which the owner had neither retained counsel nor requested a jury trial—consisted of a Government appraiser taking the stand and reading his estimate of fair market value for a number of tracts, followed by the entry of judgment in the amount of the appraised sum for each tract on the list. Other landowners, however, would pool their resources and retain one attorney to represent their cases jointly. The District Judges, then, had the unenviable task of presiding over a process that was inherently chaotic—sending notice to hundreds of landowners, trying in summary fashion those parcels not represented by an attorney, holding pre-trial conferences and hearings for those tracts represented by a handful of attorneys, and then finally conducting full-blown compensation trials involving upwards of thirty parcels each.

To achieve justice in a situation like this, where the condemned properties are distinguishable only by a docket number and a tract number, is no easy task. Few if any Trial Judges—no matter how conscientious—could be expected to maintain order without the cooperation of the one other party that was an ongoing participant throughout the entire proceedings—namely, the United States Government. Unfortunately, the Government attorneys, at least in this case, did not shoulder their responsibility for facilitating justice in these unusual circumstances, but instead assumed the distinctly adversarial role more appropriate to the conventional one-on-one litigation, the cumulative result of which was that the landowners before us on appeal were not afforded the due process guaranteed them by the Fifth Amendment. What follows is an abbreviated story of three trials, which, largely because of certain inexcusable procedural irregularities during the pre-trial proceedings,[14] must go for naught.

\*　　\*　　\*　　\*　　\*　　\*

Notices of condemnation were sent to the owners of the various properties in this case between July 28, 1975 and January 14, 1976. All of the owners eventually retained Mr. William Earle, a lawyer who specializes in eminent domain litigation, to try their cases. The various individual cases were consolidated into three groups. In the first group were 4 large tracts, ranging in size from 40 to 320 acres. The second and third groups consisted of smaller properties—29 properties averaging 1.91 acres in group 2, and 30 properties averaging 2.83 acres in group 3. Each of the groups was tried separately, before three different juries, in successive trials presided over by Senior District Judge Mehrtens during the week of May 10–14, 1976. By stipulation and with the approval of the Court, all motions, objections, proffers, and rulings applied to all three trials.[15]

The trials themselves were bitterly waged contests, object lessons that the adversary process can be carried to intolerable extremes. No participant comported himself in a manner conducive to a fair determination of the truth—in this case, just

---

14. See note 22, *infra*.

15. Because of the overlap of all rulings, motions, objections, and proffers, the three trials were much the same in their essentials. There-
fore, in this overview of the trials, we find little occasion to distinguish among them; instead, for ease in presentation we discuss the trials much as if they were one consolidated trial.

compensation. Instead, the trials were plagued with the repeated badgering of witnesses, numerous picayune objections and motions, and generally disrespectful and derisive behavior. The obstreperous conduct of the attorneys undoubtedly stemmed in large part from two crucial pre-trial rulings which the landowners perceived to place them at a serious disadvantage and therefore repeatedly attempted to circumvent or have overturned, and which the Government perceived to give it a decisive advantage which it was anxious to preserve and exploit.

The first of these two rulings was that the landowners, in attempting to show the fair market value of their properties at the date of taking, could not introduce any evidence of sales of either theirs or comparable properties that had occurred within the boundaries of Everglades National Park after July 2, 1958. This ruling was designed to give effect to a principle of condemnation law that has come to be known as the "scope of the project" rule. The underlying precept is that just compensation does not include any value attributable either to a unique governmental demand (as opposed to private demand) for the property or to the fact that the Government is exercising its powers of eminent domain on behalf of the public. Thus, if condemned property was "probably within the scope" of a public project from the time the Government became committed to that project no enhancement in value attributable to the public project may be considered in awarding compensation.[16]

The second of the crucial pre-trial rulings concerned the "highest and best use" of the properties. Another principle of eminent domain law is that a landowner is not limited to showing the value of his land as presently used, but may introduced evidence of potential uses to which his property may readily and reasonably be converted, since demand for potential use affects market value.[17] In this case, Judge Mehrtens

entered a pre-trial ruling precluding the landowners from introducing any evidence that their properties were suitable for cabin sites or other construction purposes.

In the rather unusual circumstances of these Everglades condemnation proceedings, these two rulings combined to place extremely restrictive limits, which Judge Mehrtens rigorously enforced, on the evidence the landowners could admit to show the fair market value of their properties. Other rulings made during trial further restricted the landowners' presentation of their cases. The restrictive impact of some of these rulings is discussed in the following paragraphs.

### The Scope Of The Project Ruling

On April 21, 1976, a few weeks prior to the three trials, the Government moved the Court to prohibit the landowners from making reference to any prior sales of their properties or of other lands within the Everglades National Park which took place after July 2, 1958, "on the grounds such lands were within the scope of the project after that date." By his order of April 27, 1976, Judge Mehrtens granted the Government's motion, ruling that the landowners "shall not offer evidence as to any sales which occurred within the boundaries of the Everglades National Park after July 2, 1958." Despite repeated objections during the three trials, Judge Mehrtens stood by this ruling throughout.

A full appreciation of the restrictiveness of this ruling requires some knowledge of Florida geography and of the peculiar characteristics of the condemned properties. As already mentioned, the 63 tracts involved in the three condemnation trials are all located in an area of the Park known as the Northwest Extension. More specifically, the properties are located on the southwest coast of Florida along a chain of marked, deep-draft intercoastal waterways just a few miles from the Gulf of Mexico. The

---

16. The "scope of the project" rule is thoroughly discussed in Part III of this opinion.

17. Various aspects of the "highest and best use" issue are discussed in Part V of this opinion.

land in this area is cut with numerous creeks, streams, and bays, and many of the landowners' properties lie along navigable waterways with access to the Gulf of Mexico; one of the larger tracts is actually located on the Gulf.

Portions of some of the properties are submerged except at low tide; other portions have an elevation ranging from several inches to about one foot above mean high tide. Much of the soil in the area is muck, especially during the wet season. The water is brackish—a mixture of fresh water flowing from inland regions and salt water coming in with the tides from the Gulf of Mexico. Because of this mixture, it is an extremely fertile area for a wide range of marine life. It is also populated by deer, wild pigs, raccoons, bobcats, wild turkeys, squirrels, and the like. As one Government witness testified, "[i]t is biologically one of the most productive areas that you will find anywhere in the world."

The characteristic that is most distinctive of this area, however, is its predominant vegetation—the mangrove tree. The mangrove is a "jungly" hardwood tree of about 20 to 30 feet in height (occasionally as high as 80 feet), with a very dense, tangled above-ground root system. It will grow even where its roots are covered by the tide for a portion of the day. In places, the mangroves are so thick that transportation, either by boat or over ground, is virtually impossible.

At one time, before the development of certain areas like Miami Beach, virtually all the coastal lands of South Florida were mangrove lands. Thus, the mangrove lands roughly form a horseshoe around South Florida. To the interior are sawgrass plains and the cypress zone—areas that in many respects are just as much a wilderness with as varied an animal life as the Everglades mangrove lands, but in many other respects are quite dissimilar to coastal mangrove lands.

Indeed, the landowners took the position that mangrove lands are not truly comparable to any other lands in all of Florida.

Thus, as evidence of fair market value of their lands at the date of taking (which in these cases was the date of trial), they desired to introduce appraisals based on recent sales of other South Florida mangrove lands (the only truly "comparable" sales in their opinion). The Court's "scope of the project" ruling, however, precluded them from introducing post-1958 sales of land located within Everglades National Park. Sales of "comparable" land eighteen years or older of course have only marginal probative value with respect to the fair market value of land in 1976, especially in an area which has experienced an escalating demand for recreational land in the interim. Thus, the landowners were forced to look outside the Everglades National Park for "comparable" mangrove sales.

But now Florida geography presented an obstacle. To begin with, most extant mangrove lands in South Florida are encompassed by the Park (which, undoubtedly, is one reason the Park was established—to preserve the primitive state and the rich vegetation and animal life of the coastal mangrove areas of South Florida). To complicate matters, the closest privately held mangrove lands outside the Park, adjoining the northwestern edge of the Park, were owned by a large land company, and had not been sold for many years. This meant that the only recent sales of non-Park mangrove lands were isolated sales at least 10 miles to the north and west of the Park, or along the eastern edge of the Park (about 60 miles from the landowners' properties).

Judge Mehrtens, however, ruled that these isolated, recent non-Park mangrove sales were inadmissible as not sufficiently comparable, apparently because of their distance from the condemned properties and because of their proximity to more developed, urban areas.[18] This noncomparability ruling (excluding those few recent mangrove sales outside the Park which were discovered by the landowners' expert appraisers) coupled with the scope of the project ruling (excluding post-1958 in-Park

---

18. We discuss the propriety of this ruling on comparability in Part IV, *infra.*

sales) precluded the landowners from referring to any recent mangrove sales in all of Florida.

In their effort to provide some admissible, nonspeculative evidence of the fair market value of their properties, the landowners were therefore forced to refer to recent sales of sawgrass lands in an area of Big Cypress 7–25 miles from their properties.[19] The Government's expert witness relied on sales of the same or similar sawgrass properties in making his appraisal of the fair market value of the lands. The Government's expert admitted that recent sales within the Everglades National Park would be comparable sales, typical of the marketplace. But in his opinion the sales of sawgrass land he relied upon, located just outside the Park boundaries, were also comparable sales, since the sawgrass lands were subject to the same regulations for building and development, were flooded every year for about six months, and had similarly limited accessibility. The landowners hotly contested the comparability of the sawgrass lands to their mangrove properties, however. They pointed to the marked differences in vegetation (mangrove forests versus sawgrass plains), the differences in animal life and sporting opportunities (saltwater fishing for snook, tarpon, etc. in the coastal mangrove lands; game hunting, such as deer and duck, and limited freshwater fishing in the Big Cypress sawgrass lands), differences in location (owners' mangrove lands were generally waterfront properties directly accessible by navigable waterways to the Gulf of Mexico, while sawgrass lands were interior marsh or swamp); differences in accessibility to specific tracts (owners' tracts could be reached by normal power boats; access to many sawgrass tracts, if legal access was available at all, had to be by overland swamp buggy or air boat), and alleged difficulties in locating and identifying specific tracts of

sawgrass land (which often were part of a vast and undifferentiated plain, whereas waterfront mangrove properties supposedly could be readily identified by their land contours).

A comparison of the mangrove sales tendered by the landowners and the sawgrass sales actually introduced into evidence tends to support the testimony of the landowners and their witnesses that their coastal mangrove properties were not comparable to inland sawgrass lands. For example, the owners of the 59 small tracts involved in Trials II and III generally paid from $1,000 to $3,500 per acre for their parcels. (Many of them purchased their tracts between 1967 and 1971.) In addition, the average sale price of the few non-Park mangrove sales proffered, but excluded as noncomparable, exceeded $3,100 per acre. In contrast, the average sale price of the sawgrass sales actually introduced into evidence by the Government, and relied upon by the Government in making its appraisals of the fair market value of the landowners' properties, was about $325 per acre. This disparity is a strong indication that the landowners' coastal mangrove properties do indeed possess a significantly higher fair market value than do inland sawgrass properties. To be sure, the difference in value may be due, at least in part, to the location of the landowners' properties within the Everglades Park—an element of value which, under the "scope of the project" rule, might be noncompensable. For our present purposes, however, it is sufficient to observe that the Court's rulings—excluding post-1958 in-Park sales as well as all non-Park mangrove sales uncovered by the landowners' expert witnesses on grounds of noncomparability—prevented the landowners from introducing any actual sales figures to rebut the Government's argument that their properties were worth no more than inland sawgrass properties.

---

19. By the Act of Oct. 11, 1974, Pub.L.No. 93–440, 88 Stat. 1258, Congress announced and established the Big Cypress National Preserve, which included these sawgrass lands adjoining Everglades National Park. Judge Mehrtens applied a separate version of the "scope of the project" rule to these sawgrass lands, excluding from evidence any Big Cypress sales that occurred after Oct. 11, 1974. Thus, the "comparable" sales introduced in these trials were Big Cypress sales from before Oct. 1974.

### The Highest And Best Use Ruling

The Court's second crucial ruling—on "highest and best use"—also was made pursuant to the Government's motion of April 21, 1976. In his order granting that motion, Judge Mehrtens ruled that the landowners "shall make no reference at trial to evidence that the subject properties are suitable for cabin sites or other construction purposes."

During the three trials the landowners repeatedly objected to this ruling. They conceded the validity of the underlying principle—that while a condemnee is entitled to compensation reflecting the highest and most profitable use for which his property, at the time of taking, is adaptable and needed, or is likely to be needed in the reasonably near future, he is not entitled to compensation for potential uses that are not reasonably probable either because the land is not reasonably adaptable to such a use or because there is no likely demand for that use. But they challenged this particular application of the principle, basically on two grounds.

First, the landowners contended that cabins were a reasonably probable potential use, for which there was a market and a demand. To support this contention, they introduced by way of a proffer evidence that there were at least 18 cabins in the area, as well as several permanent houseboats or barges on which permanent camps had been erected. Indeed, four of the 63 tracts involved in the three trials had been improved with cabins or weekend homes. The landowners also tendered evidence that there was a demand for recreational cabins, and many of them testified that they had bought their properties with an intent to erect fishing camps or cabins on them. And although on-the-ground cabins could not be built on many of the properties, in large part because of their low elevation and muckish soil, the landowners proffered expert testimony that stilt houses and elevated boardwalks could be constructed without damaging the mangrove forest and in compliance with all governmental regulations.

Second, the owners argued that the issue of highest and best use was for the jury to decide, with proper instructions of course that speculative uses are neither to be considered nor compensated. The owners contended that Judge Mehrtens' ruling, precluding them from introducing any evidence that their properties were suitable for cabins, boardwalks, boat docks, etc., was tantamount to instructing the jury that their properties had no use whatsoever, and therefore erroneously trenched upon the province of the jury.

Judge Mehrtens, however, stuck by his original ruling that use of the properties for recreational dwellings was speculative and conjectural and had not been shown to be reasonably probable. He indicated that this ruling was based in part upon the failure of the landowners to prove that elevated cabins and boardwalks were practicable, and in part upon various regulatory restrictions that legally precluded any and all construction on the landowners' properties, whether practicable or not. Evidence had been introduced at a pre-trial hearing [20] to the effect that coastal mangrove properties within the Northwest Extension were subject to the jurisdiction of, inter alia, the Monroe County Building and Zoning Department, the Monroe County Department of Environmental Health, and the United States Army Corps of Engineers. Although there was no indication that applicable zoning laws prohibited cabins on coastal mangrove properties, evidence was introduced at that hearing that permits for a septic tank, pit privy, or any other permanent sewage disposal facility would not be granted for properties in the area, and further that the Army Corps of Engineers would not grant permits for dredging, filling, or proposed structures for any property in the area under its jurisdiction. Apparently relying on this evidence, Judge Mehrtens dis-

---

**20.** As recounted in note 22, *infra*, this pre-trial hearing did not involve any of the 63 tracts in these three trials—a circumstance rendering reference to that hearing in these trials reversible error.

regarded the trial testimony of a landowners' expert that permits could be obtained for stilt houses or cabins and that such structures could be built in compliance with all applicable regulations, and ruled instead that any structures, even if practicable, could not legally be built.

With respect to whether the issue of highest and best use was a judge or jury question, Judge Mehrtens vacillated. His final position was that it is a jury question, and he so instructed the juries, but by excluding all evidence that the properties were suitable for buildings or other improvements, the Judge effectively decided the issue himself. Thus the consequence of his pre-trial ruling, whether correct or erroneous, was to relegate the landowners to valuing their properties as mere land, muck, and water—suitable perhaps for hunting, fishing, or communing with nature, but for no other recreational or residential uses.

### The Ruling On Illegal Uses

As mentioned, four of the properties had already been improved with cabins or weekend homes. The owner of a 40-acre parcel included in Trial I had built a cabin with an attached porch on his property in 1958, and had further improved his property with approximately 24 feet of dock on creosote pilings. A 2-acre waterfront tract in Trial II was owned by a club of sportsmen, who regularly used the property on weekends for recreational purposes and to entertain business customers. Among the improvements on the property was a cabin which one landowner's appraiser valued at $30,-000. Two other properties in Trial II had been improved with cabins erected on high and dry ground.

The juries, however, were not permitted to hear evidence of any of these existing improvements. At trial, Judge Mehrtens made explicit what was implicit in his pre-trial ruling on "highest and best use" excluding reference to "cabin sites or other construction purposes"—that the ruling applied to existing as well as potential structures. Judge Mehrtens unequivocally based this extension of his "highest and best use" ruling on the principle that landowners can not be compensated for an illegal use. He interpreted this principle to hold that before landowners can be compensated for an existing structure, they must prove that the structure was legally erected under a proper permit. The four landowners were unable to satisfy this burden of proof, and consequently their properties, along with the other 59 properties, were valued as if they were both unimproved and not reasonably suitable for any improvements.

### The Verdicts

In the end, the juries returned just compensation awards much closer to the Government's appraisals (as undeveloped and undevelopable mangrove land, based on purportedly comparable sales of Florida sawgrass land) than to the landowners' valuations. The disparities among the Government's appraisals, the landowners' valuations, and the juries' awards are presented by the table in footnote.[21] To summarize

21.

| Case No. & Trial | | Size of Tract (in acres) | Government's Valuation | Landowners' Valuations † | | Jury Award |
|---|---|---|---|---|---|---|
| 75–1467 | (Trial I) | 320.00 | $64,000 | $128,000 [a] | $118,500 [b] | $64,000 |
| 75–1624 | (I) | 200.00 | $40,000 | $ 80,000 | $107,950 | $40,000 |
| 75–1671 | (I) | 80.00 | $12,000 | $ 32,000 | $ 28,000 | $12,000 |
| 75–2252 | (I)* ° | 40.00 | $ 8,000 | - - - | $ 22,000 | $10,000 |
| 75–1637 | (Trial II) ° | 2.50 | $ 750 | $ 20,000 [c] | $ 13,150 [d] | $ 1,125 |
| 75–1688 | (II) ° | 10.00 | $ 2,000 | $ 90,000 | - - - | $ 3,250 |
| 75–2187 | (II) | 1.56 | $ 470 | $ 7,000 | $ 5,400 | $ 675 |
| 75–2190 | (II) | 1.88 | $ 570 | $ 6,000 | $ 5,400 | $ 850 |
| 75–2191 | (II) | 1.50 | $ 450 | $ 7,000 | $ 5,400 | $ 675 |
| 75–2195 | (II) | 1.25 | $ 375 | $ 8,000 | $ 9,000 | $ 675 |
| 75–2196 | (II) | 5.00 | $ 1,500 | $ 10,000 | $ 7,900 | $ 2,250 |
| 75–2831 | (II) | 1.25 | $ 300 | $ 5,000 | $ 1,875 | $ 406 |

| Case No. & Trial | Size of Tract (in acres) | Government's Valuation | Landowners' Valuations † | | Jury Award |
|---|---|---|---|---|---|
| 75–2842 (II) | 1.25 | $ 300 | $ 6,250 | $ 1,875 | $ 406 |
| 75–2865 (II) | 2.50 | $ 570 | - - - | $ 3,750 | $ 803 |
| 75–2866 (II) | 2.50 | $ 570 | - - - | $ 3,750 | $ 803 |
| 75–2919 (II) | 2.50 | $ 570 | - - - | $ 3,750 | $ 803 |
| 75–2927 (II) | 4.37 | $ 1,000 | $ 42,500 | $ 6,750 | $ 1,422 |
| 75–2928 (II) | 5.00 | $ 1,125 | $ 42,500 | $ 7,500 | $ 1,625 |
| 75–2960 (II) | 1.30 | $ 390 | $ 12,000 | $ 3,000 | $ 585 |
| 75–3014 (II) | 2.00 | $ 600 | $ 6,000 | $ 6,000 | $ 900 |
| 75–3031 (II) | 1.46 | $ 450 | $ 5,000 | $ 3,000 | $ 675 |
| 75–3055 (II) | 0.75 | $ 225 | - - - | $ 3,000 | $ 335 |
| 75–3083 (II) | 0.74 | $ 225 | - - - | $ 3,000 | $ 338 |
| 75–3111 (II) ° | 2.00 | $ 600 | $210,000 | $ 45,000 | $ 900 |
| 75–3113 (II) | 1.17 | $ 350 | $ 25,000 | $ 3,000 | $ 540 |
| 76–18 (II) | 1.57 | $ 475 | $ 7,500 | $ 3,000 | $ 588 |
| 76–19 (II) | 1.63 | $ 490 | $ 15,000 | $ 12,000 | $ 733 |
| 76–30 (II) | 0.49 | $ 150 | $ 12,000 | $ 3,000 | $ 225 |
| 76–56 (II) | 1.66 | $ 500 | $ 5,000 | $ 3,000 | $ 747 |
| 76–82 (II) | 0.52 | $ 160 | $ 5,000 | $ 3,000 | $ 234 |
| 76–87 (II) | 2.50 | $ 300 | - - - | $ 3,750 | $ 450 |
| 76–90 (II) | 1.03 | $ 350 | $ 5,000 | $ 3,000 | $ 500 |
| 76–145 (II) | 1.14 | $ 570 | $ 5,500 | $ 3,000 | $ 803 |
| 75–1622 (Trial III)* | 3.75 | $ 850 | - - - | | $ 1,688 |
| 75–1623 (III)* | 10.00 | $ 2,000 | - - - | | $ 4,500 |
| 75–2186 (III) | 1.88 | $ 570 | $ 5,000 e | | $ 1,128 |
| 75–2189 (III) | 1.50 | $ 450 | $ 4,000 | | $ 900 |
| 75–2216 (III) | 0.34 | $ 100 | - - - | | $ 160 |
| 75–2253 (III) | 1.75 | $ 525 | - - - | | $ 1,050 |
| 75–2625 (III) | 2.50 | $ 570 | $ 5,000 | | $ 1,125 |
| 75–2727 (III) | 1.25 | $ 300 | $ 3,500 | | $ 563 |
| 75–2747 (III) | 1.25 | $ 300 | $ 1,500 | | $ 563 |
| 75–2750 (III) | 7.50 | $ 1,500 | $22,500 | | $ 3,375 |
| 75–2754 (III) | 1.25 | $ 300 | - - - | | $ 563 |
| 75–2827 (III) | 1.25 | $ 300 | $ 1,500 | | $ 563 |
| 75–2886 (III) | 1.90 | $ 570 | $ 5,000 | | $ 1,140 |
| 75–3053 (III) | 0.98 | $ 300 | - - - | | $ 600 |
| 75–3077 (III) | 2.29 | $ 690 | $ 5,000 | | $ 1,374 |
| 75–3103 (III) | 1.85 | $ 550 | $ 3,500 | | $ 1,110 |
| 76–26 (III) | 0.87 | $ 260 | $ 3,500 | | $ 540 |
| 76–28 (III)* | 1.15 | $ 350 | $ 3,000 | | $ 690 |
| 76–29 (III)* | 1.15 | $ 350 | - - - | | $ 690 |
| 76–62 (III) | 5.00 | $ 420 | $12,500 | | $ 3,000 |
| 76–67 (III)* | 1.50 | $ 340 | $ 2,000 | | $ 900 |
| 76–89 (III) | 1.40 | $ 420 | - - - | | $ 840 |
| 76–91 (III) | 1.25 | $ 375 | $20,000 | | $ 750 |
| 76–99 (III) | 7.00 | $ 1,875 | $21,000 | | $ 4,200 |
| 76–108 (III)* | 5.60 | $ 1,680 | $ 5,600 | | $ 3,360 |
| 76–135 (III) | 1.06 | $ 320 | $ 2,500 | | $ 636 |
| 76–150 (III)* | 5.00 | $ 1,500 | $ 5,000 | | $ 3,000 |
| 76–151 (III)* | 4.48 | $ 1,350 | - - - | | $ 2,700 |
| 76–152 (III)* | 7.15 | $ 1,800 | $ 7,150 | | $ 4,290 |
| 76–153 (III)* | 0.98 | $ 300 | $ 1,500 | | $ 600 |

the table, the landowners were awarded an average of $251/acre for land which the Government valued at an average of $207/acre, which the landowners valued at an average of $1,298/acre, and which the landowners had purchased for upwards to $3,500/acre.

### The Fatal Procedural Error

This concludes our story of the trials themselves. We report no more because the trials, as tense and bitterly contested as they were, were doomed to futility when the Government prevailed upon Judge Mehrtens to adhere to his crucial pre-trial rulings. And the problem with those rulings was not so much substantive—although in the circumstances of this case one was erroneous and the correctness of the other is not free from doubt. Instead, the fatal flaw is that the two crucial pre-trial rulings, which (along with the trial rulings on comparable sales and illegal uses) channeled the admissible evidence of fair market value within narrow bounds indeed, were in effect entered *ex parte*.

 The unhappy story of how this came to pass is chronicled in detail in the footnote.[22] The short of the matter is that

---

* These cases are not before us—either because the owners did not appeal the District Court's judgment or because they have withdrawn their appeal—and therefore are not adjudicated in this decision.

° The tracts involved in these four cases had been improved with cabins or weekend homes.

† The figures in the left-hand column are the landowners' expert appraisals or personal opinions of fair market value that actually were admitted into evidence. The figures in the right-hand column are expert appraisals that were proffered, but excluded for one reason or another.

a As explained in text, *supra*, the landowners' expert witnesses were effectively prohibited from basing their estimates of fair market value upon any recent sales of coastal mangrove lands. They therefore had to rely (as did the Government's expert appraiser) on "comparable" sales of inland sawgrass properties. The three figures in this column are the appraised values, based on recent sales of similarly large sawgrass properties, offered by one of the landowners' expert witnesses. (This expert did not appraise the improved property in No. 75–2252.) The jury was permitted to consider these appraisals.

b These four appraisals were offered by another expert appraiser testifying for the landowners. Although this witness also attempted to comply with the Court's rulings excluding reference to mangrove sales, he admitted that he "considered" mangrove sales in making adjustments to reflect differences in location and demand, whereupon Judge Mehrtens instructed that his valuations be stricken. His appraisal of the property in No. 75–2252 does not include his estimated value of the cabin located on that property, which in a proffer he valued at $4,900.

c The only estimates of fair market value offered by the landowners that was permitted to reach the jury in Trial II were the opinions of the 23 owners who personally testified. Many of these estimates undoubtedly lacked any "expert" foundation, but were instead the landowners' personal opinions as to what their properties were worth to them. Although instructed not to include the value of any improvements, the estimates given by the three owners of improved properties probably reflected their opinion of what their improvements were worth.

d The figures in this column are the appraisals proffered by a Key West real estate broker, who had qualified as an expert witness in previous state and federal condemnation trials. His appraisals of the improved properties in Nos. 75–1637 and 75–3111 include his estimate of the value of the improvements. Judge Mehrtens did not permit this witness' testimony to go to the jury, however, ruling that he was not qualified or acceptable as an expert witness. The Court also rejected the proffered appraisals (not reported in the table) of a local real estate speculator who had once owned and sold many of the condemned properties, again on the ground that he did not qualify as an expert.

e In Trial III, the only evidence of fair market value introduced on behalf of the landowners were the personal opinions of the 21 owners who appeared and testified at trial.

22. The saga begins on January 9, 1976, when Judge Mehrtens sent the owners of 36 condemned Everglades properties notice of pre-trial conference and trial on January 28, 1976. App. 295–304. Among these 36 cases were 5 cases (Nos. 75–2747, –2750, –2754, –2827, and –2831) in which Mr. Earle would later become attorney of record, but which he did not at that time represent (see App. 310–24). Although Earle did not receive notice of the January 28th conference, he attended it for the purpose (according to a subsequently filed sworn affidavit) of announcing that he had been retained in one of the other cases noticed for that conference (No. 75–2842). See App. 387–89. (Why his personal attendance was necessary to announce his representation in No. 75–2842 is somewhat puzzling in light of the fact that one

week earlier he had filed with the court a notice of appearance and a demand for jury trial in that case. See App. 63, 395–96.) Earle's participation in the January 28th conference was limited to two brief interchanges. After a short discussion between Judge Mehrtens and another landowner's attorney concerning the issue of "highest and best use," see App. 365–67, Earle interjected himself into a discussion of which party—the landowners or the Government—would open and close, and agreed to submit a memorandum of law on that issue, App. 368–73. Near the end of the conference, Earle discussed with Judge Mehrtens the location at which future trials would be held. Other than these two incidents, the transcript of the January 28th conference contains no references to Mr. Earle. Nor does it contain any references or rulings involving either the 5 cases in which Earle later became attorney of record or No. 75–2842, in which he had just been retained.

(Nonetheless, although the transcript is silent on the point, final judgment in the amount of $500 was entered in No. 75–2842 on January 28th, see App. 63, despite the fact that one week earlier the landowner, through Earle, had made a timely request for jury trial, which was renewed on January 28th. Two months later, the owners of the tract in No. 75–2842 learned of the entry of final judgment in their case and so informed Earle. Since the case had, in the meantime, been slated for trial in May along with the other cases involved in this appeal, Earle concluded that there must have been some clerical error. See App. 390–94. He therefore asked the Assistant U.S. Attorney to join in a motion to vacate the erroneously entered final judgment in No. 75–2842. Incredibly, but consistent with other contentious, intransigent behavior by the Government in these condemnation proceedings, the U.S. Attorney refused. Over Government opposition, then, Earle filed a motion to vacate the January 28th judgment in the case, which was granted by Judge Mehrtens on April 22, 1976. App. 63. Thus, the case survived to be included in the trials during the week of May 10th and in this appeal.)

On the day following the January 28th conference, Judge Mehrtens sent notice of an evidentiary hearing to be held on February 5, 1976 to the owners and attorneys in 21 cases. App. 305–09. Earle received notice of this hearing, even though at the time he was not attorney of record in any of them. Five of the 21, however, were the same 5 which Earle would later represent and which had been included in the January 28th conference. At this February 5th hearing, Judge Mehrtens heard testimony from 5 witnesses concerning (a) details of some of the Everglades sales in the late '60s and early '70s between the "developer" and the individual landowners; (b) the topography and geophysical composition of the land in the Northwest Extension; and (c) whether the U.S. Army Corps of Engineers and/or the Monroe County authorities would permit dredging, filling, erecting structures, or installing sewage disposal systems on any parcels in the area. And it was on the basis of this evidence, supplemented by various memoranda later filed by the Government, that Judge Mehrtens made his rulings on "scope of the project" and "highest and best use" to which the Government successfully bound all 63 cases tried by Mr. Earle during the week of May 10th.

Not only were 58 of the 63 cases not even noticed for this February 5th hearing, but the 5 that were noticed (although at the time represented by someone other than Earle) *were not called* at the beginning of the hearing. See App. at 399–400. Moreover, as the Government concedes, Earle was not present at the February 5th evidentiary hearing (and, indeed, there was no reason for him to attend it since none of the cases he represented at that time had been noticed for the hearing). From our perspective, we can only speculate as to why the 5 critical cases were not called. All we know is that among the cases called for the hearing, as listed by number in the transcript (the relevant portion of which, incidentally, was never provided Earle until more than 18 months after February 5th and 15 months after the trial), not one case ultimately tried between May 10th and May 14th is included.

Earle, who apparently was ignorant of what transpired at the February 5th hearing, meanwhile began preparing his cases for trial. Between February 17th and March 19th, he was retained and he noticed his appearance in the 5 cases that had floated in and out of the January 28th and February 5th proceedings. See App. 310–24. During March, he and Government counsel negotiated the grouping of Earle's cases into three separate trials. Lists were submitted to the Court, and notices of trial for most of the cases were sent out on March 31st and April 1st. On April 14th, the parties submitted their pre-trial stipulations in all but those few cases in which stipulations had been filed earlier. Among the issues as to which the landowners, through Earle, indicated their disagreement were virtually all factual and legal issues pertaining to "scope of the project" and "highest and best use." See App. 325–53.

On April 21, 1976, the Government and the landowners simultaneously filed memoranda of law with Judge Mehrtens. The landowners' memorandum urged a certain construction of the "scope of the project" rule and argued that various sales of Everglades properties between 1967 and 1970 be admissible to show the fair market value of the subject properties. App. 206–14. On the other hand, the Government's memorandum argued (1) that all sales within Everglades National Park after 1958 were inadmissible, and (2) that with reference to the issue of "highest and best use," the landowners

should be precluded from introducing evidence at trial to show that their properties were suitable for cabin sites or other construction purposes. App. 161–75. The Government also moved the Court to issue pre-trial rulings in accordance with its two arguments.

The Government's April 21st memorandum and motion for pre-trial rulings is curious in two regards. First, it "adopt[ed] and incorporate[d] by reference" three motions and/or memoranda previously filed by the Government. See App. 165–66. The record before us on appeal, however, contains no such motions or memoranda, nor do the docket entries in any of the 63 cases indicate that any such documents had been filed. Undoubtedly, the memoranda and motions to which the Government referred had been filed in some of the hundreds of other condemnation cases pending before Judge Mehrtens. But the natural implication of the Government's casual representation was that the two critical issues of scope of the project and highest and best use had already been briefed and argued in these 63 cases, when, in fact, they had not. Second, the Government compounded this misrepresentation by referring to *evidence* that it had presented to support its requested pre-trial ruling on highest and best use. See App. 174. Presumably, the Government was referring to the evidentiary hearing held on February 5th. As already discussed, however, none of Earle's 63 cases had been called for that hearing and thus none of the landowners had had an opportunity to counter whatever evidence was introduced at that hearing. But for all Judge Mehrtens knew, based on the Government's memorandum, the landowners had been present and represented at that hearing and could, consistent with principles of due process, be bound by the evidence introduced therein.

It is not altogether surprising then that six days later, on April 27th, Judge Mehrtens granted the Government's motion to exclude evidence that the properties were suitable for cabin sites or other construction purposes, as well as any evidence of sales within the Everglades after 1958. App. 232–35. In his order, Judge Mehrtens stated that "[t]he parties have submitted extensive memoranda on the above issues, and the Court has heard oral argument upon the same in the various pre-trial hearings held in the cases." App. at 234. Since the record refutes these statements as applied to these 63 cases, we can only conclude that Judge Mehrtens' subsequent refusal to reconsider his crucial pre-trial rulings constituted a denial of due process.

The Government nonetheless attempts to justify binding all 63 landowners to Judge Mehrtens' pre-trial rulings with three arguments. The first two of these arguments focus on the 5 cases noticed for the February 5th evidentiary hearing. The Government argues first that the landowners in these cases cannot erase already concluded proceedings simply by changing attorneys, and second that once these 5 cases were consolidated with 58 other cases, trial could not be conducted with two differing sets of ground rules (one set for 5 cases and another for 58 cases). Even if we could accept the premise that, consistent with principles of due process, 58 landowners may be bound by the conclusions drawn from evidence they had no opportunity to counter, these two arguments must fall for the simple reason that the 5 critical cases, although noticed, were not properly before the court at the February 5th hearing. Events that transpired at that hearing were therefore no more applicable to them than to the other 58 cases.

The Government also argues that Earle knew about the February 5th hearing and Judge Mehrtens' pre-trial rulings for some time prior to May 10th, when the trials began, and that by waiting until May 10th to voice his objections he waived them. In light of the fact that none of his cases were involved in the February 5th hearing and that he apparently did not receive a transcript of that hearing until long after the trial, Earle cannot be charged with knowledge of that hearing or with a pre-trial responsibility to rebut evidence introduced at that hearing. On the other hand, a diligent lawyer might reasonably be expected to respond to the references to "evidence" and prior memoranda contained in the Government's April 27th motion and memorandum. Earle contends, however, that Judge Mehrtens issued his April 27th order one day before any response was due to the Government's April 21st motion under the Local Rules and that the Court's order foreclosed the matter.

Still, there is some merit to the Government's suggestion that Earle should have objected to the April 27th pre-trial rulings prior to May 10th. On balance, however, we do not believe that justice would be served by binding the landowners to rulings and evidentiary findings entered without the benefit of any hearing whatsoever because their attorney delayed making his objection for 13 days. (The delay would have been an even shorter one had the cases gone to trial on May 3rd as originally scheduled.) First, there is reason to believe that an objection would have been futile. When, at the beginning of proceedings on May 10th, Earle first objected that his clients had been deprived of due process by entry of an order without a hearing, Judge Mehrtens commented: "I do not really and truly think so, but if there is any question about it, we are having a hearing right now and I reiterate and repeat my ruling." Second, to the extent that Earle engaged in brinkmanship and failed to point out procedural irregularities with the proper punctiliousness, the Government was equally if not more culpable. Again, in proceedings of this sort, brought by the Government for the benefit of the Government, where the potential

Judge Mehrtens apparently thought that these 63 cases had been before him at an earlier pre-trial hearing in which he heard evidence and arguments concerning the two crucial issues of "scope of the project" and "highest and best use." In reality, however, that hearing involved none of these 63 cases nor were any of the landowners or their attorney Mr. Earle present at that hearing. Judge Mehrtens' mistake is somewhat understandable midst the welter of Everglades condemnation cases pending before him, especially since the Government, in requesting the pre-trial rulings, represented to the Court that a hearing involving these 63 cases already had been conducted on the two crucial issues. But the Court's misplaced reliance on the Government's misrepresentation, although understandable, cannot be sustained. To bind litigants to rulings on the basis of evidence and arguments they have had no opportunity to contest is the most elementary sort of due process violation. We therefore are compelled to vacate the 52 judgments of just compensation which have been appealed and remand those cases for another trial.

\* \* \* \* \* \*

Our labors have just begun, however. In addition to asserting procedural error, the landowners have denominated 13 substantive or evidentiary rulings to which they assign error. The record, which contains numerous proffers of evidence the landowners would have presented the juries but for the restrictive rulings, is without question sufficiently developed for us to consider the merits of the landowners' arguments on these points. We decline, however, to address those alleged errors which are unlikely to recur on retrial. Other contested issues will inevitably, or at least quite probably, arise again on remand. Of particular importance are the application of the "scope of the project" rule and the principle of "highest and best use" to the unusual circumstances presented by the condemnation of private lands—largely wilderness, arguably dissimilar to all surrounding lands, and strictly regulated—within the boundaries of a pre-established National Park. To ignore these issues might well be to condemn any retrials to the futility of the original trials. But before turning to their consideration, we pause to review the basic precepts and principles of just compensation law, lest we lose sight of the forest for the trees.

## II. BASIC PRINCIPLES

The Fifth Amendment itself, specifically the Just Compensation Clause of that Amendment, contains no mention of the "scope of the project" rule or the principle of "highest and best use." It merely provides that no "private property [shall] be taken for public use, without just compensation." Thus, the only standard of compensation mandated by the Constitution is that it be "just," which in turn "evokes ideas of 'fairness' and 'equity,'" see *United States v. Commodities Trading Corp.*, 1950, 339 U.S. 121, 124, 70 S.Ct. 547, 549, 94 L.Ed. 707.

But what is just, fair, and equitable? To begin with, the Supreme Court has made clear that in the condemnation context, as in all areas of the law, justice is not measured from the jaundiced perspective of either the individual alone or the collectivity alone: "Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual \* \* \*." *Bauman v. Ross*, 1897, 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270. Giving yet more content to the concept of just compensation, the Court has explained that the underlying principle is that the dispossessed owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States*, 1934, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236. But

---

for confusion and error is great by virtue of the sheer number of individual cases, the Government cannot adopt the more conventional adversarial role, abjuring any and all responsibility for the fate of opposing parties, but must instead work hand-in-hand with the Trial Court to ensure that justice is administered in accordance with the commands of the Fifth Amendment.

these obvious (although sometimes overlooked) precepts do not, by themselves, decide the multitudinous condemnation cases with their almost limitless range of fact complexes. Supplementing these precepts are a number of "working rules" and "practical standards" developed by the courts in their endeavor to do substantial justice in eminent domain proceedings. *United States v. Cors*, 1949, 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392.

▮ Among these working rules and practical standards are the following. The measure of compensation is to be the *value* of the property *at the date of taking*. *E. g., United States v. Miller*, 1943, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336. In most cases, the "value" of the property can be "justly" determined by its monetary "market value." *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 1949, 338 U.S. 396, 402, 70 S.Ct. 217, 94 L.Ed. 195. "Market value" has been defined as "what it fairly may be believed that a purchaser in fair market conditions would have given," *New York v. Sage*, 1915, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143, or "what a willing buyer would pay in cash to a willing seller," *United States v. Miller, supra*, 317 U.S. at 374, 63 S.Ct. at 280.[23] And since a hypothetical, "reasonable man" buyer will purchase land with an eye to not only its existing use but to other potential uses as well, fair market value takes into consideration "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future * * * to the full extent that the prospect of demand for such use affects the market value while the property is privately held." *Olson v. United States, supra*, 292 U.S. at 255, 54 S.Ct. at 708. Thus, "just compensation" is not limited to the value of the property as presently used, but includes any additional market value it may command because of the prospects for developing it to the "highest and best use" for which it is suitable.

▮ These rules and standards are not absolute and invariable, however. Some cases may involve peculiar circumstances in which it is impossible to determine a "market value." There may be other cases in which strict adherence to the concept of market value would involve inclusion of elements which, because they would result in manifest injustice to the owner or the public, must be eliminated from the compensation calculus. *United States v. Miller, supra,* 317 U.S. at 375, 63 S.Ct. at 280; *United States v. Commodities Trading Corp., supra,* 339 U.S. at 123, 70 S.Ct. at 549. For cases such as these courts have fashioned and applied other rules and standards, including the "scope of the project" rule discussed in the next Part. But neither are these secondary rules and standards absolute. The only absolute standard is that provided by the Constitution—"just compensation"—and the only sure guide in a difficult condemnation case is the consideration "What compensation is 'just' both to [the] owner whose property is taken and to the public that must pay the bill?" *Id.*

With this consideration foremost in mind, we turn now to the questions raised by this appeal.

## III. THE SCOPE OF THE PROJECT RULE

### IIIA. *The Substance Of The Rule*

▮ The "scope of the project" rule can be stated easily enough: If the condemned land was probably within the scope of the governmental project for which it is being condemned at the time the Government became committed to that project, then the

---

**23.** And in determining what some hypothetical willing buyer would give for the land, courts often look to actual, comparable sales on the open market between willing buyers and sellers. *See Kimball Laundry Co. v. United States,* 1949, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765; *United States v. Trout,* 5 Cir., 1967, 386 F.2d 216, 222–23; Luttrell, *Federal Rules in a*

*Condemnation Trial,* in 1 Condemnation Appraisal Practice 139, 143 (1961). "What comparable land changes hands for on the market at about the time of taking is usually the best evidence of market value available." *Baetjer v. United States,* 1 Cir., 1944, 143 F.2d 391, 397, *cert. denied,* 1944, 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618; *see* note 61, *infra.*

owner is not entitled to any increment in value occasioned by the Government's undertaking the project. But, as this case so aptly illustrates, it is not so easily understood or applied.

■ It is most profitably understood as one of the secondary rules refining the concept of market value as the basic measurement of compensation so that injustice does not result from a naive or mechanical determination of market value. As it so happens, the "scope of the project" rule [hereinafter SOP rule] is primarily concerned with awards that are unjust from the perspective of the public footing the bill.

■ As such, it shares a kinship with other secondary rules or principles that have been developed to ensure that the Government, in pursuing public benefits through the power of eminent domain, is not forced to overcompensate private propertyholders. One such principle is that special value to the *taker,* or *value created solely by the taker's demand* for the property, is not compensable.[24] *E. g., United States v. Cors, supra,* 337 U.S. at 332–34, 69 S.Ct. at 1090–1091; *United States v. Weyerhauser Co.,* 9 Cir., 1976, 538 F.2d 1363, cert. denied, 1976, 429 U.S. 929, 97 S.Ct. 336, 50 L. Ed.2d 300; *United States v. Whitehurst,* 4 Cir., 1964, 337 F.2d 765, 771–72; *United States v. Catlin,* 7 Cir., 1953, 204 F.2d 661, 665; *In re Valuation Proceedings under Regional Rail Reorganization Act,* Spec. Ct. R.R.R.A., 1977, 445 F.Supp. 994, 1013–16; *cf. United States v. Michoud Industrial Facilities,* 5 Cir., 1963, 322 F.2d 698, 708–09, cert. denied, 1964, 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 185. "Since the owner is to receive no more than indemnity for his loss, * * [the property's] special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value." *United States v. Miller, supra,* 317 U.S. at 375, 63 S.Ct. at 280.

■ At least three considerations support this principle excluding from compensation "value resulting from the government's special or extraordinary demand for the property"[25]—value that is caused solely by the Government's actions as taker of the condemned property. First, this value is not true "market value" as determined by what a willing buyer would pay a willing seller under "fair market conditions." The Government has entered the "market" as a "purchaser" with a unique and pressing demand, and in so doing has distorted the market; absent the Government's activity as "purchaser" or condemnor, there would be no market reflecting this unique demand. That element of value created solely by the Government's activity as purchaser or condemnor is more "hold-up value" than "fair market value." Second, to force the Government to pay, because of a special public need for property, a premium over that which the property would bring on the open market absent the Government's demand, obviously would increase the cost of public projects and perhaps frustrate some public objectives. Third, to permit recovery of value that is not created by fair, open market conditions would be to award a few private propertyholders windfall gains solely because of public needs and exigencies. *See generally United States v. Cors, supra,* 337 U.S. at 332–34, 69 S.Ct. at 1090–91; Note, *Valuation of Conrail Under the Fifth Amendment,* 90 Harv.L.Rev. 596, 597–606 (1977). The underlying notion of the "no value attributable to Government demand" principle, then, is that the Government, when pursuing public benefits through its condemnation power, should not have to spend more for property than would a reasonable and willing private purchaser *solely*

---

**24.** Value unique to the *owner* is not compensable either. *E. g., United States v. Miller, supra,* 317 U.S. at 375, 63 S.Ct. at 280. "[I]n view * * of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it * * * is properly treated as part of the burden of common citizenship." *Kimball Laundry Co. v. United States,* 1949, 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765.

**25.** *United States v. Cors, supra,* 337 U.S. at 333, 69 S.Ct. at 1091.

*because* it is exercising its condemnation power on behalf of the public; instead, the Government is to be equated to a private purchaser buying the property for its "highest and best" nongovernmental use in an open market.[26]

The Supreme Court has also announced another, related refinement of "market value" compensation, excluding from compensation an element of value in order to ensure that condemnation awards are just, fair, and equitable to the public as well as to the dispossessed propertyholder. In a limited number of cases, the Court has held, in effect, that the condemnee is not to be compensated for the value of benefits conferred on his property by virtue of its proximity to Government property.

The leading decision announcing, and giving effect to, this principle is *United States v. Fuller*, 1973, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16. In *Fuller*, the Government condemned privately-owned grazing lands that were adjacent to Government-owned grazing lands. The owner had been granted a revocable permit to use the Government lands in conjunction with his own lands, and contended that he was entitled to the value by which his lands were enhanced because of their actual or potential use in conjunction with the permit lands. Although the Court conceded that this element of value would be considered by a potential buyer on the open market, it held that the Government need not compensate the owner for this "Government-conferred" value. In so doing, it referred to "the general principle that the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain." 409 U.S. at 492, 93 S.Ct. at 804.

This "general principle," as applied in *Fuller*, is distinct from the "no value attributable to Government demand" principle. In the cases applying the latter principle, the value excluded is a direct product of the Government's actions as condemnor, and is, by definition, a value that could not be obtained from private purchasers; it is an artificial value not to be found in the private market. The value excluded in *Fuller*, on the other hand, *could* have been obtained in the private market; it was an element of *real* market value. As the Court conceded, a private purchaser of grazing lands *would* pay a premium for lands that adjoin Government grazing lands (especially when Government grazing permits are granted almost as a matter of course). Moreover, the value was not created by the Government's demand for the condemned property and its activity as condemnor, but rather by a special relationship between the condemned property and adjoining Government property that happened to benefit the private property.

Unlike the "no value attributable to Government demand" principle, the "no value of Government-conferred benefits" principle announced in *Fuller* is far from being a "general principle," much less a hard and fast rule. The only cases (other than "no value attributable to Government demand" cases) cited by the Supreme Court as examples of its application are the line of Supreme Court decisions holding that compensation for fast lands taken pursuant to the Government's navigational servitude with respect to navigable waters does not include as an element of value any benefits conferred upon the fast lands by their access to the navigable waters and potential use as portsites or hydro-electric sites. *E. g., United States v. Rands*, 1967, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329; *United States v. Twin City Power Co.*, 1956, 350

---

**26.** Thus, it is the "no value attributable to Government demand" principle that informs those decisions which hold that in determining the fair market value of condemned property, the use which the Government proposes to devote the property to should not be considered unless private owners could also reasonably devote the property to that use. *E. g., United States v. 46,672.96 Acres of Land*, 10 Cir., 1975, 521 F.2d 13; *United States v. Catlin*, 7 Cir., 1953, 204 F.2d 661; *Cameron Development Co. v. United States*, 5 Cir., 1944, 145 F.2d 209.

U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240.[27] Moreover, the *Fuller* Court admitted that other decisions defined limits, and in effect major exceptions, to this "no Government-conferred value" principle.[28] Nonetheless, *Fuller* does stand for the proposition that in some circumstances, a condemnee may not recover that element of fair market value which his property enjoys at the grace of the Government in part because of its special relationship to Government property.

We have considered in some detail these two sorts of excludable values—value attributable to Government demand and (in some circumstances) value of Government-conferred benefits—because both values are relevant to the "scope of the project" rule. Furthermore, as we will see, both values arguably are at issue in the Everglades condemnation proceedings before us.

The origins of the SOP rule are found in two nineteenth-century decisions of the Supreme Court: *Kerr v. South Park Commissioners*, 1886, 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924, and *Shoemaker v. United States*, 1893, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170. Both cases involved lands taken for an urban public park (in Chicago and the District of Columbia, respectively). In both cases there was evidence that subsequent to the legislative authorization of the park, lands in the area of the park-to-be increased appreciably in value.[29] And in both cases, the Supreme Court approved lower court instructions that in effect informed the fact-finding body (a jury in *Kerr* and a commission in *Shoemaker*) that it was not to consider any such value attributable to the authorization of the park.[30] The con-

27. The reasoning underlying these decisions is that since "the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss, * * * it also permits the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated." *United States v. Virginia Elec. & Power Co.*, 1961, 365 U.S. 624, 629, 81 S.Ct. 784, 788, 5 L.Ed.2d 838. *See also United States v. Appalachian Elec. Power Co.*, 1940, 311 U.S. 377, 424, 61 S.Ct. 291, 85 L.Ed. 243.

Although these decisions firmly establish that the *Constitution* does not require compensation for value inherent in condemned riparian fast lands by virtue of their access to navigable waters, Congress has nonetheless decided *legislatively* to award that element of fair market value denied judicially in *Rands* and its predecessors. Section 111 of the Rivers and Harbors and Flood Control Act of 1970, Pub.L.No. 91–611 (codified at 33 U.S.C. § 595a) provides, in part, that

In all cases where real property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States, and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, the compensation to be paid for real property taken by the United States above the normal high water mark of navigable waters of the United States shall be the fair market value of such real property based upon all uses to which such real property may reasonably be put, including its highest and best use, any of which uses may be

dependent upon access to or utilization of such navigable waters.
*See United States v. 967,905 Acres of Land*, 8 Cir., 1971, 447 F.2d 764, *cert. denied*, 1972, 405 U.S. 974, 92 S.Ct. 1193, 31 L.Ed.2d 248; *United States v. 8,968.06 Acres of Land*, S.D.Tex., 1971, 326 F.Supp. 546.

28. We do not suggest that such a general principle can be pushed to its ultimate logical conclusion. In *United States v. Miller, supra*, the Court held that "just compensation" did include the increment of value resulting from the completed project to neighboring lands originally outside the project limits, but later brought within them. Nor may the United States "be excused from paying just compensation measured by the value of the property at the time of the taking" because the State in which the property is located might, through the exercise of its lease power, have diminished that value without paying compensation. *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 284 [, 63 S.Ct. 1047, 1057, 87 L.Ed. 1390] (1943).
409 U.S. at 492, 93 S.Ct. at 804.

29. In *Kerr*, the legislative act authorizing the park also fixed the precise boundaries of the park. In *Shoemaker*, the Act merely authorized appropriation of a fixed acreage within a larger area, while providing that the precise location and boundaries of the park were to be established subsequently by a special commission.

30. In *Kerr*, the lower court had excluded from evidence sales of properties adjoining the park or in its immediate vicinity that had taken place after the park boundaries had been defi-

demned properties could not be valued as parklands, for the simple reason that they had no use as parklands to their private owners. Nor could they be valued the same as neighboring tracts that were not condemned and ended up fronting upon the park; since the condemned lands were within the proposed park, they (unlike their neighbors) received no special benefits, and possessed no special value, resulting from the establishment of a park in the neighborhood. *See Kerr*, 117 U.S. at 385, 6 S.Ct. at 804. Finally, and in sum, the condemned properties were to be valued without "reference to * * * any supposed or speculative value given to [them] by reason of the act * * * creating the park project." *Shoemaker*, 147 U.S. at 305, 13 S.Ct. at 392–393. The values the landowners unsuccessfully sought to have considered were values created solely by the Government's undertaking the park projects for which their lands were condemned. In approving exclusion of these values, *Kerr* and *Shoemaker* can be seen as rather straightforward applications of the "no value attributable to Government demand" principle.

The SOP rule, which was as yet somewhat inchoate in *Kerr* and *Shoemaker*, was given full articulation in *United States v. Miller*, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336. In *Miller*, the United States had condemned the subject lands for the relocation of railroad right-of-ways, made necessary by a Government dam-and-reservoir project, which, when completed, would inundate the old right-of-way. The project had been under consideration for a number of years; construction of it had been approved by the President in 1935; funds were appropriated for it by Congress in

both 1936 and 1937; and in August 1937 Congress gave final authorization for the project. Although the need for new railroad right-of-ways had been anticipated early in the planning stages, and alternative routes had been surveyed and staked out in 1936, the actual location of the new railroad right-of-ways was not made known until the United States filed its declaration of taking in December 1938. Prior to 1937, the condemned lands at issue in *Miller* were largely uncleared brush lands. Sometime in 1937 they were plotted for subdivisions. By the date of taking in December 1938, they were part of a town that had been built up for business and residential purposes.

The issue in *Miller*, as stated by the Supreme Court, was whether the owners should "have the benefit of any increment of value added to the property taken by the action of the public authority in previously condemning adjacent lands," and, "[i]f so, were the lands in question so situate as to entitle respondents to the benefit of this increment?" 317 U.S. at 375, 63 S.Ct. at 281.

To decide this question, the Court referred to the following "working rules," which remain the definitive statement of the "scope of the project" rule:

If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but

nitely fixed by legislation, *see* 117 U.S. at 384–85, 6 S.Ct. at 803–804; it further instructed the jury not to consider any such sales as evidence of the value of the condemned lands, *see id.* at 386, 6 S.Ct. at 804. In *Shoemaker*, the lower court had instructed the commissioners to "receive no evidence tending to prove the prices actually paid on sales of property similar to that included in said park, and so situated as to adjoin it or to be within its immediate vicinity, when such sales have taken place since the passage of the act of Congress * * * au-

thorizing said park," 147 U.S. at 303, 13 S.Ct. at 392; more generally, it instructed the commissioners not to consider "the value given [the condemned lands] by the establishing the park," *id.* at 304, 13 S.Ct. at 392. Thus, in both *Kerr* and *Shoemaker* the substantive ruling excluding any value attributable to authorization of the park was made, at least in part, by way of evidentiary rulings. Elsewhere we consider in some detail the use of evidentiary rulings, as opposed to instructions, in order to give effect to the SOP rule. See Part IIIB(3), *infra*.

only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

*Id.* at 376–77, 63 S.Ct. at 281.

Applying this test to the facts of the case, the Court held that the owners were not entitled to any increment in value due to the Government's project:

> The project, from the date of its final and definite authorization in August 1937, included the relocation of the railroad right-of-way, and one probable route was marked out over the respondents' lands. This being so, it was proper to tell the jury that the respondents were entitled to no increase in value arising after August 1937 because of the likelihood of the taking of their property. If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, or by possible purchasers from them, as to what the Government would be compelled to pay as compensation.

*Id.* at 377, 63 S.Ct. at 282.

The two reported opinions in *Miller*—the Supreme Court decision and the circuit court decision which it reversed [31]—contain strong indications that the owners had purchased and subdivided previously undeveloped land, gambling that it would increase considerably in value once the adjoining dam-and-reservoir project became a reality. And it is apparent from the Supreme Court opinion in *Miller* that the Court's foremost concern was to ensure that the owners would not extract, under the compulsion of the Just Compensation Clause, any speculative profits from the Government (and the public) because of the Government's activities as condemnor in completing the dam-and-reservoir project. Thus *Miller* as well is essentially yet another application of the "no value attributable to Government demand" principle.

The most significant aspect of *Miller*, however, is its statement of the "scope of the project" rule. For in that statement the Court categorizes compensable and noncompensable values due to Government projects: if, on the one hand, the property in question can be viewed as part of the project "from the beginning," any increment in value attributable to the project is not compensable; if, on the other hand, the property in question is taken pursuant to a *subsequent* decision to *enlarge* the project, the owner is entitled to compensation for "the value added in the meantime by the proximity of the improvement." This categorization was reaffirmed and explained further in *United States v. Reynolds*, 1970, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12, the Supreme Court's only other major SOP decision:

> The Court early recognized that the "market value" of property condemned can be affected, adversely or favorably, by the imminence of the very public project that makes the condemnation necessary. And it was perceived that *to permit compensation to be* either reduced

**31.** *Miller v. United States*, 9 Cir., 1942, 125 F.2d 75.

or *increased because of an alteration in market value attributable to the project itself would not lead to the "just compensation" that the Constitution requires.* On the other hand, the development of a public project may also lead to enhancement in the market value of neighboring land that is not covered by the project itself. And *if that land is later condemned, whether for an extension of the existing project or for some other public purpose, the general rule of just compensation requires that such enhancement in value be wholly taken into account,* since fair market value is generally to be determined with due consideration of all available economic uses of the property at the time of the taking.

397 U.S. at 16–17, 90 S.Ct. at 805 (emphasis added and footnotes omitted).[32]

**32.** After this general overview, the Court in *Reynolds* quoted in full and with approval the SOP rule as stated in *Miller.* 397 U.S. at 17–18, 90 S.Ct. at 805.

As indicated in *Reynolds,* the SOP rule is applicable to *depreciations* in value, as well as enhancements, attributable to the Government project for which property is taken:

> [T]o permit compensation *to be either reduced or increased* because of an alteration in market value attributable to the project itself would not lead to the "just compensation" that the Constitution requires.

*Id.* at 16, 90 S.Ct. at 805. That governmental demand for property should be disregarded altogether in assessing the fair market value of that property, so that neither the landowner nor the Government profits from the effect the Government's condemnation activities have upon the market, had been emphasized by the Court previously in *United States v. Virginia Elec. & Power Co.,* 1961, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838. In that case, the United States had appropriated a perpetual and exclusive flowage easement. The Court held that the value of the easement was the "nonriparian value of the servient land discounted by the improbability of the easement's exercise," and that in determining this value, "no weight should be given to the prospect of governmental appropriation." 365 U.S. at 635–36, 81 S.Ct. at 792. As the Court explained further,

> The value of the easement must be neither enhanced nor diminished by the special need which the Government had for it. * * * The court must exclude any depreciation in value caused by the prospective taking once the Government "was committed" to the project. *United States v. Miller, supra,*

■ This categorization, it should be observed, parallels the distinction developed earlier between "value attributable to Government demand" and the value of "Government-conferred benefits." In essence, the SOP rule excludes compensation for the former but commands compensation for the latter. By holding that the Government, in condemning property x as part of project A, need not pay compensation for value attributable to project A *if* property x was included in the project "from the beginning," the SOP rule ensures that the just compensation award will not reflect the Government's special demand for property x for inclusion in public project A. But the SOP rule also provides that if project A did not initially include property x, the Government must pay compensation for any additional value property x enjoys because of its proximity to project A as originally under-

at 376–77 [, 63 S.Ct. 276 at 281, 87 L.Ed. 336]; see *United States v. Cors, supra,* [337 U.S.] at 332 [, 69 S.Ct. at 1090]. Accordingly, the impact of that event upon the likelihood of actual exercise of the easement cannot be considered. As one writer has pointed out, "[i]t would be manifestly unjust to permit a public authority to depreciate property values by a threat . . . [of the construction of a government project] and then to take advantage of this depression in the price which it must pay for the property" when eventually condemned. 1 Orgel, Valuation under Eminent Domain, § 105, at 447 (2d ed.); see *Congressional School of Aeronautics v. State Roads Comm'n,* 218 Md. 236, 249–250, 146 A.2d 558, 565.

*Id.* at 636, 81 S.Ct. at 792. *See also United States v. 8,968.06 Acres of Land,* S.D.Tex., 1971, 326 F.Supp. 546, 548–50; *see generally* 4 Nichols, The Law of Eminent Domain § 12.3151 (rev'd 3d ed.).

Not all depreciations in value arguably attributable to nearby governmental projects are disregarded in determining just compensation awards, however; some depreciations in value are deemed to be among the normal incidents (and risks) of ownership which the condemnees can fairly be expected to bear.

Compensation problems raised by depreciation in value attributable to governmental activities are frequently analyzed in terms of "condemnation blight" or "de facto takings," rather than under the SOP rule. *See generally* 4 Nichols, *supra,* § 12.3151[5].

taken. This value, while in a sense created by the Government, is not attributable to the fact that the Government has a unique demand for property $x$ and has committed itself to taking property $x$ for inclusion in project $A$, but rather is the value of beneficial uses for which there is a private market demand, and, as such, is a true element of fair market value.[33]

Nonetheless, *Miller* did not explicitly formulate the test for distinguishing between noncompensable and compensable value in terms of value attributable to the Government's special demand and its actions as condemnor (noncompensable) and the fair market value of benefits derived from the property's proximity to the Government project as originally undertaken (compensable). Instead, the shorthand test announced in Miller is whether "[the] lands were probably within the scope of the project from the time the Government was committed to it." 317 U.S. at 377, 63 S.Ct. at 281; *United States v. Reynolds, supra,*

397 U.S. at 21, 90 S.Ct. at 807. If so, the condemnee is not entitled to enhancement attributable to the project; if not, the Government must compensate the condemnee for any such enhancement.

■■■ As subsequently explained in *Reynolds,*

> [A]pplication [of this test] to any particular set of facts requires discriminating judgment. The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use.

*Id.*

In *Miller* itself, the "discriminating judgment" called for by the test dictated that the enhanced value be excluded from the compensation award. Two facts in particu-

---

**33.** That the SOP rule announced in *Miller* did authorize compensation for the value of Government-conferred benefits was expressly recognized by the Court in *United States v. Fuller, supra,* 409 U.S. at 492, 93 S.Ct. 801; see note 28, *supra.*

This categorization of values due to Government projects—no compensation for value attributable to the Government's special demand and its actions as condemnor, but compensation for value the condemned property enjoys because of its proximity to an earlier governmental undertaking—represents an accommodation of sorts between the Government's pursuit of the public welfare through public projects and private interests in devoting land to its most productive uses. *Miller* and *Reynolds* recognize that public projects are not constructed in a day: proposals must be formulated, approved, and perhaps revised; funding must be obtained; lands must be acquired; contractors must be designated; the project itself must actually be constructed or established (and often, only in a piecemeal or step-by-step fashion); and throughout this entire process features of the project may have to be changed to adjust for earlier miscalculations, lack of funds, intervening needs or demands, etc. To force the Government upon commencement of a project to specify with absolute precision the private lands needed for the project, and then to condemn those lands immediately and simultaneously, would deprive the Government of any flexibility in the planning and execution of public projects, unreasonably (and unjustly) burdening its ability to

promote the public welfare. *Miller* and *Reynolds* provide the Government a certain measure of flexibility for they hold that with regard to any private property within the scope of a project from its inception, the Government may condemn that property some time *after* commencing the project without having to pay a premium due solely to the fact that it now finds that property necessary for completion of the project.

On the other hand, to grant the Government complete freedom to condemn lands for a public project without regard to the value by which those lands may have been enhanced by their proximity to the project would be equally undesirable (and unjust). For such an unfettered governmental power would place a restraint on the free use and marketability of lands near Government projects, since the compensation that would follow an expansion or adjustment of the project would be pegged to land use patterns of a pre-project world. *Miller* and *Reynolds* in effect recognize the interrelatedness of land uses and the fact that changes in the use of one parcel of land may well alter the potential uses, and the fair market value, of nearby parcels of land. By requiring compensation for that element of value by which neighboring lands not within the initial scope of Government projects are enhanced by those projects, *Miller* and *Reynolds* free those lands to be developed to their new highest and best use.

lar were relied upon by the Court in reaching this conclusion: first, from the date of its final and definite authorization in August 1937, the project had included the relocation of the railroad right-of-way, and second, one alternative route for the relocation had been marked out over the owners' lands in 1936. 317 U.S. at 377, 63 S.Ct. at 281. Thus, the owners undoubtedly had been placed on notice that the subject lands might be taken in conjunction with the dam-and-reservoir project.

Subsequent cases in the lower federal courts illustrate that application of the test and categorization of compensable and noncompensable values is often a more difficult task, requiring even more discriminating judgment, than in *Miller*.[34] A case in point is *United States v. Crance*, 8 Cir., 1965, 341 F.2d 161, *cert. denied*, 1965, 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63, which involved the condemnation of 35 acres of land for public recreational facilities abutting a dam-and-reservoir project. In 1958 the Government had purchased about 7 other acres from the same landowners for inundation by the reservoir itself.[35] From its inception, however, the project had contemplated the establishment of 20–40 acre recreational areas as well, located approximately every five miles around the reservoir. But neither a 1956 preliminary design memorandum nor a 1960 proposal of sites approved by the Chief of Engineers designated any of defendants' land for use as one of these recreational areas. However, after a 1960 public hearing announcing the proposal and after the public response to that proposal, the Government determined that another recreational site in the area of defendants' land was desirable. After further study, it decided to acquire 35 additional acres of defendants' property for this recreational site. On these facts (even though defendants' 35 acres were not among those originally designated for acquisition and the probability was slight that their property would ever be acquired under a recreational-area-every-five-miles principle), the court found that the additional acreage was within the scope of the original dam-and-reservoir project and therefore subject to condemnation without regard to enhancement.[36]

A similar case in this Circuit involving land condemned as a recreational site adjoining a reservoir project is *Louisiana, Through the Sabine River Auth. v. Lindsey*, 5 Cir., 1975, 524 F.2d 934, *cert. denied*, 1976, 426 U.S. 948, 96 S.Ct. 3166, 49 L.Ed.2d 1184. In that case we held that the owners of the condemned recreational site were not entitled to enhancement when that site had been included in 1961 in the very first preliminary map of possible recreational sites, had been submitted as a proposed site to the Federal Power Commission in 1964, and had been approved as a recreational site by the FPC in 1967 more than four months before the condemnees signed a purchase agreement to buy the to-be-condemned land from its previous owner. Although the facts in *Lindsey* do not present as close a question as those in *Crance*, we observed that the "project scope is not to be narrowly interpreted." Id. at 942.[37]

Change the facts ever so slightly, however, and the results are just the opposite:

> reservoir alone was not also sufficient for recreational utilization. Since the Crance property abutted the reservoir line, it was within the sphere of probable acquisition for recreational use.
>
> *United States v. Crance, supra,* 341 F.2d at 165.

**34.** In *Reynolds*, the Court had no occasion to pass on the application of the SOP rule to the facts of that case, since the issue before the Court was simply whether the "scope of the project" question was for the judge or the jury. See p. 808, *infra*.

**35.** The defendants originally owned about 135 acres in all.

**36.** The significant factor here is that this project contemplated recreational areas from its very inception and certainly property lying beyond a perimeter of the reservoir would probably be incorporated for recreational purposes if the land acquired for the

**37.** Nonetheless, we reserved judgment on the "broad statement in *Crance* that property for a recreational site would be within the scope of the project simply because it abutted the reservoir line." *Id.; see United States v. 62.17 Acres of Land [Jasper County]*, 5 Cir., 1976, 538 F.2d 670, 679 n.21.

the landowner, instead of being compensated for his property without regard to the Government's project, receives that element of value conferred on his property because of its proximity to the Government's project. A striking example, particularly because of the close similarity of its facts to *Crance*, is *United States v. 172.80 Acres of Land [Mercer County]*, 3 Cir., 1965, 350 F.2d 957. This case, like *Crance*, involved a dam-and-reservoir project. Plans for the project, which included provision for small recreational areas in the immediate vicinity of the proposed dam, were approved in 1957, and in 1959 Congress appropriated funds for the project. The defendants in the case owned a 100-acre riparian tract some 2,000 feet upstream from the proposed dam on the side where no recreational facilities were planned. After negotiations with the owners, the Government purchased from them a fee interest in about 20 acres of their land that would be affected by flooding, as well as easements over about 14 more acres. During these negotiations, the Government representative assured the owners that the proposed acquisitions were the only parts of their land that would be needed for the project. Shortly thereafter, however, President Kennedy assumed office and there was a change in Government policy toward greater public development and use of reservoir areas. Pursuant to this change in policy, a decision was made in 1961 to expand the project and to acquire in fee the remaining 80 acres of the owners' lands for recreational and other public use. The owners were notified of this decision in October 1961, and in January 1962 the Government condemned the remainder of their land. The Third Circuit conceded that at the time the Government committed itself to the project in 1959, a perceptive landowner or prospective purchaser might have been aware of the possibility that the project would be expanded across the river to include this tract less than a half mile upstream from the dam. Nonetheless, Government plans at that time disavowed any such inclusion and, moreover, the owners had received specific assurance that their remaining 80 acres would not be taken. These factors, according to the Court, distinguished the case from *Crance*,[38] and tipped the balance in favor of permitting the owners compensation for the project-enhanced value of their land as lakefront property, instead of its unenhanced value as farmland.

In sum, a purchaser contemplating the acquisition and private development of the Totten property after the 1959 initiation of the reservoir project could reasonably anticipate that he would be able to devote the land to its highest economic use, enjoying advantages inherent in the proximity of the nearby government development without serious apprehension that his land would soon be condemned. Thus, enhancement of value during this period was properly included in the subsequent condemnation award.

350 F.2d at 959. *See also United States v. 959.68 Acres of Land*, 3 Cir., 1969, 415 F.2d 401, *cert. denied*, 1970, 397 U.S. 964, 90 S.Ct. 991, 25 L.Ed.2d 256.

The Third Circuit's decision in *Mercer County* is closely paralleled by this Circuit's decision in *United States v. 2,353.28 Acres of Land [Brevard County]*, 5 Cir., 1969, 414 F.2d 965. The land in that case, owned by defendant Colton, had been condemned in 1963 for an expansion of Government facilities at Cape Canaveral, Florida (now Cape Kennedy). The project had had its origins in August 1961 when the Government, responding to President Kennedy's challenge to place a man on the moon by the end of the decade, decided to build a new launch site at Cape Canaveral and, toward that end, filed a complaint in condemnation describing a 72,644-acre tract bounded on the north by Haulover Canal. Colton's land, however, lay north of the canal and was not included in the original condemnation. In

---

**38.** For in the *Crance* case, no overall policy or particular governmental assurance minimiz- ed the likelihood of future project expansion to include the lands in question. 350 F.2d at 959.

September 1961, a NASA official appearing at public hearings before a Senate committee to seek appropriations for the acquisition of the 72,644-acre tract, exhibited a map of that tract and testified that additional acquisitions were not anticipated. In June 1962, however, a NASA official revealed to the Senate committee that it needed additional funds to acquire 14,800 acres north of the canal, including the Colton property. Subsequently, in December 1963, the Government condemned Colton's land.

The Government of course argued that Colton was not entitled to any enhancement in the value of his land caused by the original project action in August 1961. We found, however, that the only evidence as of that date that the Colton land might be condemned was contained in two confidential NASA reports, and that these classified materials "did not serve as public notice of the project's scope." 414 F.2d at 970. We acknowledged the importance to the Government of flexibility during the planning stages of a project, but found this argument unpersuasive in view of the fact that NASA officials had conveyed to the public the impression that no land in addition to the 72,644 acres · originally condemned would be needed. We concluded that the earliest disclosure by a project official that the Colton land probably would be taken did not occur until June 1962, and that prior to that date "a buyer in the real estate market reasonably could expect * * that the Colton land would not become a part of the lunar landing project, but would enjoy a position proximate to the project."

Id. at 971.[39] We therefore held that Colton was entitled to the value by which his land was enhanced between August 1961 and June 1962 because of its proximity to the Government project for which it ultimately was taken.[40]

We have since derived from *Brevard County* the proposition that if enhancement due to the project for which property is taken is to be excluded under the SOP rule, "[i]t must * * * be evident to the public that [the property] might be taken for the project." *Louisiana, Through the Sabine River Auth. v. Lindsey, supra,* 524 F.2d at 942. In *United States v. 62.17 Acres of Land [Jasper County],* 5 Cir., 1976, 538 F.2d 670, we identified three factors relevant to this determination of whether, from the time the Government committed itself to project *A*, it was evident to the public that property *x* might be taken for the project, *id.* at 680:

(i) The foreseeability that the original proposed dimensions of project *A* might have to be changed to include property *x.*

This factor, which figured prominently in the decisions in *Crance* and *Lindsey,* was also important in *Jasper County.* In that case, the Government had announced in 1960 that as part of a dam-and-reservoir project it would purchase in fee all lands in the project area below the 5-year flood line, which was calculated to lay on the contour 171 feet above mean sea level. After staking out the lines of acquisition drawn in a design memorandum the Government, in 1961, purchased from the defendant land-

**39.** We also observed that "[e]ven though the probability of a given tract's being added to the project is known within the confidential circles of Government planning, if the probability is not publicly disclosed, the tract may realize a legitimate increase in value since a developer contemplating acquisition of the land can make an offer without serious apprehension that the land will be condemned." *Id.* at 968.

**40.** Another decision in this Circuit finding property outside the original scope of the Government project for which it was taken is *Scott v. United States,* 5 Cir., 1944, 146 F.2d 131. In *Scott,* an Army training camp was established near Brownwood, Texas in November 1940. Two months later, the Scotts bought adjoining land and began to subdivide it into lots for buildings to be rented or sold to officers and employees at the camp. After the attack at Pearl Harbor in December 1941 an all out effort was begun to raise and train a great Army. In March 1942 the Scotts were warned that their land probably would be taken for the camp and in August 1942 condemnation proceedings were instituted. We found that the Scotts' land was not included in the original scope of the project and held that they were entitled to any "subdivisional" value their land acquired by its proximity to the original camp before enlargement was undertaken.

owner's predecessor in title so much of the property as was included within the 171 foot line as then drawn and staked. In 1965 it became obvious that the Government had made some errors in demarking the 171 foot line. Because of congressional delay in appropriating additional funds, the perimeter area was not resurveyed and re-staked until 1969. *Jasper County* involved the 1971 condemnation of 62 acres of land, bought by the defendant six months earlier as part of an 1800-acre tract, which were within the 171 foot line as resurveyed in 1969. In remanding the case,[41] this Court observed that there was a reasonably fore-seeable "likelihood of some mistakes in sur-veying and [consequently a] probability that this perimeter acreage would be subject to adjustment for such mistake." 538 F.2d at 681.[42]

(ii) The length of time between commence-ment of project *A* and condemnation of property *x*.

In *Jasper County* we commented that the most disturbing factor in suggesting that the 1971 taking might be within the origi-nal scope of the project was the length of time that passed before the Government acted (public disclosure of initial 171 foot line in 1960, manifestation of mistake and need for adjustments in 1965, resurveying in 1969, condemnation in 1971). We noted, however, that the need for adjustments might not reveal itself until several years after impoundment began, and observed that "these projects are not of the stop watch variety and * * * gradualism in acquisition is oft times fact and not fiction."

*Id.* at 680. The crucial question we left to the District Court on remand was whether "Government action or inaction after the need for such adjustment became clear made it no longer evident to the public that the taking here might be forthcoming." *Id.* Thus, the length of time before condemna-tion of property *x* does not, in and of itself, decide the scope question, but "time can be a factor in removing the mote of potential acquisition from the eyes of area landown-ers," *id.* at 681.

(iii) Government representations concern-ing the finality of project *A* as originally announced.

In *Jasper County* we found the record ambiguous concerning any Government rep-resentations that the original 171 foot line drawn in 1961 would be final, and we indi-cated that further factfinding with regard to Government disclosures of the project at its commencement might be dispositive of the scope question.[43] This same factor, of course, was likely the crucial consideration in *Mercer County* (landowners had been assured upon initial acquisition that no more of their land would be needed) and *Brevard County* (project official represent-ed publicly that initial acquisition would be sufficient to complete project).

This review of prior decisions that have struggled with whether lands were proba-bly within the scope of the Government's original project or not illustrates that the "scope" test announced in *Miller*, while a convenient rule of thumb in many cases, does little more than restate the problem in difficult cases. In those cases, it is often

**41.** The District Court had found that the land-owner was entitled to compensation for the value which had accrued to the perimeter acre-age by the time it was condemned in 1971 because of its proximity to the project. Two possible theories supported the inclusion of this element, but we found that the record below had not been sufficiently developed to affirm on the basis of either theory, and we therefore remanded the case.

**42.** We contrasted this likelihood that some ad-justments might have to be made to the much less foreseeable possibility, present in *Mercer County, supra*, that there would be a relevant change in policy imposed by a new administra-

tion. 538 F.2d at 680. *See also Scott v. United States*, 5 Cir., 1944, 146 F.2d 131 (discussed at note 40, *supra*).

**43.** Sufficiently definite representations by the Government that the line originally drawn was final could lead to a finding that the acreage here was outside the project's scope regardless of the general probability of mis-takes in surveying. Alternatively, statements making it clear to the public that the line might need adjustment could bring the land within the project's scope without need for us to resort to the probability standard * *. 538 F.2d at 681.

necessary to confront the underlying problem head-on: would compensation for value attributable to the very project for which property is taken be just or unjust? *Miller* and *Reynolds* teach that compensation would not be just, and therefore is not required, if the additional value reflects the Government's special demand for the property and the fact that it is acquiring private property for a public project through eminent domain. But they also teach that compensation *is* required, and just, where the increment in value attributable to the Government project is instead an element of fair market value inherent in the property's proximity to the Government project.

■ Whether or not that increment in value is attributable more to the Government's special demand for the property or more to a private market demand for benefits conferred upon the property by its proximity to the Government project is largely a function of reasonable expectations. The crucial inquiry is whether, after commencement of project *A* but prior to condemnation of property *x*, the owner or a private purchaser contemplating acquisition and development of property *x* could *reasonably* anticipate that he would be able to devote that property to its highest economic use, enjoying the advantages inherent in its proximity to the nearby Government project, without serious apprehension that property *x* would soon be condemned.[44]

The factors identified in *Jasper County* will often be relevant to this inquiry. For

example, if the Government unequivocally represents to the landowner or the public that it will not need property *x* for project *A*, the Government in effect relinquishes property *x* as enhanced by its proximity to project *A* to private market forces. Although not as decisive, the length of time between commencement of project *A* and condemnation of property *x* may also serve to transform noncompensable value into compensable value: the longer the Government waits to condemn property *x*, the more it tends to abandon that property as benefitted by project *A* to the private market. Finally, the less foreseeable it is at the outset of project *A* that property *x* will not be needed, the more likely it is that the enhanced value is not due to the Government's special demand and its actions as condemnor, but instead is an element of fair market value that a reasonable private purchaser would pay for property *x* by virtue of its proximity to project *A*.

Regardless of how the inquiry is framed, however—whether in terms of the *Miller* test [45] or in terms of reasonable expectations [46]—the object is the same: to distinguish value attributable to Government demand from true fair market value of Government-conferred benefits, and to ensure that the landowner is not awarded a premium for the former but, at the same time, is justly compensated for the latter.

### IIIB. Errors In The District Court's Application Of The Rule

With all this as a background, we are finally in a position to direct our attention

---

**44.** *Cf. Mercer County, supra,* 350 F.2d at 959; *Brevard County, supra,* 414 F.2d at 968. If the private owner or purchaser can reasonably anticipate such use or development of property *x*, then any value attributable to project *A* is not a value unique to the Government but rather is an element of true fair market value.

Of course, even if, at the time the project is first announced, it was reasonable to anticipate being able to enjoy and develop freely beneficial uses conferred by the project (so that the owner is entitled to compensation for the value of those Government-conferred benefits), there will come a point at which this no longer is true. At a certain point—for instance, when the Government announces an expansion or adjustment of the project's dimensions—the property does finally fall within the probable

scope of the project and it no longer is reasonable to discount the prospects of condemnation and anticipate free use and development of the property, and from that point on until the date of taking any value attributable to the project cannot be included in the compensation award.

**45.** Was property *x* probably within the scope of project *A* from the time the Government was committed to it?

**46.** Could the private owner or a prospective private purchaser reasonably anticipate being able to enjoy the benefits conferred on property *x* by its proximity to project *A*, and devote property *x* to its highest economic use in light of those benefits, without serious apprehension that property *x* would soon be condemned?

specifically to these Everglades condemnation proceedings and consider how the SOP rule was applied below and how it should be applied on remand.

To recapitulate briefly, the pertinent facts are as follows: In 1947, after 18 years of discussion, Everglades National Park was established and dedicated with land donated by the State of Florida. In 1958, the boundaries of the Park were redrawn by Congress to include an area known as the Northwest Extension. At that time, Con-

gress authorized the expenditure of $2,000,-000 to purchase some 81,000 acres within the Park boundaries that were then privately owned, but Congress did not actually appropriate this sum until a number of years later, by which time it was inadequate to cover the purchase of at least 74,000 acres.[47] In the meantime, the landowners in the area had been informed by the Department of the Interior that until Congress appropriated the necessary funds, they were free to sell, use, or improve their property as they saw fit.[48] Congress autho-

---

**47.** See pp. 768–770, supra.

**48.** In 1959, about 100 owners of land within the Northwest Extension inquired of then-Senator George Smathers regarding the status of their land under the 1958 Act. Senator Smathers passed the landowners' concerns along to the Department of the Interior, and in response received the following letter (which was made part of the record in Trial I):

* * * Mr. Webb, who represents some 100 owners of land within the boundaries of Everglades National Park, is concerned because the property owners within the area have not been given any assurance as to when negotiations to purchase their properties will be started.

Mr. Webb's concern in this matter is understood. However, * * * we cannot state at this time just when funds for the acquisition of these properties will be included in an appropriation estimate. Funds for this purpose are only a small part of the Federal Government's over-all budgetary consideration.

* * * It is clear that Mr. Webb is in error in believing that landowners in Everglades National Park cannot dispose of their land. Most of the national parks contain privately owned lands. In many instances these privately owned lands have existed in such status for many years. Yosemite National Park, California, has had privately owned lands therein since its establishment nearly 100 years ago. Most of these privately owned properties have changed ownership several times.

Mr. Webb appears to have some misconception as to the effect of redefining the boundaries of the Everglades National Park by recent legislation. The privately owned lands lying within the new boundaries were not taken away from the owners, nor were they dispossessed. It is true that the National Park Service hopes at some future time to acquire all such privately owned lands when funds are available therefor. However, the owners have not been deprived in any way of

the attributes of ownership or of their right to use the lands as fully as if they were located outside of a national park.

We realize, of course, that the quicker we are able to acquire these lands the better it will be from the standpoint of the park. However, no funds are currently available for the purpose and there is no possibility of getting the land acquisition program under way during the 1960 fiscal year. * * * [Emphasis added]

Also in the record are three letters from the Department of the Interior to Mr. Grantt, one of the landowners in Trial I, who had purchased his property in 1956 and was similarly concerned about how the 1958 Act affected him. The Department's first letter, dated Oct. 17, 1958, informed Mr. Grantt that

The Act requires that certain exchanges of areas with the State of Florida be effected before any privately-owned lands are acquired. Thereafter, money for purchases must be obtained, title data developed, appraisals made and other procedural steps taken. * * *

It is obvious from the above that no early purchases are possible. The exchange with the State has not been completed, nor any appropriation of funds by Congress made. Naturally, the Park Service wishes to proceed as rapidly as possible.

This was updated in the second letter, dated May 27, 1960.

The exchange of certain lands with the State of Florida * * * has been completed. Otherwise the situation is unchanged. No funds have been made available for any of the preliminary steps mentioned or for any land purchase. Obviously I cannot know when an acquisition program may be begun. [Emphasis added] In its third letter, dated July 30, 1962 (four years after the 1958 Act), the Department told Mr. Grantt the following:

* * * [A] request for funds to begin the purchase of privately owned lands within the Park boundaries has been included in the Department of the Interior's budget for both fiscal years 1961 and 1962. However, Congress did not see fit to appropriate any funds

rized additional expenditures and appropriated the necessary funds early in the 1970's, at which time the Department of the Interior was able to begin in earnest the process of acquiring the remaining privately-held parklands, including the 52 tracts involved in this appeal.

In his pre-trial order of April 27, 1976, Judge Mehrtens ruled that under the SOP rule, the landowners could not offer evidence as to *any* sales that occurred within the boundaries of Everglades National Park after July 2, 1958 (the date upon which Congress redefined the boundaries of the Park to include the Northwest Extension). Because Everglades National Park encompassed almost all the coastal mangrove land in Florida, this ruling left the landowners with precious few post-1958 sales of coastal mangrove lands upon which to base their appraisals of the fair market value of their mangrove lands. And when the Court ruled that the few non-Park sales also were inadmissible on grounds of noncomparability,[49] the landowners were put to the choice of basing their appraisals upon either in-Park sales of mangrove lands of at least 18 years vintage or sales of sawgrass lands, which they contended were not at all comparable to their properties.

In addition to the procedural errors involved in this pretrial ruling discussed earlier,[50] the ruling also represented an erroneous application of the SOP rule to the facts of the case, for three reasons.

### (1) Application Of The Rule To The Park In Its Entirety

All of the properties involved in this case were located within the Northwest Exten-sion, which was added to the Park in 1958. The Northwest Extension, as the name itself signifies, was clearly an enlargement of the project. *Miller* and *Reynolds* unmistakably command that the owners of lands condemned pursuant to the enlargement of a Government project must be compensated for any enhancement resulting from the proximity of their lands to the project as originally defined. *Miller, supra,* 317 U.S. at 376–77, 63 S.Ct. at 281; *Reynolds, supra,* 397 U.S. at 16–17, 90 S.Ct. at 805; see pp. 785–788, *supra.* The 63 tracts in this case may have enjoyed such an enhancement by virtue of their proximity to the 1,000,000-plus acre Park as defined by the pre-1958 boundaries, but the pre-trial ruling entered below effectively excluded any evidence of such an enhancement.

All that the 1958 Act did was declare an enlargement of the Park and indicate that the Government would eventually condemn certain private lands within the Extension. Whether the Government thereby committed itself to acquiring the lands involved in this case is discussed below. But assuming for the moment that in passing the 1958 Act the Government did commit itself to the land acquisition program that eventually culminated in these condemnation proceedings, the Act nonetheless did nothing more than trigger the SOP rule to exclude compensation for value attributable to the land acquisition program itself and any special Governmental demand for properties within the Extension. The 1958 Act did not, however, suddenly terminate any benefits conferred upon lands within the Exten-

---

for this purpose either year. Accordingly, *we cannot predict when we will be in a position to start a program of land purchase at Everglades.*

In your letter * * * you ask that we give you some concrete answers rather than vague generalities. This we cannot do as the matter is beyond our authority until such time as the funds are available to purchase. * * *

You may rest assured that *we expect to acquire, eventually, all of the privately owned lands* within the Park boundaries, and whenever land acquisition funds are available the owners of property will be contacted.

The fact that your land is within the Park boundaries has no effect on its title. *You are as free to sell it, use it, or improve it as any property you might own elsewhere.* As soon as Everglades land purchase funds are available *we intend to negotiate for purchase of lands with whomever might own it at that time.*

[Emphasis added]

**49.** The propriety of this ruling on comparability is discussed in Part IV, *infra.*

**50.** P. 777 & note 22, *supra.*

sion by the presence of the Park as defined prior to 1958. And, under *Miller* and *Reynolds*, the landowners are entitled to the fair market value of such benefits, if any, *as of the date of taking* (*i. e.*, May 1976).[51]

To be sure, post-1958 sales of in-Park lands located in areas of the Park other than the Northwest Extension may themselves be tainted under the SOP rule. This problem of whether to admit into evidence sales arguably inflated by a Government project is discussed below.[52] Our point at this juncture is that the District Court's ruling, by excluding post-1958 sales occurring elsewhere in the Park, erroneously excluded as an element of just compensation the fair market value, if any, the condemned properties enjoyed by virtue of their proximity to the Park as it existed prior to 1958.[53]

### (2) Application of the Rule as of 1958

While the SOP rule should not have been applied to exclude any value attributable to the Government's project unenlarged by the Northwest Extension, the rule is without question applicable to the Northwest Extension itself. But what is the "just" application of the rule with respect to the Northwest Extension? Was it "just" in the circumstances of this case to exclude from the compensation awards any and all value arguably attributable to the Northwest Extension after 1958?

In most "scope" cases, there has been a "second" round of takings, necessitated by an adjustment, redefinition, or expansion of the bounds of a project, and the critical question is whether property condemned pursuant to this second round of takings was "probably" within the scope of the project from the very beginning. In this case, the condemned properties were unquestionably within the scope of the project (the Northwest Extension) as originally announced and defined in 1958. Therefore, a mechanical application of the SOP rule, using the *Miller* test (Was the land *probably* within the scope of the project from the time the Government was committed to it?), would indicate that all value attributable to the Northwest Extension after 1958 must be excluded. But the rule is not to be divorced from its objective—compensation awards that are just to both the public *and* the dispossessed landowner. *See* Part II, *supra*. Viewed from this perspective, it becomes apparent that for three reasons it would not be just to the condemnees to extend the reach of the SOP rule back to 1958 in these condemnation proceedings.

First is the sheer length of time—here, 18 years. As we observed in *Jasper County*, the length of time between commencement of a project and condemnation of property for that project can be a "factor in removing the mote of potential acquisition from the eyes of area landowners."[54] Of course, *Jasper County* involved the more typical "scope" case—the condemnation of property on the fringes of a project pursuant to an adjustment or redefinition of the project. This case, to repeat, is unusual as "scope" cases go in that there are no questions of probability—the lands were *clearly* within

---

51. In other words, any value excluded under the SOP rule must be value attributable solely to the 1958 Extension. For purposes of the SOP rule, the relevant project in this case is the Northwest Extension.

52. See Part IIIB(3), *infra*.

53. It is quite possible, of course, that the value of the properties in this case was not enhanced at all by the Park as established and maintained within its pre-1958 dimensions. The record before us contains no evidence either way. But the landowners should have the opportunity to prove any such enhancement, if there is any reasonable possibility that it existed.

54. 538 F.2d at 680–81; see p. 792, *supra*. In *Jasper County* the date of taking was 11 years after the project had been publicly disclosed and 6 years after it became evident that mistakes had been made in the initial calculations of the project's dimensions. Although we indicated some uneasiness with the idea of applying the SOP rule to exclude value attributable to the Government project after such a lapse of time, we did not preclude application of the rule in those circumstances. In this case, of course, the takings occurred 18 years after the Government announced its project; not just 6 or 11.

the scope of the project as originally defined and announced. But even in this situation, where the Government defines the bounds of a project and announces its intent to acquire *eventually* lands within those project bounds, there comes a point in the passage of time when it no longer would be just to apply the SOP rule in the Government's favor. Without any limits on the temporal reach of the SOP rule, the Government could encumber the free use and marketability of private property indefinitely simply by announcing a project and its intent to condemn property for that project some time in the future.[55] Because of other factors present in this case in addition to the sheer length of time, we need not define here the "just" limits on the temporal reach of the SOP rule. We caution the Government, however, that 18 years may indeed exceed those limits.

A second reason why the SOP rule should not be applied in this case as of 1958 is that the Government's "commitment" to the project in 1958 is not very convincing. True, in passing the 1958 Act the Government did enlarge the Everglades National Park to include the Northwest Extension. But with respect to a *land acquisition program*, the 1958 Act merely authorized a niggardly $24/acre for the purchase of 81,000 acres located throughout the Everglades *without actually appropriating* any of this sum. An intent to acquire lands at some future date, unaccompanied by the appropriation of any funds for that purpose, hardly evinces a firm commitment, especially when the Government has permitted certain lands within numerous other National Parks to remain privately owned. Furthermore, it was not until 7 or 8 years later that the Government got around to

appropriating even a paltry sum for the land acquisition program, and it was not until 1966 that the Department of the Interior first acquired private lands with federal funds.[56] In these circumstances, a finding that the Government became sufficiently committed to acquiring private property within the Northwest Extension for purposes of the SOP rule cannot be sustained.[57]

The assurances made by the Department of the Interior to area landowners constitute yet a third reason against extending the SOP rule back to 1958. In 4 letters sent between 1959 and 1962, the Department of the Interior informed the landowners that it could not begin its land acquisition program until Congress appropriated the necessary funds, that it did not know when Congress would in fact appropriate the funds, but that in the meantime the owners were perfectly free to use and sell their properties as if their lands were outside a Government project.[58] These letters of course represent additional evidence that the 1958 "commitment" was more talk than substance. But they also indicate that, at least until 1962, there was a private market, and a fair market value, for the landowners' properties *as* benefited and enhanced by their location within the Northwest Extension of Everglades National Park. And, as discussed earlier,[59] the landowners were entitled under *Miller* and *Reynolds* to compensation for the value of any such Government-conferred benefits.

Individually and together, these three factors—the sheer length of time between the 1958 Act and the takings, the lack of any firm commitment to a land acquisition program in 1958, and the Governmental assurances that the landowners

---

55. *See* note 33, *supra.*

56. See pp. 768–769, *supra.*

57. In its brief on appeal, the Government seems to concede the flimsiness of its 1958 commitment, for it argues alternatively for a 1966 commitment date. We decline to endorse or reject this alternative argument given the dearth of evidence on this issue in the record before us. We observe, however, that if all the "facts" related by the landowners at pages 51-

53 of their Brief on Appeal are true, they have a strong case that the Government did not commit itself to a land acquisition program covering their properties until passage of the Act of Sept. 26, 1970, see note 13, *supra,* raising the ceiling for private land acquisitions in the Everglades to $22,000,000.

58. See note 48, *supra.*

59. See pp. 785-788, *supra.*

could use and sell their properties freely—compel the conclusion that application of the SOP rule to exclude any and all value attributable to the Northwest Extension from 1958 to the date of taking was erroneous.[60]

### (3) Implementing The Rule By Means Of An Evidentiary Exclusion

If in any condemnation case it is appropriate and just to exclude from compensation under the SOP rule any value attributable to the Government's special demand for the properties it is taking, there remains the question of how procedurally to implement the rule and exclude the prohibited element of value. In this case, by ruling inadmissible all *evidence* of sales within Everglades National Park the District Court chose to give effect to the SOP rule by means of a sweeping evidentiary exclusion. This *evidentiary* exclusion was neither required by previous "scope" decisions, nor essential to the *substantive* principle excluding value attributable to the Government's special demand. Moreover, an evidentiary exclusion might well be unjust and improper given the particular facts of this case.

Courts have consistently recognized that, in general, comparable sales constitute the best evidence of market value.[61]

We have defined comparable sales as "sales from a willing seller to a willing buyer of similar property in the vicinity at or about the same time [as the taking]." *United States v. Trout,* 5 Cir., 1967, 386 F.2d 216, 223. As the definition indicates, comparability is largely a function of three variables: characteristics of the properties, their geographic proximity to one another, and the time differential.[62] For any particular condemned property, there may be an entire spectrum of comparable open market sales: from almost simultaneous sales of adjoining, virtually identical property to sales of such dissimilar and distant properties occurring so long ago that they are not in any sense of the term "comparable" sales. Generally, the more comparable a sale is, the more probative it will be of the fair market value of the condemned property. In most cases, of course, there are no open market sales "ideally" comparable (*i. e.,* virtually identical characteristics, immediate vicinity, and within a short time of the taking), but instead an assortment of sales that are only reasonably comparable in all or several respects.[63] Sound and just trial practice is to admit [64] as many of the "most comparable" sales available as is necessary to fairly permit each side to present its argument of fair market value for the jury's consideration. As with all evidentia-

**60.** How the appropriate, and just, beginning date for application of the SOP exclusion should be determined is discussed in Part IIIC, *infra.*

**61.** *E. g., United States v. Trout,* 5 Cir., 1967, 386 F.2d 216, 222–23; *United States v. 25.02 Acres of Land,* 10 Cir., 1974, 495 F.2d 1398, 1400; *United States v. 60.14 Acres of Land,* 3 Cir., 1965, 362 F.2d 660, 665; *United States v. Whitehurst,* 5 Cir., 1964, 337 F.2d 765, 775; *Knollman v. United States,* 6 Cir., 1954, 214 F.2d 106, 109; *United States v. Baetjer,* 1 Cir., 1944, 143 F.2d 391, 397, *cert. denied,* 1944, 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618.

**62.** *Cf. Knollman v. United States, supra,* 214 F.2d at 109:

The proper test is the similarity in character and locality of the land sold, together with the fact that the sale was not so far removed in point of time from the appropriation as to make a comparison inaccurate or impossible. * * * These features will vary as the particular situation varies.

**63.** And in some cases, there are not any comparable sales, or just a few such sales, so that recourse must be had to some other approach for ascertaining fair market value. *See generally United States v. Toronto, Hamilton & Buffalo Nav. Co.,* 1949, 338 U.S. 396, 402–03, 70 S.Ct. 217, 94 L.Ed. 195.

**64.** The comparable sales may be admitted either as substantive and direct proof of the value of the condemned property or to support the opinion of an expert testifying as to the value of the property taken. *E. g., United States v. Smith,* 5 Cir., 1966, 355 F.2d 807, 809; *United States v. Johnson,* 9 Cir., 1961, 285 F.2d 35, 40; *United States v. Featherstone,* 10 Cir., 1963, 325 F.2d 539, 542; *United States v. Michoud Industrial Facilities,* 5 Cir., 1963, 322 F.2d 698, 718–19 (Brown, J., dissenting), *cert. denied,* 1964, 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 185.

ry matters, the trial judge has considerable latitude in admitting or excluding tendered "comparable sales," [65] but it is not an unbounded latitude and the trial judge's rulings are reversible for abuse of discretion.[66]

In this case, the District Court, in attempting to ensure that the landowners would receive no value that is noncompensable under the SOP rule, may well have unnecessarily and erroneously excluded from evidence the most probative and comparable sales available—sales of other coastal mangrove properties in the same general vicinity and within a reasonable time of the taking. Instead, under the Court's ruling,[67] the parties were relegated to relying upon two other sets of "comparable" sales: (1) sales within the Northwest Extension that occurred before July 2, 1958,[68] and (2) sales of inland sawgrass properties, 7 to 25 miles distant, which the landowners persuasively argued were dissimilar to their coastal mangrove lands in many respects.[69]

 To be sure, the sale price of lands *within* the Northwest Extension sold after 1958 may have reflected the fact that the Government planned eventually to acquire all privately owned parklands. Thus, post-1958 sales of parklands may be tainted by the same element of value that is noncompensable under the SOP rule. This consideration does not, however, automatically dictate that such sales be excluded from evidence.

Faced with the analogous problem of whether it is necessary to exclude from evidence all proffered comparable sales that occurred *subsequent* to the taking of the property whose fair market value is being determined, Judge Lumbard of the Second Circuit observed

There is no absolute rule which precludes consideration of subsequent sales. The general rule is that evidence of "similar sales in the vicinity made at or about the same time" is to be the basis for the valuation and evidence of all such sales should generally be admissible, * * * including subsequent sales. * * * The generality of this rule is limited, however, by the consideration that a condemnation itself may increase prices and the government should not have to pay for such artificially inflated values. See *International Paper Co. v. United States*, 5 Cir., 1955, 227 F.2d 201. But that possibility does not produce a hard and fast exclusionary rule. In every case it is a question of judgment as to the extent of this danger and, particularly where a judge is sitting without a jury, it would seem the better practice is to admit the evidence and then to weigh it having due regard for the danger of artificial inflation.

*United States v. 63.04 Acres of Land*, 2 Cir., 1957, 245 F.2d 140, 144 (reversing the lower court for excluding evidence of subsequent sales). Other Circuits have followed suit in rejecting a per se rule excluding evidence of subsequent sales. *E. g., United States v. 1,129.75 Acres of Land*, 8 Cir., 1973, 473 F.2d 996, 998–99 (holding that it was an abuse of discretion for trial judge, *in a jury trial*, to exclude all comparable sales made subsequent to the date of taking); *United States v. 691.81 Acres of Land*, 6 Cir., 1971, 443 F.2d 461, 462–63; *accord United States*

---

**65.** *E. g., United States v. Certain Land in the City of Fort Worth*, 5 Cir., 1969, 414 F.2d 1029, 1031; *United States v. 124.84 Acres of Land*, 7 Cir., 1968, 387 F.2d 912, 915; *United States v. Eden Memorial Park Association*, 9 Cir., 1965, 350 F.2d 933, 935.

**66.** *E. g., United States v. 1,129.75 Acres of Land*, 8 Cir., 1973, 473 F.2d 996, 999; *Knollman v. United States, supra*, 214 F.2d at 109.

**67.** Supplemented by the ruling at trial that the few non-Park mangrove sales found by the landowners were not admissible because they

were not sufficiently comparable. *See* p. 772 *supra*; Part IV, *infra*.

**68.** Actually, these sales may well have been "so far removed in point of time from the appropriation as to make a comparison inaccurate or impossible," *Knollman v. United States, supra*, 214 F.2d at 109. Certainly, we would not reverse as an abuse of discretion, except perhaps in the most unusual case, a trial court ruling that 18-year-old sales were inadmissible because they were too remote in time.

**69.** See p. 773, *supra*.

*v. An Easement and Right of Way*, 6 Cir., 1969, 405 F.2d 305, 308 (eminent domain case tried before a commission).[70]

 The reasoning of these subsequent sales cases applies with equal force to SOP cases. Rather than exclude from evidence through an absolute, pre-trial ruling all sales that may have been artificially inflated by the Government's nearby condemnation activities, in many cases the preferable course and the only just course would be to adopt a liberal policy of admission, permit the possibly tainted sales to go to the fact-finder under proper instructions, and leave it to the fact-finder to weigh them "having due regard for the danger of artificial inflation." After all, the presence of artificial inflation merely indicates that the "comparable" sales are in fact dissimilar to that extent, and generally, dissimilarities in sales that are otherwise comparable go to the weight of their evidentiary value, rather than to their admissibility, *e. g., United States v. 691.61 Acres of Land, supra,* 443 F.2d at 463; *United States v. 124.84 Acres of Land, supra,* 387 F.2d at 915; *see United States v. Certain Land in the City of Fort Worth, supra,* 414 F.2d at 1031.

We have been unable to find any decisions in which an appellate court has squarely addressed the question and concluded that the SOP rule requires an evidentiary exclusion. In their discussions of

the substantive exclusion (no compensation for value attributable to the Government's special demand and its actions as condemnor), the Supreme Court's two major SOP decisions—*Miller* and *Reynolds*—contain no hint that an evidentiary exclusion is either necessary or, for that matter, proper.[71] And this Circuit's opinion in *Jasper County* (heretofore the most extensive consideration of the SOP rule in this Circuit) carefully avoids any suggestion that an evidentiary exclusion is proper, despite the fact that the Government had sought "to exclude evidence of any enhancement" at trial,[72] and that this Court agreed that the SOP rule might be applicable to the facts of the case.

There are, however, decisions affirming application of the SOP rule in cases in which the trial court had excluded evidence of sales possibly tainted by the Government's condemnation activities. *Kerr* and *Shoemaker,* the two nineteenth-century progenitors of the SOP rule in the Supreme Court,[73] are among those decisions. So too is one decision from this Circuit—*Wardy v. United States,* 5 Cir., 1968, 402 F.2d 762. These decisions, however, did not squarely address the propriety of the evidentiary exclusion; rather, they were concerned with the propriety of the substantive exclusion or, as in *Wardy,* with some other collateral matter.[74] And, significantly, there is no

---

70. *But cf. United States v. 25.02 Acres of Land,* 10 Cir., 1974, 495 F.2d 1398, 1401; *International Paper Co. v. United States,* 5 Cir., 1955, 227 F.2d 201, 209 (discussed in note 75, *infra*).

71. In *Miller,* the Ninth Circuit had described the District Court's SOP ruling as an evidentiary ruling: "the [District] Court ruled that no evidence could come in as to sales of similar properties after August 26, 1937." *Miller v. United States,* 9 Cir., 1942, 125 F.2d 75, 78. The Supreme Court, in reversing the Ninth Circuit and affirming the District Court, was careful to point out that the Ninth Circuit had erroneously characterized the District Court's ruling. *Miller, supra,* 317 U.S. at 372–73 & n.6, 63 S.Ct. at 279 & n. 6. In truth, the District Court had given effect to the SOP rule *by instructing the jury* "that, in arriving at market value as of the date of taking, they should disregard increment of value due to the initiation of the project and arising after August 26, 1937," *id.* at 373, 63 S.Ct. at 279.

72. *Jasper County, supra,* 538 F.2d at 673.

73. See pp. 784–785, *supra.*

74. The properties in *Wardy* had been condemned in 1966 for the Chamizal Project in El Paso, Texas, pursuant to the Chamizal boundary settlement between the United States and Mexico which had been announced in July 1963. The boundary settlement clearly contemplated Government acquisition of as-yet unspecified private lands, and Congress authorized the necessary condemnations in April 1964. Five months later, in September 1964, the appellants in *Wardy* began to purchase the soon-to-be-condemned lands. The District Court ruled that the lands were within the scope of the Chamizal Project as of July 1963, and further specified "that no reference to the price thereafter paid for these tracts would be allowed at trial." 402 F.2d at 763. We rejected the appellants' contention that the ruling was erroneous, and affirmed the District Court.

indication in these decisions that the condemnees were seriously hampered in their efforts to prove fair market value by the exclusionary evidentiary rulings.[75]

 This last consideration is an extremely important factor in evaluating the propriety of an evidentiary exclusion. To repeat, sound trial practice is to admit a liberal number of the "most comparable" sales available, leaving it to the fact-finder to assess the ultimate probative worth of any and all sales admitted.[76] To exclude some of these sales on the ground that they may reflect a noncompensable element of value is not unfair so long as a reasonable number of other "most comparable" sales remain. If, for example, the parties offer 20 sales, all relatively recent and involving substantially similar properties in the same general vicinity, and it is reasonably possible that the price in 10 of the sales was influenced by the Government's condemnation activities, exclusion of the 10 tainted sales would still leave 10 more or less equally comparable sales for consideration by the fact-finder. Neither party could complain that the evidentiary ruling excluded altogether the best evidence of fair market value available. Moreover, in these circumstances, an evidentiary exclusion might well be preferable, as a means for giving effect to the SOP rule, to admitting all 20 sales with cautionary instructions that the fact-finder, in considering the sales as evidence of fair market value, must discount them to the extent it finds them tainted by an element of noncompensable value.[77] The fair-

It is clear from our opinion that the central issue on appeal was not the propriety of the evidentiary exclusion (as opposed to instructions as a means for implementing the SOP rule). Instead, the issue presented in *Wardy* was who decides whether the substantive SOP exclusion is applicable at all—judge or jury: The district court correctly applied the *Miller* test in dealing with the United States' motion *in limine*. The question was whether appellants' "lands were probably within the scope of the project from the time the Government was committed to it." * * * Appellants contend that the jury should have been allowed to answer this question. Under rule 71A(h) the jury's function is limited to determining "just compensation." It is the duty of the court to decide the legal issues, as well as all other fact issues.
*Id.*; *see* Part IIID, *infra*. Thus, despite the fact that it affirmed the evidentiary exclusion, *Wardy* did not reach the question whether such an exclusion is invariably proper.

75. *Kerr* and *Shoemaker* both involved urban properties condemned for a city park. Nothing in the opinions tends to negate the reasonable assumption that, although the trial courts in those cases had excluded from evidence sales of properties adjoining the park or within its immediate vicinity, *see* note 30, *supra*, there were numerous other sales of similarly comparable urban properties upon which the landowners could rely in proving the fair market value of their properties. *Wardy* also involved the condemnation of urban lands, and again there is no indication in the opinion that the exclusion from evidence of sales of lands within the scope of the project left the landowners only a few equally comparable sales with which to argue their case.

We think the same consideration explains language in *International Paper Co. v. United States*, 5 Cir., 1955, 227 F.2d 201, suggesting that evidence of subsequent sales must be excluded because they may reflect an increment in value due to the Government's condemnation activities, see *id.* at 209. In that case too, there is no reason to believe that the exclusion of three subsequent sales comprising 62, 160, and 187 acres each unfairly restricted the pool of comparable sales the landowners could rely upon in proving the fair market value of their 9,000-acre tract.

76. To be sure, in making admissibility determinations trial judges may legitimately endeavor to keep the evidence within manageable limits, and may therefore exclude cumulative or redundant comparable sales. Nonetheless, as a general rule, a bias towards inclusion rather than exclusion is the fairer practice.

77. Thus an evidentiary exclusion might be more justifiable in any forthcoming compensation trials of lands appropriated for the neighboring Big Cypress National Preserve. That project was announced on October 11, 1974, see note 19, *supra*, and in the statute creating the project Congress stated its express intent that the Secretary of the Interior should "substantially complete" the necessary land acquisition program within 6 years, see 16 U.S.C. § 698g(c). If this intent has been carried out, it is quite possible that the date of taking for at least some of the Big Cypress lands was as early as 1978. It is also quite likely that in any just compensation trials involving 1978 takings a substantial number of 1970–1974 sales of comparable Big Cypress properties would be available as evidence of fair market value. If the available pre-project sales are truly compa-

ness of¹ an evidentiary exclusion may be entirely different, however, if the exclusion would eliminate all or nearly all of the "most comparable" sales. For then the parties would be forced to resort to sets of "less comparable" sales (sales much further removed in time or distance, or sales of properties with markedly different characteristics), and the very factors that diminish the comparability of these sales vis-a-vis the excluded sales may significantly favor one party and disadvantage the other. Nor would the exclusion necessarily serve to expedite the trial proceedings in these circumstances, for it is likely that more time and effort would be devoted to litigating whether and what sort of adjustments must be made to reflect the greater dissimilarities between the condemned property and the "less comparable" sales.[78]

Thus, where an evidentiary exclusion would eliminate the "most comparable" sales available, the better course would be to admit the possibly tainted sales with appropriate instructions, permit the parties to present testimony pro and con regarding whether the sales are tainted and how much the taint distorts true market value, and then instruct the fact-finder as to what elements of value must be included or excluded from the compensation award.[79] The scope of the project rule commands only that *value* attributable to the Government's special demand and its actions as condemnor be excluded from compensation (and, conversely, that the value of Government-conferred benefits be included). It does not command that *evidence* be excluded. In many cases, the *substantive* exclusion can be accomplished as effectively through the use of proper instructions as it

rable (*i. e.*, if there were no dramatic changes in the market aside from the announcement of the Big Cypress project), exclusion of all post-1974 sales that might be tainted by the Government's announcement would simplify the evidentiary factors the fact-finder would have to weigh, without unfairly prejudicing either party.

78. The trials below provide a case in point. A major portion of the testimony and cross-examination was focused upon whether, and how much, the landowners' coastal mangrove lands differed from the inland sawgrass lands of the only comparable sales admitted in evidence. See p. 773, *supra.* (In attempting to argue that the difference affected fair market value, the landowners naturally were handicapped by the fact that they could not introduce the sales price of *any* coastal mangrove lands for purposes of comparison.) It is unlikely that the trials would have been any longer or more complicated had the Court instead permitted the introduction of in-Park sales; in that case, the Government undoubtedly would also have based its case on in-Park sales, and the principal contested factual issue would have been whether or to what extent those in-Park sales reflected an element of value attributable to the Government project.

79. The only other Court, federal or state, which to our knowledge has given thorough consideration to this question has reached the same conclusion. In a trilogy of cases decided in 1971, the California Supreme Court explicitly declined to adopt an "iron-clad rule" of exclusion for all project-enhanced comparable sales. *Merced Irrigation Dist. v. Woolstenhulme,* 1971, 4 Cal.3d 478, 93 Cal.Rptr. 833, 483 P.2d 1;

*People ex rel. Dept. of Public Works v. Reardon,* 1971, 4 Cal.3d 507, 93 Cal.Rptr. 852, 483 P.2d 20; *County of San Luis Obispo v. Bailey,* 1971, 4 Cal.3d 518, 93 Cal.Rptr. 859, 483 P.2d 27. Rather, the thrust of that trilogy was to the contrary, as indicated by the following summarization of those decisions in a later opinion by the California Supreme Court:

> Those cases involved the propriety of admitting in evidence the sales prices of properties comparable to the condemned property when those prices were bloated by project enhanced value for which the owner of the condemned property could claim no compensation. Collectively, they hold that the trial court stood empowered to admit such sales in evidence if it found them sufficiently comparable to the condemned property to shed light upon its value, cautioned the jury to disregard those sales to the extent that they reflected noncompensable project enhancement, and permitted the opposing party to cross-examine the party introducing such sales on the extent of comparability.

*City of Los Angeles v. Retlaw Enterprises, Inc.,* 1976, 16 Cal.3d 473, 481, 128 Cal.Rptr. 436, 441, 546 P.2d 1380, 1385. As the Court had observed in *Merced, supra,* 4 Cal.3d at 501, 93 Cal.Rptr. at 848, 483 P.2d at 16, sales of comparable properties that were tainted by project enhancement "may also reflect recent increases in land values attributable to other factors, such as other new public or private improvements or zoning changes, which the owner of the condemned land is entitled to have included in a consideration of the market value of his land at the time of taking."

can through an evidentiary exclusion. And in some cases it is possible that *only* by the use of instructions can the substantive exclusion be given effect justly and fairly.[80]

■ We do not decide if this is such a case. That depends largely upon a new determination, according to the principles announced in this opinion and after a full and fair evidentiary hearing, of whether and as of when the substantive SOP exclusion applies to the 52 tracts left in this case.[81] We hold only that an evidentiary exclusion is not required and that, in the circumstances of these condemnation proceedings as revealed by the record before us, it is possible that an evidentiary exclusion would not produce a compensation award that is just to the landowner as well as to the public.

### IIIC. *Proper Application Of The Rule In These Eminent Domain Proceedings*

If, as we have already concluded, it would be improper and unjust to apply the SOP rule as of 1958 to exclude any and all value thereafter attributable to the Northwest Extension, then how *should* the rule be applied to these takings? Because the parties have not yet had a full and meaningful opportunity to present and include in the record evidence relevant to a proper determination of this question, its answer must await further proceedings in the District Court upon remand. At this juncture we can do no more than review some of the pertinent considerations and provide a framework of analysis to guide the decision below.

■ As an initial matter, it should be remembered that the SOP issue is, after all, but one aspect of the just compensation determination. There is a danger that our extended discussion of the SOP rule might exaggerate its importance and obscure the principal function of the trial on remand—to determine the fair market value of the landowners' properties *at the date of taking* (which was May 1976), see Part II, *supra*. The SOP rule refines the concept of fair market value only with respect to alterations in value attributable to the Northwest Extension. It has no bearing whatsoever upon alterations in value attributable to other events or market forces. If the value of these coastal mangrove lands has increased between 1958 and 1976 because of factors *other* than the creation of the Northwest Extension, the landowners are entitled to compensation for any such increments in value *regardless* of how the SOP rule is ultimately applied. Thus, to the extent that the value of these properties has increased due to a general escalation in market demand for properties suitable for such recreational activities as camping, fishing, and boating—no matter where in South Florida such properties are located—the compensation awards must reflect that increase. Similarly, the awards must also include any increase in dollar value attributable to inflation. At the risk of belaboring the point, the SOP problem involves *only* whether the compensation awards for the 52 tracts remaining in this case should reflect any alteration in value occasioned by

---

**80.** An additional factor that should be considered in connection with a decision on whether or not to exclude arguably tainted sales is that instructions on the substantive SOP exclusion will almost invariably be given to the factfinder in any event. For example, if the SOP rule is found applicable as of a certain date, the jury (assuming it is a jury trial) will in all likelihood be instructed at the end of trial that it must disregard any change in value attributable to the project after the specified date of governmental commitment. If the jury is to be apprised of the principle at any rate, arguments for exclusion based on the potential for jury confusion lose much of their force; the potential for jury confusion would not be significantly increased if the jury were given the identical instruction *during* trial along with an explanation that because of the rule "tainted" comparable sales must be discounted by whatever amount they reflect value attributable to the project after the date of government commitment. Thus, if SOP instructions are to be given at the end of trial, the argument for excluding arguably "tainted" sales during trial must rest primarily on the trial time that would be saved by restricting the evidence to clearly untainted sales. Standing alone, such considerations of trial efficiency and economy rarely will justify excluding probative, noncumulative evidence.

**81.** See Part IIIC, *infra*.

the expansion of Everglades National Park to include the Northwest Extension.[82]

The reason the SOP issue constitutes something of a problem is, of course, that the SOP rule is dual-pronged. As articulated in *Miller* and *Reynolds* and their progeny, the rule commands that any increment in value attributable to the Government's special demand for the properties and its actions as condemnor must be excluded from the compensation awards, but that the landowners are entitled to compensation for the value of any beneficial uses their properties enjoy because of their relationship to the Northwest Extension.[83] One of the perplexing aspects of this case is that it is plausible, more so than in many SOP cases, that *both* of these values are present—value attributable to Government demand as well as value attributable to Government-conferred benefits.[84]

The Government, for example, has argued that the landowners have derived unique and valuable benefits from the Wilderness Waterway—a north-south channel through the meandering waters of the Everglades, including the Northwest Extension, which has been marked and maintained by the National Park Service. This Waterway, according to the Government, serves much as a marine path through an aquatic jungle, enabling owners to locate their parcels of land more readily, and reducing the chances of becoming hopelessly lost while fishing and boating in the labyrinthine waters of the area. The Government also suggests that the landowners have been benefited by the presence of Park rangers in the area and the fact that the governmental regulations covering the Park preserve the unique characteristics, fish, and wildlife (and the concomitant recreational opportunities) of these ecologically sensitive coastal mangrove lands.

The Government contends that under the SOP rule the landowners are not entitled to the value of these benefits. Absent (1) the length of time between the announcement of the Northwest Extension and any significant land acquisitions in the area, and (2) the governmental representations back in the late '50s and early '60s that area landowners were free to use and sell their properties as they desired, this contention would have some merit. But by waiting 18 years to condemn these properties, and in particular by encouraging landowners in the interim to enjoy any and all attributes of ownership (including sales, exchanges, and resales), the Government in effect permitted a private market for these lands to continue. Moreover, the Government permitted that market to reflect the value of whatever beneficial uses these

**82.** And in order to further ensure that the SOP issue is not defined too broadly, we reiterate that the relevant project for the SOP determination below is the Northwest Extension, not Everglades National Park in its entirety. It is quite clear that the landowners are entitled to the fair market value, if any, of any benefits they can prove their properties enjoyed by virtue of their proximity to the 1,000,000-plus acres of Everglades National Park as it existed prior to the 1958 Extension. See Part IIIB(1), *supra*.

**83.** See pp. 785–788, *supra*.

**84.** Because there has never been a hearing devoted to the SOP issue, there is little evidence in the record bearing upon the source and magnitude of any enhancement. At trial, the only testimony presented by the landowners was that their properties were *not* enhanced by either the announcement or the existence of the Northwest Extension. It is possible that the owners took this position in an effort to have the sweeping evidentiary exclusion (barring them from introducing into evidence as comparable sales any in-Park sales) reconsidered and lifted. In any event, because the District Court and the parties were all operating with an erroneous conception of the proper application of the SOP rule, and because the remand must include the evidentiary hearing on the SOP issue that was never conducted the first time around, the landowners are not bound by their initial position of no enhancement, although the Government may of course make whatever use permitted under the Federal Rules of Evidence of the testimony given in the first trials denying enhancement. The Government, on the other hand, has attempted to justify the SOP ruling below by arguing on appeal that the properties *were* enhanced in a number of ways by the announcement and establishment of the Northwest Extension, and it is these governmental arguments concerning enhanced value and their proper treatment under the SOP rule that we evaluate in the following paragraphs.

lands enjoyed because of their location within the Northwest Extension. Thus, contrary to the Government's argument, the landowners are entitled to the value of any Government-conferred benefits—such as proximity to the Wilderness Waterway—that might reasonably be enjoyed by private parties interested in purchasing these lands on the open market.[85]

But the Government also argues that these lands were enhanced in value by the knowledge that the Government would eventually acquire them to complete the transfer of the Everglades from private to public ownership. Although a decade of congressional inaction and the Department of Interior letters may have negatived the possibility of imminent acquisition until the late '60s or early '70s, area landowners and the public knew, from 1958 on, that someday the Government would acquire these properties. This knowledge may have given these properties an additional value as speculative investments—buy cheap and hope to exact a profit from the Government when it finally commences its acquisition program. Of equal if not greater importance than the possibility of hold-up, the Government argues, was simply the assurance that there would be a buyer. The 1958 Act, according to the Government, provided a floor on down-side risk, which, in light of the roller-coaster, cyclical boom-to-bust nature of the South Florida real estate market, constituted a significant element of value.

These arguments are not implausible. And it is clear that any value derived from the knowledge that the Government would eventually acquire the properties—whether hold-up value or simply the insurance value of a guaranteed buyer—is not compensable. Any such value is attributable solely to the fact that the Government has a unique demand for these properties and the privilege to satisfy that demand through eminent domain. To permit the landowners to re-cover this value from the Government would be to force the Government to pay a premium solely because it is exercising its condemnation power on behalf of the public. The SOP rule had its origins in the perception that any value attributable to Government demand and its actions as condemnor is not an element of just compensation, and the rule commands that any such value be excluded from the compensation awards in this case.

Compounding the problem of how to treat any alterations in value caused by the Northwest Extension is the possibility, suggested by the landowners, that the value of their properties was not enhanced, but rather *depreciated* by the threat of condemnation. This too is not an implausible possibility. Anyone interested in buying these coastal mangrove lands for recreational use might well be dissuaded by the knowledge that their privileges of ownership would probably be relatively short-lived, and that they might not be able to recoup their investment through the negotiations or compensation trials that would follow governmental appropriation. And, just as it is clear that it would be unjust for private landowners to profit from the Government's condemnation activities, it is equally clear that it would be unjust for them to suffer because the promise of condemnation has depressed the private market. The principle that no weight should be given to the prospect of governmental appropriation is an evenhanded principle. Once the Government is committed to a project, depreciations in value caused by a prospective taking must be disregarded.[86]

How are these possible elements of value—positive value attributable to Government-conferred benefits, positive value attributable to Government demand, negative value attributable to the threat of condemnation—to be sorted out and handled so

85. If, on the other hand, the Government had acquired these properties shortly after the 1958 Act and without encouraging private use and sales of the properties, it would have foreclosed the possibility that a private market demand for these properties as enhanced by any Government-conferred benefits would develop.

86. See note 32, *supra*.

that the compensation award is just to both the Government and the landowners? [87]

This problem is best approached by reconsidering how the SOP rule operates. If applicable, the rule dictates that any alterations in value (positive or negative) attributable to the project for which property is taken are to be disregarded in ascertaining fair market value and just compensation. Under the traditional formulation of the SOP test, the crucial date which triggers the rule is the date the Government became committed to the project. The SOP rule, then, operates much like a presumption: as of the crucial date of Government commitment, it is presumed that any positive alteration in value is attributable to Government demand (and therefore must be excluded from the compensation award), and that any negative alteration in value is similarly attributable to the Government's condemnation activities (and must also be disregarded). The key to a just determination of the SOP issue is to set the date as of which the rule is triggered with due regard for the compensation consequences, so that the presumption does not unfairly favor either the Government or the landowner.[88]

In most cases where the condemned property has been found to have (probably) been within the scope of the project from its inception, a just "commitment" date triggering the rule will be the date the Government announced the project. In this case, however, we have seen that three factors militate against triggering the rule as of the date of the project announcement (July 2, 1958): first, the length of time between that announcement and the takings; second, the mere token commitment at the time of the project announcement to the land acquisition program necessary to complete the project; and third, the governmental blessing given area landowners to use and sell their properties freely. The question to be decided on remand, then, is, if not 1958, at what date *would* it be fair and just to trigger the SOP rule and its presumption that alterations in value thereafter attributable to the project must be disregarded?

---

**87.** An obvious and straightforward answer, which at least superficially commends itself, is simply to instruct the fact-finder on the compensability or noncompensability of each element of value for which there is some evidentiary foundation. If, for example, the Government presented testimony that the lands were enhanced in value by the knowledge that they would be condemned, the fact-finder could simply be instructed to exclude from its compensation award any value attributable to the Government's special demand and its condemnation activities. Conversely, if the landowner presented evidence of depreciation, the fact-finder would be instructed to adjust upward for any depreciation caused by the threat of condemnation. Finally, the fact-finder could be instructed that it should include in its compensation award the value of any Government-conferred benefits.

Under this approach, the entire SOP issue—whether or not alterations in value due to the Government project are to be considered in awarding compensation—would be left to the fact-finder, albeit of course with appropriate instructions. Despite the simplicity and logical appeal of this solution, a number of reasons counsel against its use. Foremost of these reasons, and sufficient by itself, is that determination of the SOP issue is committed to the Court under F.R.Civ.P. 71A(h). *See* Part IIID, *infra*. The fact-finder may in the end have to be instructed to disregard or include certain alterations in value, but it is the Court's responsibility to decide initially whether the rule is applicable and, quite importantly, as of what date it is applicable.

**88.** Insofar as the SOP rule operates as a presumption, it is a legal presumption to be applied by the *judge*, and the judge alone. As we explain in detail in Part IIID, *infra*, the judge determines whether the SOP rule is applicable *and* the crucial date commencing its application. With regard to this *judicial* function, it is useful to think of the rule in terms of a presumption. *With regard to the fact-finder* (whether it be a jury or a commission), however, *presumptions have no place whatsoever.* The fact-finder's role is limited to determining just compensation according to ground rules established by the judge, and among those ground rules is whether alterations in value due to the project are to be disregarded or included in the compensation award. Under no circumstances is the fact-finder to be instructed that post-commitment date changes in value attributable to the project are "presumed" to be due to the Government's condemnation activities; rather, the fact-finder is to be *unequivocally* instructed that, in fixing the just compensation award, it *must* disregard any post-commitment date changes in value which it finds were due to the project.

As foreshadowed in our earlier discussion,[89] the appropriate date is largely a function of reasonable expectations. It is the date as of which the landowners or prospective purchasers no longer could reasonably anticipate being able to devote these properties to their highest and best use in the context of the surrounding governmental project, without serious apprehension that the properties would soon be condemned. In other words, it is the date as of which the prospect of imminent condemnation becomes sufficiently definite that it would be a major factor in the decision of any reasonable person to buy or develop the property. From this date on, it may fairly be presumed that any depreciation in value is attributable to the threat of condemnation, and that any increase in value is attributable to the Government's special demand for the property and its actions as condemnor.[90]

Whatever the date turns out to be after a proper consideration of relevant evidence, fully and fairly presented, the rule for trial will be that compensation must be awarded without regard to any increase or decrease in value attributable to the Northwest Extension after that date.[91] And, under the rule, the question for the fact-finder will be: what would land having the characteristics of these properties (and the characteristics *include* whatever beneficial uses these properties derived from the Northwest Extension as of the crucial date[92]) be worth in the private real estate market as of May 1976 (the date of taking)?

### IIID. *Division Of Responsibilities Between Judge And Jury (Or Commission)*

Implicit in the foregoing is that the primary responsibility for deciding the scope of the project issue is committed to the trial judge. This has unequivocally been the law in this Circuit since our 1968 decision in *United States v. Wardy, supra,*[93] which was expressly approved by the Supreme Court in *United States v. Reynolds, supra,* as the law in all federal courts. Nonetheless, as explained below, the jury (if there is one) shares to a limited extent responsibility for ensuring that the SOP rule is properly and justly reflected in its compensation award.

Because there is no constitutional right to a jury trial in eminent domain proceedings,[94] the distribution of responsibilities between judge and jury is governed by F.R.Civ.P. 71A(h),[95] which, along with

89. See pp. 792–793, *supra.*

90. Again, we emphasize that this analysis in terms of a presumption is to be used *only* by the *judge* in determining the fair and just date after which alterations in value due to the project must be disregarded. Once the judge has determined this date, the fact-finder is to be instructed that it *must* disregard any such alterations in value which it finds to have occurred thereafter.

91. Any decision upon whether to implement this rule for trial by means of a sweeping evidentiary exclusion—*i. e.,* by excluding from evidence all sales within the Northwest Extension after the crucial date—should be guided by the considerations discussed in Part IIIB(3), *supra.*

92. For up until that date, owners or prospective buyers could reasonably anticipate being able to partake of the advantages conferred upon the properties by their location within the Northwest Extension.

93. See note 74, *supra.*

94. *E. g., United States v. Reynolds, supra,* 397 U.S. at 18, 90 S.Ct. at 806; *Bauman v. Ross,* 1897, 167 U.S. 548, 593, 17 S.Ct. 966, 42 L.Ed. 270; *Georgia Power Co. v. 138.80 Acres of Land,* 5 Cir., 1979, 596 F.2d 644, 647; Blair, *Federal Condemnation Proceedings and the Seventh Amendment,* 41 Harv.L.Rev. 29 (1927).

95. The full text of F.R.Civ.P. 71A(h) is as follows:

If the action involves the exercise of the power of eminent domain under the law of the United States, any tribunal specially constituted by an Act of Congress governing the case for the trial of the issue of just compensation shall be the tribunal for the determination of that issue; but if there is no such specially constituted tribunal any party may have a trial by jury of the issue of just compensation by filing a demand therefor within the time allowed for answer or within such further time as the court may fix, unless the court in its discretion orders that, because of the character, location, or quantity of the property to be condemned, or for other reasons in the interest of justice, the issue of compensation shall be determined by a commission of three persons appointed by it. If a commission is appointed it shall have the

the other sections of Rule 71A, defines the procedures for federal court condemnation proceedings. Rule 71A(h) limits the role of a jury in two important ways. First, it provides that in some eminent domain proceedings there need not be a jury at all: Congress may designate and constitute a special tribunal for trial of the issue of just compensation, or even where Congress has not so designated a special tribunal, the trial judge may, in certain broadly defined circumstances, exercise his discretion and appoint a three-person commission to try the issue of just compensation in lieu of a jury.[96] Second, the Rule provides that even where a jury is used, it decides *only* the issue of just compensation and "[t]rial of all [other] issues shall * * * be by the court." [97]

In *Wardy,* we held that the scope of the project issue—specifically, whether the condemned "lands were probably within the scope of the project from the time the Government was committed to it"—was among the "other issues" committed by Rule 71A(h) to the trial judge. As we explained, the judge, in deciding the SOP issue, "merely decide[s] a legal question which limit[s] the factors necessary to the determination of 'just compensation.' " 402 F.2d at 763. The Supreme Court further elaborated upon this in *Reynolds:*

> [W]e think the Rule's basic structure makes clear that a jury in federal condemnation proceedings is to be confined to the performance of a single narrow but important function—the determination of a compensation award within ground rules established by the trial judge. The Rule gives the trial court

discretion to eliminate a jury entirely. And when a jury is afforded, the sweeping language of the final sentence of the Rule discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial. It is for him to decide "all issues" other than the precise issue of the amount of compensation to be awarded. It follows that it is for the judge to tell the jury the criteria it must follow in determining what amount will constitute just compensation, and that in order to do so he must decide the "scope-of-the-project" issue as a preliminary matter.

397 U.S. at 20, 90 S.Ct. at 807.

 While it is thus clear that the SOP issue is a "preliminary matter" whose determination is committed to the trial judge by Rule 71A(h), this is an oversimplification to the extent that it suggests that the jury (or the commission or special tribunal) has no responsibilities whatsoever for effectuating the SOP rule. What the trial judge decides, essentially, is whether—under the Fifth Amendment and subsidiary principles of just compensation—the jury is to consider any alterations in value attributable to the Government project for which the condemned property is taken. In other words, the judge decides whether any increase in value due to the project must be excluded from the compensation award (because it is value attributable to the Government's special demand and its condemnation activities) or instead must be included in the award (because it represents the fair market value of Government-conferred ben-

---

powers of a master provided in subdivision (c) of Rule 53 and proceedings before it shall be governed by the provisions of paragraphs (1) and (2) of subdivision (d) of Rule 53. Its action and report shall be determined by a majority and its findings and report shall have the effect, and be dealt with by the court in accordance with the practice, prescribed in paragraph (2) of subdivision (e) of Rule 53. Trial of all issues shall otherwise be by the court.

**96.** Under the Rule, the circumstances that would justify the discretionary appointment of a commission, even though the parties have

filed a timely demand for a jury, are "because of the character, location, or quantity of the property to be condemned, or for other reasons in the interest of justice." In Part VIII, *infra,* we consider briefly whether, under these criteria, a commission should be appointed on remand for the just compensation trials of the properties before us on appeal.

**97.** Commissions (where appointed by the judge) and special tribunals constituted by Congress also decide only the "issue of just compensation" under the Rule.

efits). In addition, the judge decides whether any depreciation in value must be disregarded by the jury in determining compensation (because attributable to the threat of condemnation). Under the SOP rule, the judge makes these preliminary determinations of value that must be included or disregarded by deciding whether the condemned lands were probably within the scope of the project from the time the Government was committed to it, or (using the more precise formulation of the test), by deciding the date as of which the owner or a prospective purchaser no longer could have reasonably anticipated being able to devote the condemned lands to their highest and best use, enjoying the beneficial uses if any derived from a nearby or surrounding public project, without serious apprehension that the property would soon be condemned for that project. In sum, the judge decides (a) whether the evidence warrants application of the SOP rule, (b) how the rule should be applied—*i. e.,* whether or not any change in value attributable to the project should be included or disregarded, and (c) where appropriate, the date after which any change in value should be disregarded.[98]

But whether there in fact has been any increase or decrease in value due to the project, and by how much, is ultimately for the jury (or commission) to decide as part of its just compensation determination on the basis of the evidence presented it. Thus, although the landowners may produce suf-

ficient evidence to raise the possibility that their properties depreciated in value because of the threat of condemnation, and by virtue of that possibility to necessitate appropriate instructions, the jury is free to disregard that evidence in favor of contrary evidence presented by the Government. Nor is the jury required to credit landowners' estimates of the fair market value of compensable beneficial uses derived from the Government project. And by the same token, the jury may decide that the evidence supports the landowners' estimates of fair market value despite Government evidence that those estimates include a noncompensable element of value attributable to the Government's special demand and its condemnation activities.[99]

 To echo the Supreme Court's language in *Reynolds,* the judge establishes the "ground rules" or "criteria" for the determination of just compensation by the jury. And he enforces those ground rules through a combination of evidentiary rulings (tempered by the concerns discussed in Part IIIB(3), *supra* ) and instructions. But once he has instructed the jury to disregard any value attributable to the project after a certain date,[100] his responsibility ends, and it becomes the jury's responsibility—as with any other legal instruction—to follow the instruction in its fact-finding mission. And so long as the jury's verdict is within the range of the evidence presented it, it must be assumed that the jury fulfilled its responsibilities faithfully.[101]

98. These SOP determinations, together with any underlying findings of fact, should be made on the record.

99. Of course, these issues will not always be squarely presented to the jury. In many cases, the judge's preliminary determinations together with supplemental evidentiary rulings will sufficiently narrow the range of contested factual issues so that the jury never hears conflicting evidence on any particular element of value. Still, the jury should simply be instructed to disregard or include alterations in value attributable to the project, not (to give an extreme example) that it must add 10% to its just compensation award to adjust for depreciation caused by the threat of condemnation.

On the other hand, commissions (which under Rule 71A(h) have the powers of a master),

because of their greater freedom to control the evidence presented them, will more frequently be confronted with conflicting evidence as to whether, and by how much, there has been a change in value attributable to the project.

100. Or, where appropriate, to include value attributable to the project up to the date condemnation of the property became reasonably foreseeable, see p. 807, *supra* & note 44, *supra.*

101. However, where a commission is used, Rule 71A(h) contemplates that the commission will file a report with the District Court, that the report will contain findings, and that the Court will deal with the report and findings as it would with those of a master. Consequently, commission determinations are subject to somewhat stricter review, as, for example,

## IV. COMPARABLE SALES

Before turning to the other crucial pre-trial ruling (relating to highest and best use), we pause to consider the landowners' contention that the District Court erred in excluding 5 sales of mangrove lands located *outside* Everglades National Park which the landowners had tendered as comparable sales.[102] According to the landowners, this ruling, coming on top of the pre-trial ruling excluding all post-1958 sales *within* the Park, vitiated their case. The only "comparable" sales to reach the juries were inland sawgrass sales which averaged about $325/acre. The landowners identified a number of differences between their coastal mangrove properties and inland sawgrass properties, but having been prohibited from introducing the sales price of *any* coastal mangrove lands (which averaged about $3100/acre), they were unable to prove their position that because of these differences their lands commanded a much higher fair market value than did inland sawgrass properties.

█ In Part IIIB(3), *supra*, we held that the SOP rule does not *require* the exclusion of sales within the scope of the project which are offered as comparable sales. Moreover, we strongly indicated that an evidentiary exclusion might constitute reversible error where it would compel the parties to rely on distinctly "less comparable" sales to the prejudice of one of the parties. For the same reasons which led us to this conclusion concerning comparable sales within the project,[103] we hold that the District Court erred in excluding the 5 non-Park comparable sales in the trials below.

We recognize that the decision upon whether to admit or exclude tendered comparable sales is committed to the sound discretion of the trial judge.[104] And in this case, the Court's decision to exclude the 5 mangrove sales in question was not wholly arbitrary; Judge Mehrtens indicated that the 5 tendered sales were too far away from the landowners' properties[105] and too close to developed, urban areas to be truly comparable. But the inland sawgrass sales that were admitted were equally dissimilar to the condemned properties, and perhaps more so, albeit in different respects. Although the sawgrass sales, like the condemned properties, were also fairly distant from urban areas, they possessed substantially different physical characteristics and were not suitable for the same recreational uses. From the standpoint of admissibility —namely, the *degree* of comparability— there was no reason to prefer the sawgrass sales over the 5 excluded mangrove sales. To be sure, the dissimilarities between the 5 mangrove sales and the condemned properties may not have affected market value to the same extent. Proximity to urban areas might have been a more significant element of value than the unique characteristics of coastal mangrove lands. But the extent to which dissimilarities are reflected in market value is a question of the evidentiary weight of the comparable sales, which is a question for the jury. By excluding the 5 mangrove sales, the Court in effect substituted itself for the jury, and there is a strong likelihood that by so doing the landowners were substantially prejudiced since they were left with no tangible evidence to support their contention that the differences between coastal mangrove properties and inland sawgrass properties translated into differences in fair market value. In these circumstances—where but one of two sets of sales possessing relatively equal de-

---

where the report contains conclusory findings only and does not reveal any indication of the reasoning by which the commission reached those findings. *See generally United States v. Merz,* 1964, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629; *Georgia Power Co. v. 138.80 Acres of Land,* 5 Cir., 1979, 596 F.2d 644, 649; 7 Moore's Federal Practice ¶¶ 71A.90[9.–4] to [9.–6] (2d ed.).

**102.** See pp. 772–773, *supra.*

**103.** See pp. 768, 801–803, *supra.*

**104.** See note 65, *supra.*

**105.** This ground is undermined somewhat by the fact that several of the 5 excluded non-Park mangrove sales were closer to the condemned properties than were most of the sawgrass land sales admitted into evidence.

grees of comparability is admitted, coupled with a strong likelihood of substantial prejudice to one of the parties—it was an abuse of discretion to exclude the 5 tendered mangrove sales.[106]

## V. HIGHEST AND BEST USE

 The second crucial pre-trial ruling which the landowners contest concerned the issue of the highest and best use of their properties. One of the basic principles of eminent domain law is that condemnees are entitled not just to the value of their properties as used at the date of taking, but rather to the value their properties would command in the open market in light of the highest and most profitable use to which they might reasonably be devoted in the near future.[107] Perhaps the best summarization of the law with regard to highest and best use is found in the Supreme Court's opinion in *Olson v. United States,* 1934, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed.2d 1236:

> Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. * * * But the value to be ascertained does not include, and the owner is not entitled to compensation for, any element resulting subsequently or because of the taking. Considerations that may not reasonably be held to affect market value are excluded. * * *
>
> * * * [Market value is] the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. * * * The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.[108]

With respect to the highest and best use of these coastal mangrove properties, Judge Mehrtens granted the Government's motion *in limine* and ruled prior to trial (and with-

---

**106.** Of course, in all probability this error would not have occurred had the SOP rule been applied properly. And if on remand the date as of which the substantive SOP exclusion is triggered does not taint all relatively recent in-Park mangrove sales, or if the Court decides to admit all in-Park sales regardless of the possibility that may have been tainted by an alteration in value attributable to the project (leaving the question of possible taint to the fact-finder), there probably will be no need to refer either to inland sawgrass sales or to non-Park mangrove sales in proving fair market value.

**107.** One important qualification is that the use must be one which a *private* owner might reasonably develop or enjoy. The condemnee is not entitled to compensation for potential uses that could be exploited only by the condemnor, see pp. 781–783 & note 26, *supra,* nor, of course, is the condemnee entitled to the value of any beneficial uses derived from the Government project for which his property is taken if, under the SOP rule, he could not reasonably anticipate being able to develop and enjoy that use without serious apprehension that his property would soon be condemned for the project.

**108.** 292 U.S. at 255–57, 54 S.Ct. at 708–709; *accord, McCandless v. United States,* 1936, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205. *See also Cameron Development Co. v. United States,* 5 Cir., 1944, 145 F.2d 209, 210.

out a proper evidentiary hearing) that the landowners "shall make no reference at trial to evidence that the subject properties are suitable for cabin sites or other construction purposes." During the trials, he adhered to and enforced this ruling over the landowners' repeated objections that their undeveloped properties were suitable for cabins erected on stilts, for boat docks, and for elevated boardwalks.[109] Although he never explicitly set forth his reasons for excluding evidence that the highest and best use of the properties was as sites for the sorts of permanent improvements proffered by the landowners, the record indicates that Judge Mehrtens based this ruling on two considerations. First, he evidently believed that stilt cabins, boat docks, etc., were impracticable, and hence speculative uses for which compensation may not be awarded as a matter of law. But second, even if practicable uses for which there was a market demand, Judge Mehrtens believed that various regulatory restrictions precluded these uses without a permit, and that absent proof that the necessary permits had been or could be obtained, the properties could not be valued as suitable for buildings or other improvements.

The landowners contend that this ruling, the result of which was that their lands were valued as unsuitable for any development purposes, was erroneous for three reasons. First, the owners contend that to the extent the ruling was based on any pre-trial evidentiary hearings to which they were not a party, it is void for failure to satisfy the requirements of due process. Their second argument is that the evidence they tendered during the trials on highest and best use was *not* speculative, and therefore should have been admitted for the jury's consideration in determining the fair market value of their properties. Finally, the landowners argue that the issue of highest and best use is a jury issue, and that the

Court's ruling, tantamount as it was to an instruction that their properties had to be valued as undevelopable virgin land, erroneously trenched upon the province of the jury.

We have of course already addressed the landowners' first argument and ruled in their favor.[110] Although at trial the landowners did proffer in summary form evidence pertaining to the suitability of their lands for permanent structures and some conclusory testimony pertaining to permits, it is apparent that Judge Mehrtens based his ruling primarily upon evidence presented elsewhere, presumably at the February 5th evidentiary hearing involving *other* tracts and *other* landowners.[111] Thus, the landowners in the three May trials currently before us never had a meaningful opportunity to present fully their evidence on the feasibility of permanent structures or to rebut the Government's contention that their properties were within the jurisdiction of various regulatory authorities which would not grant the necessary permits for any permanent structures. Regardless of the merits of the landowners' second and third contentions, the ruling on highest and best use cannot stand because of this most basic failure of due process.

As the landowners point out, the only evidence on highest and best use introduced in proceedings to which they were a party consisted of their proffers during the trial, to the effect that stilt houses, boatdocks, and elevated boardwalks were feasible uses for which there was a market demand and for which there was a reasonable probability of obtaining permits. Consequently, the owners urge us to hold that stilt houses and the like are *not* speculative uses. We decline to do so. The record on this issue not only has been developed in a most awkward fashion, but is as yet quite sparse. Because

---

109. In addition, Judge Mehrtens extended this ruling to the four properties which had already been improved with permanent structures, reasoning that those structures were "illegal uses." See p. 775, *supra*. We discuss this additional ruling on "illegal uses" in Part VI, *infra*.

110. See p. 777 & note 22, *supra*.

111. See note 22, *supra*.

the Government had no reason to call rebuttal witnesses or otherwise respond to the owners' trial proffers, the record before us is virtually one-sided with little more than conclusory assertions at that. Although we are reluctant to make any predictions, it seems to us that the issue is far too complex to be decided on the present record.[112] Determination of the highest and best use issue, as with the scope of the project issue, must await further proceedings in the District Court in accordance with the principles announced in this opinion.

Because it will inevitably be of central importance to the proceedings on remand, we turn to the landowners' third argument—that the issue of highest and best use is committed to the fact-finder (the jury or a commission). We have already observed that F.R.Civ.P. 71A(h) commits only the ultimate issue of "just compensation" to the fact-finder, leaving determination of "all [other] issues" to the court.[113] And we have held that pursuant to this division of responsibilities under Rule 71A(h), determination of the scope of the project issue is delegated to the judge to the extent that the judge decides whether the rule is applicable, how it should be applied, and the date after which all changes in value attributable to the project must be disregarded by the fact-finder.[114] The question we consider here is the appropriate division of responsibilities under Rule 71A(h) with respect to highest and best use.

In light of the fact that highest and best use is an issue in almost every eminent domain case (whereas scope of the project is an issue in only a small percentage of condemnation cases), it is somewhat surprising that this question apparently has been considered only once before by an appellate court, and even in that case, which comes from this Circuit, the question was not resolved. In *United States v. 158.24 Acres of Land [Bee County]*, 5 Cir., 1975, 515 F.2d 230, the appellant landowner contended that the District Court had erroneously invaded the jury's domain (just compensation) in the guise of deciding "other" legal and factual issues when it ruled that the highest and best use of the condemned property was ranching (its existing use), and excluded the landowner's testimony that the highest and best use was subdivision into small rural tracts held for recreational and residential purposes. In affirming the District Court we noted that the judge's power under Rule 71A(h), as construed by the Supreme Court in *United States v. Reynolds, supra*,[115] "may be broad indeed," 515 F.2d at 232 & n.3, but we declined to define the outer parameters of that power. Instead,

---

**112.** Among the complications is the likelihood that the highest and best use determination will have to be made more on an individual, parcel-by-parcel basis than, for instance, will the scope of the project determination. From our reading of the trial transcripts, it appears that there are significant differences among the individual properties—for example, their size, the extent to which they are high and dry, and their accessibility to easily traversed waterways. Because of these and other differences, stilt houses and the like may be practicable and reasonably possible future uses for some of the tracts but not for others. It is also possible that the need for permits will turn upon some of these differences; *i. e.*, it is possible that some but not all of the properties will be subject to the jurisdiction of a particular regulatory authority. For example, the jurisdiction of the Army Corps of Engineers under § 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, is limited to activities which either are below the mean high tide line or have "some effect upon navigable waters, some alteration or modification of either course, location, condition or ca-

pacity of those waters." *United States v. Moretti (Moretti II)*, 5 Cir., 1976, 526 F.2d 1306; *see also United States v. Sexton Cove Estates, Inc.*, 5 Cir., 1976, 526 F.2d 1293; *Weiszmann v. District Engineer*, 5 Cir., 1976, 526 F.2d 1302. Although the present record indicates that it is likely that dredging, filling, or the construction of permanent structures on some of the parcels would fall within the jurisdiction of the Army Corps, as thus defined, it is impossible to conclude whether or not the Corps' jurisdiction extends to such activities on all of the properties. The record is similarly unilluminating concerning the possible application of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376, and the jurisdiction and regulations of any state or local agencies.

**113.** See Part IIID, p. 808, *supra*.

**114.** See Part IIID, pp. 807–809, *supra*.

**115.** See p. 808, *supra*.

we affirmed on the ground that the proffered evidence as to subdivision was "speculative," and therefore "could have been excluded by the trial court on this ground." *Id.* at 232.[116]

The principle that just compensation cannot be predicated upon potential uses which are speculative and conjectural is of course firmly established. It is but the converse of the principle, as stated in *Olson,* that just compensation must take into account "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future," 292 U.S. at 255, 54 S.Ct. at 708. Indeed, in *Olson* itself, the Court held that the condemned lands of the petitioners could not be valued as suitable for use as a reservoir where the landowners had failed to prove that there was any reasonable probability of their acquiring the numerous flowage easements necessary to adapting their lands for reservoir purposes. *See id.* at 260, 54 S.Ct. 704. To like effect is *United States ex rel. TVA v. Powelson,* 1943, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390, in which the fact-finder valued the condemned property as suitable for a hydroelectric plant, but the Supreme Court reversed because there was insufficient evidence of a reasonable likelihood that the condemned lands could be incorporated as part of a power project within the reasonably near future. *See also McGovern v. New York,* 1913, 229 U.S. 363, 372, 33 S.Ct. 876, 57 L.Ed. 1228. In a similar case from this

Circuit, *United States v. Cooper,* 5 Cir., 1960, 277 F.2d 857, we too overturned a just compensation award based on the value of the land as a potential hydroelectric site, on the ground that there had been a "complete failure of proof" that use as a dam site was a reasonably probable use, *id.* at 859. Relying on *Olson,* we held that the prerequisite to having land valued on the basis of a particular potential use was proof that the use was practicable and that there was a reasonable likelihood that the land would be so used in the reasonably near future. *Id.*[117]

▮ Absent such proof, there would be no legitimate reason for concluding that there is any market demand for the property as so used, and therefore no legitimate reason for concluding that the property has any additional market value because of its asserted suitability for that use. In short, absent such proof the alleged potential use remains a speculative use for which, as a matter of law, the landowner cannot be compensated. Consequently, there is no reason to allow the jury (or commission), in deciding the issue of just compensation, to even *consider* any use that is not reasonably probable. "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration * * *." *Olson v. United States, supra,* 292 U.S. at 257, 54 S.Ct. at

116. Among the factors indicating that the potential subdivision of the condemned ranch lands was speculative at best were the following:

While landowner's experts stated that in general there was a market for small tracts across the entire South Texas area, statements with which the government expert agreed, the sole proffered indicator of such a trend in the area south of Beeville was a single group of smaller tracts north of the land in question. However, sales of these tracts were few in number and not concentrated in time period. A good number of them did not take place until two to three years *after* the date of taking—hardly an indication of demand for small tracts at the valuation date. Further, all witnesses agreed that there had been no subdivision in this

area, other than the group of sporadically divided tracts mentioned above, even though all the property south of Beeville was susceptible to subdivision. The population in Beeville was nearly stagnant. Finally, and significantly, the property borders on Chase Air Field, close to the runway, where noise from takeoff and arrival of aircraft would be a constant nuisance.

515 F.2d at 238.

117. This proof of course would have to take into account whatever expenditure of capital would be necessary for converting the land from its current use, and the infusion of capital would have to be demonstrated to be economically reasonable, as judged by the value and profitability of the land once converted.

709.[118] At the very least, then, the trial judge has the responsibility under Rule 71A(h) to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses.

But should the trial judge go further and actually decide, from among various practicable and reasonably probable uses, what one use (or combination of uses) actually represents the highest and best use of the property for purposes of the just compensation determination? A number of cases indicate that he should not, that if the landowner's evidence is sufficient to show that a prospective use is feasible and reasonably probable, the landowner is then entitled to have that evidence considered by the jury (or the commission).

Among these decisions is one from the Supreme Court—*McCandless v. United States*, 1936, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205. The condemnees in that case had tendered evidence that, by bringing in water from neighboring lands for irrigation purposes, their lands could be converted from their existing use as a cattle ranch to a more profitable use as a sugar plantation. The trial court did not permit the jury to hear this evidence. The Supreme Court reversed. It first reiterated the principle of *Olson* that the most profitable use to which the land can probably be put in the reasonably near future should be considered to the extent it affects market value. It then held, contrary to the conclusion of the trial court, that on the basis of the landowners' tendered evidence the possibility of obtaining water from outside sources was not so remote and speculative as to preclude the jury from considering as an element of value the potential use of the land for the cultivation of sugar cane. 298 U.S. at 345–46, 56 S.Ct. at 765.

A similar, and particularly instructive, decision is *Hembree v. United States*, 8 Cir., 1965, 347 F.2d 109. In that case, the Government had contended that the highest and best use of the condemned properties was limited to grazing purposes. The landowners, on the other hand, claimed that the highest and best use was either commercial quarrying for limestone or residential development. Although the landowners offered evidence in support of both these claims, the trial court ruled that evidence insufficient to warrant submission to the jury. The Eighth Circuit affirmed concerning the insufficiency of the evidence as to residential development, but held that it was error to exclude the landowners' evidence pertaining to potential use as a dolomite limestone quarry. After reviewing the landowners' proffer against the principles announced in *Olson*, the Eighth Circuit concluded that "there was * * * evidence from which a jury could permissibly find for appellants on this issue," *id.* at 113. Accordingly, the Court held, potential use as a limestone quarry should have been submitted to the jury:

> We are convinced * * * that the [trial] court's decision was dictated by its evaluation of the weight of the evidence which turned in part at least on credibility. The court, in the role of the factfinder, concluded that there was no evidentiary basis for the claim that the value of the condemned land was enhanced because of the limestone deposit. Perhaps a jury would reach the same conclusion but that was not for the trial court to determine and is not, of course, an issue before us. We are constrained to hold that the evidence provided a sufficient factual background to require submission of the limestone issue to the jury.

*Id.* at 113–14.[119]

To like effect is *United States v. 100 Acres of Land [Marin County]*, 9 Cir., 1972,

---

**118.** In so stating, the Supreme Court in *Olson* was expressly approving the trial court's action in excluding the condemnees' evidence that the highest and best use of their lands was as a reservoir.

**119.** Significantly, one of the tracts had been operated as a quarry under a lease agreement for five years, but the operation had been discontinued six years prior to the date of taking. The trial court apparently believed that it was discontinued because it no longer was commercially profitable, but the Eighth Circuit held

468 F.2d 1261, *cert. denied*, 1973, 414 U.S. 864, 822, 94 S.Ct. 37, 119, 38 L.Ed.2d 84, 54, in which the Ninth Circuit had to decide whether the District Court had erred in permitting the jury to decide the highest and best use issue. At trial, the Government had urged that the highest and best use of the subject property (a small peninsula of sandy real estate about 45 miles north of San Francisco) was for recreational purposes only. The landowner, however, offered expert testimony that the highest and best use was a recreational and residential development, involving subdivision into beach lots. The trial judge permitted this testimony to reach the jury, after finding that there was a sufficient foundation for it.[120] The Ninth Circuit affirmed:

> that the evidence was inconclusive on this point.

**120.** The admission of this testimony may have been critical in light of the fact that the Government had valued the property at about $180,000, while the landowner's experts had valued it at an average of $1,750,000, and the jury returned a verdict for $700,000.

**121.** Earlier in its opinion, the Ninth Circuit had observed:

> It is not uncommon for expert witnesses to disagree in regard to the highest and best use to which condemned property may be put and as to values based on their respective opinions. Ultimately, this is a question to be decided by the trier of fact, in this case the jury, from the evidence.
> *Id.* at 1266.

**122.** In this case, the Sixth Circuit reversed the District Court, which, sitting without a jury, had refused to receive or consider any evidence or testimony whatsoever concerning the value of a 193-acre farm, with 1.4 miles of road frontage, as a potential site for residential subdivision. At trial, the owners offered evidence that they had received inquiries about selling parcels along the road bordering their farm for residential uses, along with evidence that other farmland in the vicinity had been sold for homesite purposes at substantial prices. In addition, they offered evidence of the value of their land (a) if subdivided in its entirety, taking into account the cost of laying out additional roads, and (b) if subdivided into homesites only along the existing road frontage with the remainder of the property retaining its character *as farmland. The Sixth Circuit held that the landowners' tendered proof was sufficient to require the trial court, at a minimum, to give

It appears to be well settled that in determining market value of condemned property, evidence as to the reasonable probabilities of its use is admissible and may be considered. See *McCandless v. United States*, supra * * *. The weight to be given evidence of reasonable probability is a question for the trier of fact. Cf. *Olson v. United States*, supra. Evidence in regard to prospective uses is admissible and whether adaptability and probability affect market value is for the jury.

468 F.2d at 1267–68.[121] *See also United States v. 1,291.83 Acres of Land*, 6 Cir., 1969, 411 F.2d 1081;[122] *Atlantic Coast Line R.R. v. United States*, 5 Cir., 1943, 132 F.2d 959.[123]

"serious consideration" to valuation (b). 411 F.2d at 1086. The Court concluded with the observation:

> It is clear that in condemnation proceedings if evidence shows a reasonable probability of adaptability of lands for specific uses evidence regarding the value of the property for such prospective uses *should be received. Id.* at 1087 (citing *Olson v. United States*).

**123.** This case involved the condemnation of 986 acres of undeveloped marsh land near Tampa, Florida extending along a narrow peninsula from the terminus of the appellant's existing railroad line. The trial court permitted witnesses to testify concerning the value of the property for residential purposes, but excluded from jury consideration as too speculative the *otherwise competent opinion of one expert* concerning the value of the land for industrial purposes. Observing that a "reasonable argument is made for [industrial development] as a probable use," and that "[i]t is not more speculative than is the use of the land for residence," 132 F.2d at 963, the Court held that the expert's testimony and valuation should have been submitted to the jury.

Elsewhere in the opinion, the controlling principles were summarized as follows:

> The sum to be paid the owner does not depend upon the uses to which he has devoted it, or if he is not using it at all upon the uses to which he expects to devote it, but is to be ascertained on just consideration of all the uses to which it is suitable. *Olson v. United States*, [*supra*]; *McCandless v. United States*, [*supra*]. Evidence as to all such uses may be offered by either side, the jury being the final judge under proper instructions as *to what uses it was suitable for, and was* most valuable.
> *Id.*

To be sure, all but one of these decisions antedate—and the other (*Marin County*) does not mention—the Supreme Court's opinion in *United States v. Reynolds, supra,* in which the Court stated that under Rule 71A(h) "[i]t is for [the judge] to decide 'all issues' other than the precise issue of the amount of compensation to be awarded," 397 U.S. at 20, 90 S.Ct. at 807; see p. 808, *supra.* Nonetheless, we align ourselves with these decisions and hold that once the landowner has produced credible evidence that a potential use is reasonably practicable and reasonably probable within the near future, it is for the jury (or commission) to decide whether the property's suitability for this use enhances its market value, and, if so, by how much. To that extent and in that sense, the jury decides the highest and best use issue.

Our reason for so holding is that adaptability or suitability for nonexisting uses is an inextricable factual element of market value. Consider, for example, the following hypothetical: The Government contends that the highest and best use of a farm on the outskirts of a rapidly expanding urban area is its existing use (farming). The landowner offers evidence showing that reasonably practicable and probable alternative uses in the reasonably near future are (i) a commercial airfield for small planes, (ii) quarrying for substrata granite deposits, (iii) subdivision into residential lots, or (iv) a combination of farming and residential subdivision. Were the judge to decide that any one of these alternatives, say residential subdivision, was the highest and best use—and so instruct the jury—he would in effect be deciding that residential subdivision is the most *valuable* use. No matter how one slices it, in order to reach the conclusion that residential subdivision is the highest and best use, the judge would have to engage in a rather detailed evaluation of the characteristics of the property and its immediate environs, the likely pattern of land use development in the area, and finally current and future market demand in the area—precisely the sort of factual analysis that enters into the determination of "fair market value." In so doing, he would be deciding more than just the "preliminary matters" which *Reynolds* and Rule 71A(h) tell him to decide. Instead, he would be deciding in part the very issue of just compensation which, under *Reynolds* and the Rule, is committed to the jury or commission. For, as *Olson v. United States* defines it, "just compensation includes *all elements of value that inhere in the property*"; it is "to be arrived at upon just consideration of *all the uses for which it is suitable.*" [124]

In other words, if suitability for a particular use *might* reasonably affect fair market value—in the sense that a just compensation award based in part upon the potential for that use would not be invalid as a matter of law—then evidence pertaining to that use must be admitted for consideration by the trier of fact. And it is for the trier of fact to decide—on the basis of all the evidence (including rebuttal evidence) and upon proper instructions—whether the property has any additional market value because of its suitability for

In *Bee County, supra,* we intimated that since this case was decided prior to the promulgation of Rule 71A, it might no longer be controlling. 515 F.2d at 232–33 n. 4. Although it is true that our *Atlantic Coast Line* opinion must be read in the light of the supervening adoption of Rule 71A, we find that in general it remains a sound statement of the law with respect to all of the issues which it addresses.

**124.** 292 U.S. at 255, 54 S.Ct. at 708 (emphasis supplied). We emphasize, however,—as did the Supreme Court in *Olson*—that the "suitable uses" which the jury may consider are only those uses "for which the property is adaptable and needed or likely to be needed *in the reasonably near future,*" *id.* (emphasis supplied).

The principle that the condemned property is to be valued on the basis of "all the uses for which it is suitable" must also be qualified by the concept of inconsistent uses. Obviously, our hypothetical farm could not be used in the future as both an airfield and a quarry (or an airfield and a residential subdivision). To the extent that potential uses are inconsistent or incompatible uses, whatever value the land possesses because of its suitability for each of these uses cannot be aggregated in determining fair market value and just compensation.

**818**

this use.[125] If, on the other hand, a proffered potential use is not reasonably practicable or probable, so that no reasonably minded trier of fact faithfully applying the law could find that it represents an element of fair market value, then of course the landowner is not entitled to have evidence concerning that use considered by the trier of fact. Indeed, as we have already held,[126] under Rule 71A(h) the trial judge *must* exclude evidence of any such speculative uses.[127]

■ Finally, it bears emphasizing that a prospective use may be speculative, and therefore subject to exclusion from consideration by the trier of fact, not just because there is insufficient evidence of either the property's adaptability or of any market demand for that use, but rather because the use simply is not permitted. So far we have ignored the legal framework of land use restrictions to which virtually all private real estate is subject. But regulatory restrictions may preclude an otherwise possible use even more decisively than the inherent physical characteristics of a property. And it is clear that just compensation must be determined in light of such regulatory restrictions.[128] Thus, in screening proffered potential uses to ascertain whether there is sufficient evidence of their practicability and probability to warrant submission to the trier of fact, the judge must take into account any regulatory restrictions applicable to the property and the proposed use. And if the judge finds that the regulations preclude the proffered use, he must under Rule 71A(h) exclude evidence of that use from the just compensation determination.[129]

Construing governmental regulations is of course a paradigmatic judicial function. With respect to this issue, there is no room for a division of fact-finding responsibilities between judge and jury. There are no "if's," "and's," "but's," or "maybe's" for the jury to consider. A legal restriction either applies to the proposed use or it does not—

**125.** The jury (or commission) is not of course obligated to believe a landowner's evidence that his farmland is enhanced in value by $X$ amount of dollars because it is suitable for an airfield or a granite quarry. In light of the Government's evidence, and after the Government has had an opportunity to cross-examine, counter, or refute the landowner's witnesses, the jury may decide that the property must be valued solely on the basis of its existing use after all, either because it is not sufficiently suitable for an airfield or a quarry, or because the market demand for those uses is is not strong enough. Or, even if the jury decides that the value of the land is enhanced by these prospective uses, it very well may conclude that the enhancement is substantially less than what the landowner claims.

**126.** See pp. 814–815, *supra.*

**127.** This allocation of decisional responsibilities with respect to the issue of highest and best use is but a counterpart of the division of responsibilities with respect to the scope of the project issue, see Part IIID, *supra.* With regard to both issues, the judge determines whether an arguable *element* (or source) of value is a legally cognizable element of value for which compensation may be awarded, and, where the judge does find the element a legally compensable one, the trier of fact decides whether it is *in fact* an element of fair market value and, if so, just how much *value* it in fact represents. For example, the judge decides whether the landowner *may* be compensated either for any value attributable to the project or for any value due to the fact that his property is reasonably suitable for residential development, but the trier of fact decides whether there *is* any value, and *how much*, due either to the project or to the potential for residential development.

**128.** *See, e. g., United States v. Commodities Trading Corp.*, 1950, 339 U.S. 121, 70 S.Ct. 547, 94 L.Ed. 707 (wartime price controls); *United States v. Eden Memorial Park Ass'n*, 9 Cir., 1965, 350 F.2d 933, 936 (zoning restrictions); *Fairfield Gardens, Inc. v. United States*, 9 Cir., 1962, 306 F.2d 167, 170 (rent control); *United States v. Delano Park Homes, Inc.*, 2 Cir., 1944, 146 F.2d 473, 474.

**129.** "Thus if existing zoning restrictions preclude a more profitable use, ordinarily such use should not be considered in the evaluation." *United States v. Meadow Brook Club*, 2 Cir., 1958, 259 F.2d 41, 45, *cert. denied*, 1958, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239. *See also Scott Lumber Co. v. United States*, 9 Cir., 1968, 390 F.2d 388, in which the Court reversed because the highest and best use according to which the jury awarded just compensation— the "clear cutting" of all timber located on the condemned property—was an impermissible and illegal use under state rules and regulations governing the harvesting of timber.

and that is a quintessential question of law for the judge to decide.

 However, it is not at all uncommon within regulatory systems for permits or variances to be granted, or for the regulations themselves (especially zoning regulations) to be changed. And since the prospect of obtaining a permit or a change of zoning classification is a factor that might well be considered by a prospective purchaser, and thus a factor affecting the price a willing buyer would pay for the property, it will often represent an element of fair market value. Accordingly, it is well settled law that if the landowner can demonstrate a "reasonable possibility" that a permit would be issued or that rezoning will occur, thereby freeing the property for a use which otherwise would be precluded by regulatory restrictions, the owner is entitled to have that "reasonable possibility" considered by the jury, provided of course that the use is otherwise a practicable and reasonably probable one. *See, e. g., H & R Corp. v. District of Columbia*, D.C. Cir., 1965, 122 U.S.App.D.C. 43, 45, 351 F.2d 740, 742; *Wolff v. Commonwealth*, 1 Cir., 1965, 341 F.2d 945, 946–47; *United States v. Meadow Brook Club*, 2 Cir., 1958, 259 F.2d 41, 45, *cert. denied*, 1958, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239. *See generally* 4 Nichols, The Law of Eminent Domain § 12.322[1] (rev'd 3d ed.). We emphasize, however, that it is for the judge to determine whether this "reasonable possibility" exists. If and only if he finds that it does exist, then the jury must consider and decide what effect this reasonable possibility of a permit or zoning change has upon the fair market value of the condemned property.

In sum, we hold that it is the trial court's responsibility under Rule 71A(h) to screen all proffered potential use evidence and exclude from consideration by the trier of fact evidence of any potential uses upon which a just compensation award may not, as a matter of law, be based. This of course encompasses alleged potential uses which have not been demonstrated to be practicable and reasonably probable even absent regulatory restrictions as well as potential uses that are proscribed by legal restrictions from which there is no reasonable possibility of relief.[130] If, however, the party offering the potential use evidence (almost invariably, the landowner) is able to meet this threshold burden, then evidence pertaining to that use must be submitted to the trier of fact under whatever instructions are appropriate, and the weight of that evidence as regards the fair market value of the property is for the trier of fact to decide.

With respect then to the 52 tracts in this case, the landowners on remand bear the burden of producing credible evidence that as of the time of taking, stilt houses, boat docks, elevated boardwalks, etc., were practicable uses and that there was a reasonable likelihood that their properties would be so used in the reasonably near future. *United States v. Cooper, supra* (p. 814, *supra*). And if the Government demonstrates that any of these uses are subject to local zoning restrictions or to the regulatory authority of other local or state agencies or federal agencies such as the U.S. Army Corps of Engineers, the landowners bear the additional burden of showing that there was, at the time of taking, a reasonable possibility that the use nonetheless would have been permitted. On the basis of the little evidence in the record before us, it appears

130. In order to carry out this screening function, it will often be necessary to hold an evidentiary hearing. Regardless of the procedure, however—whether it be evidentiary hearing, sworn affidavits, or whatever—the judge should make his preliminary findings and rulings on the record, showing clearly why he is excluding or admitting evidence of a particular use. As a general rule, in deciding whether there is sufficient evidence for the jury or commission, the judge should not resolve questions of credibility. Nonetheless, a party obviously cannot make out a jury question simply be asserting that a particular use is reasonably practicable and reasonably probable, or that there is a reasonable possibility of obtaining a permit; as with all opinion evidence, there must be some foundation in fact. Nor is the judge constrained to admit inherently incredible testimony. The guiding consideration should be: could the jury (or commission) reasonably conclude that the potential for this use affects the fair market value of the property?

likely that some of the owners will be unable to meet this threshold burden of proof, that for some of the properties these claimed potential uses are indeed too speculative and remote to serve as a basis for awarding compensation. On the other hand, some of the owners may well be able to produce "juryworthy" (or "commissionworthy") evidence that their properties were, even given the existence of various regulatory restrictions, reasonably suitable for at least some of these uses. But all this is a matter for the trial court to decide in the first instance upon a much more complete evidentiary presentation than is currently available to us. And if an owner's evidence is sufficient to survive the preliminary judicial screening, it then falls to the trier of fact to decide upon all the evidence and under proper instructions whether, and by how much, his property is enhanced because of its suitability for any of these uses.[131]

## VI. ILLEGAL EXISTING USES

Of course, it would be impossible to hold that permanent structures such as cabins

---

**131.** Implicit in the foregoing is that at least some, or perhaps even most, of the properties cannot be valued as suitable for any permanent structure after all—just as Judge Mehrtens ruled (albeit without a proper evidentiary hearing) prior to the first set of trials. On appeal, the landowners professed to be outraged by this possibility, claiming that it is without precedent for property to be valued "as if 'no building or structure could be placed on it' and as if its 'only use is preservation in its natural state.'" We have not examined the precedents, or lack thereof, because we do not feel that the issue is squarely presented by the present posture of the case.

All the same, we strongly suspect that the landowners' protestations are somewhat exaggerated. If in fact land is not reasonably suitable for any development, there is nothing in the Fifth Amendment that commands the Government to ignore reality and compensate the landowner for mythical, magical, impossible uses. The landowner, after all, is entitled to the fair market value of his property and nothing more, and if his property in its natural state would have no prospective use value to a reasonable private purchaser other than its use as a site for hunting, fishing, and camping, then it cannot be valued otherwise in an eminent domain proceeding.

If, however, it is because of governmental regulations, and not because of the peculiar characteristics and location of the property, that the land cannot be developed at all, then the landowners have a stronger position. For it is clear that the Government may effect a taking within the meaning of the Fifth Amendment not just by acquiring possession of or title to a property but also by imposing overly restrictive regulations on the free use of the property. See, e. g., Pennsylvania Coal Co. v. Mahon, 1922, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 ("The general rule * * * is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."); Pete v. United States, 1976, 531 F.2d 1018, 1030-36, 209 Ct.Cl. 270; Maher v. City of New Orleans, 5 Cir., 1976, 516 F.2d 1051, 1065. (It is also clear that the Government may not regulate for the purpose of depressing value in eminent domain proceedings. E. g., Washington Metropolitan Area Transit Auth. v. One Parcel of Land, D.Md., 1976, 413 F.Supp. 102, 106, aff'd, 4 Cir., 1977, 548 F.2d 1130, and cases cited therein.) Usually a landowner's remedy for such "confiscatory" regulations which deprive him of any reasonable use whatsoever is an injunction against enforcement of the regulations, but occasionally landowners have brought "inverse condemnation" actions and recovered damages (just compensation) instead. See generally Note, Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance, 26 Stan.L.Rev. 1439 (1974). In this case, the owners are in effect seeking to introduce an inverse condemnation claim into this conventional eminent domain proceeding, for they contend that to value their land as undevelopable because governmental regulations preclude development is tantamount to a regulatory taking.

Their argument is not a frivolous one, but we decline to address its merits. So far there has not even been a proper determination of what restrictions these properties were subject to, much less any consideration of whether these restrictions so substantially deprived the owners of the reasonable free use of their lands as to amount to a regulatory taking. Until these factual and legal issues have been properly presented and considered, we defer consideration of the extremely complex questions of law and procedure raised by the landowners' argument, questions which would be complicated further where the regulatory taking, if there has in fact been one, was effected by the combined force of federal and state regulatory restrictions (such as local zoning restrictions, state sewage disposal regulations, and federal environmental regulations), see generally Harris, Environmental Regulations, Zoning, and Withheld Municipal Services: Takings of Property by Multi-Government Action, 25 U.Fla.L. Rev. 635, 682–91 (1973).

were not feasible, practicable uses for any of the properties. For 3 of the 52 tracts that remain before us on appeal, along with one parcel whose owner did not appeal, had already been improved with cabins at the time of taking.[132] Yet at trial, the juries were not permitted to receive evidence of these existing improvements, and the four improved properties were valued along with all the other tracts as undeveloped, suitable only for hunting, fishing, and perhaps camping.

The reason given by Judge Mehrtens for excluding any evidence of these existing structures was that they were illegal uses. The record does not reveal which laws and regulations rendered them illegal, but we presume that they were the same zoning, sewage disposal, and environmental regulations (also never precisely identified) relied upon to exclude testimony that permanent structures were not potential uses for which the properties were suitable. Later, Judge Mehrtens explained that before the owners could introduce evidence of existing structures, they had to prove that the structures had been legally erected under a proper permit.

Our review of this illegal use ruling is severely handicapped by the wholly inadequate state of the record. Most of the evidence proffered at trial pertained to the improved parcel which has not been appealed, and even that evidence is sketchy: in 1958 the owner sunk pilings and built a frame cabin with a metal roof, insulated ceiling, and attached porch on a spot on his property above the high tide mark; at the time the cabin was built no construction permits were required and subsequently the owner was never questioned about a permit or the legality of the cabin; the National Park Service had been aware of the cabin for years and had never objected to its existence; during the 18 years after it was built, the owner used the cabin at least once a month. Aside from this and the bare fact that there were cabins on three other properties, the record contains virtually no other evidence pertaining to the existing struc-

tures and their supposed illegality. As already mentioned, there is no evidence of the laws, ordinances, or regulations under which these cabins were purportedly illegal uses. A fortiori, there is no evidence of when these laws and regulations went into effect. Nor does the record contain any indication of when the other 3 cabins were constructed. Finally, there is no evidence of how the unidentified regulatory authorities would treat nonconforming uses or whether they would grant after-the-fact permits.

■ Given that the current record is almost devoid of relevant evidence, we can provide only limited guidance as to how the three remaining improved properties should be valued upon remand. If, contrary to the Government's as-of-now unsupported contention, the cabins on these properties are perfectly legal and unobjectionable uses, the owners certainly are entitled to full compensation for them. Assuming that there was a market in 1976 (the date of taking) for similarly improved recreational properties, then the familiar "market value" approach, using comparable sales of similar properties, should be used to determine the compensation due these owners. If for some reason it is impossible or would be unfair to use a "market value" approach, the court will have to resort to whatever alternative valuation approach (for example, reproduction cost less depreciation) is fairest. *See generally* Orgel, Valuation Under the Law of Eminent Domain §§ 150–199 (2d ed. 1953).

■ If, however, the cabins were, at the time of taking, illegal uses, the issue of just compensation is much more complex than the rulings below would suggest. As a preliminary matter, it is the *Government*'s burden to prove that an existing structure is unlawful and therefore should not, as a matter of public policy, be compensated. Only if the Government proves that a permit or variance was required at the time the structure was erected does it become incumbent upon the landowner to prove

132. See p. 775, *supra*.

that the structure was built legally with a valid permit. But even failing this burden of rebuttal, it is still open to the landowner to prove that the relevant regulatory authority might nonetheless grant an after-the-fact permit or otherwise allow the structure to remain. Furthermore, compensation for an existing and otherwise valuable structure can be completely denied only if it was an illegal use at the time it was built. If it is only by virtue of supervening laws and regulations that the structure has become an illegal use, the owner does not forfeit his constitutional right to be justly compensated for his property. In this situation the appropriate compensation calculation may be difficult and somewhat unorthodox. It may be necessary to refer to whatever provision, if any, the supervening law makes for nonconforming uses, and it may be necessary to use some standard of valuation other than "market value," such as reproduction cost less depreciation. But the difficulties involved in ascertaining "*just* compensation" in these circumstances do not warrant denying compensation altogether. *See generally* Orgel, *supra*, §§ 32–34; Note, *Determination of Just Compensation in Eminent Domain Proceedings for Land Subjected to Illegal Uses or Conditions*, 38 Notre Dame Law. 196 (1963).

Of course, the compensation due the owners of the three remaining improved properties cannot properly be considered until all the relevant facts have been ascertained. On remand, the trial court should obviously concern itself with ensuring that the compensation awarded the owners of these three properties is "just" both to them and the public, but the trial court must also do that which it alone is able to do—develop a competent and complete factual record, so that at the very least all its other efforts do not go for naught.

## VII. MISCELLANEOUS TAG–ENDS

In addition to all the above, the landowners have assigned error to a number of evidentiary rulings that occurred during the three trials and to the charges given the jury at the end of each trial. We see no need to address ourselves to the asserted deficiencies in the jury instructions[133] or to several of the allegedly erroneous evidentiary rulings that are unlikely to recur on remand. However, one of the evidentiary disputes would likely be repeated on remand absent our review, and another of the appealed rulings was so manifestly erroneous that it warrants express disapproval.

### A. Admissibility of Just Compensation Statements Sent Landowners Prior to Instituting Proceedings in Eminent Domain

One of the admissibility questions that may recur on remand concerns the statements of just compensation provided various landowners by the Department of the Interior in compliance with the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (the Act). Section 301 of the Act (42 U.S.C. § 4651) establishes certain uniform nationwide "guidelines" for the public taking of any lands by agencies of the federal government.[134] Among these guidelines or policies is the exhortation that, prior to instituting proceedings in eminent domain or to entering into any negoti-

---

**133.** Any such deficiencies should be cured by a correct understanding of the controlling substantive principles.

**134.** As underscored by Section 102 of the Act and the legislative history of the Act, the provisions of § 4651 are hortatory guidelines and not enforceable mandatory requirements. Section 102(a), as finally enacted and codified as 42 U.S.C. § 4602(a), in effect precludes judicial review of agency actions under § 4651 by providing that

The provisions of section 4651 of the title *create no rights or liabilities* and shall not

affect the validity of any property acquisitions by purchase or condemnation.

42 U.S.C. § 4602(a) [emphasis added]. For the relevant legislative history, see the thorough presentation and analysis in *Barnhart v. Brinegar*, W.D.Mo., 1973, 362 F.Supp. 464, 467–73. *See also Paramount Farms, Inc. v. Morton*, 7 Cir., 1975, 527 F.2d 1301. Judicial review of agency actions under other provisions of the Act, as well as review of any actual eminent domain proceedings is not affected by § 4602(a). *See Barnhart, supra*, 362 F.Supp. at 471.

ations with the owner of land sought for a federal project, a federal agency should appraise the property, establish an amount which it believes to represent just compensation, and then offer to acquire the property for no less than this appraised fair market value. In addition, the statute states that the owners of the property should be provided with "a written statement of, and summary of the basis for, the amount * * established as just compensation." See 42 U.S.C. § 4651(3).[135]

Pursuant to § 4651, the Department of the Interior sent landowners Grantt and Ciccone statements that its "best estimate of 'just compensation'" was $20,000 for the Grantt property and $80,000 for the Ciccone property.[136] Early in Trial I, Earle unsuccessfully attempted to introduce into evi-

---

135. In full, 42 U.S.C. § 4651 provides

In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies:

(1) The head of a Federal agency shall make every reasonable effort to acquire expeditiously real property by negotiation.

(2) Real property shall be appraised before the initiation of negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property.

(3) Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property. Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property. The head of the Federal agency concerned shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount he established as just compensation. Where appropriate the just compensation for the real property acquired and for damages to remaining real property shall be separately stated.

(4) No owner shall be required to surrender possession of real property before the head of the Federal agency concerned pays the agreed purchase price, or deposits with the court in accordance with section 258a of Title 40, for the benefit of the owner, an amount not less than the agency's approved appraisal of the fair market value of such property, or the amount of the award of compensation in the condemnation proceeding for such property.

(5) The construction or development of a public improvement shall be so scheduled that, to the greatest extent practicable, no person lawfully occupying real property shall be required to move from a dwelling (assuming a replacement dwelling as required by subchapter II of this chapter will be available), or to move his business or farm operation, without at least ninety days' written notice from the head of the Federal agency concerned, of the date by which such move is required.

(6) If the head of a Federal agency permits an owner or tenant to occupy the real property acquired on a rental basis for a short term or for a period subject to termination by the Government on short notice, the amount of rent required shall not exceed the fair rental value of the property to a short-term occupier.

(7) In no event shall the head of a Federal agency either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property.

(8) If any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings. No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property.

(9) If the acquisition of only part of a property would leave its owner with an uneconomic remnant, the head of the Federal agency concerned shall offer to acquire the entire property.

136. The last sentence of the form statements read as follows:

The above sum * * * represents the Government's best estimate of "just compensation" and accordingly constitutes the sum to be offered to you for your interest within the boundaries of Everglades National Park.

dence, as an admission against interest, the $20,000 appraisal provided the Grantts. Later, when the Government presented its case, its expert appraiser testified that the fair market value of the Grantt property was $12,000 and that of the Ciccone property was $64,000. In order to impeach this testimony, Earle then sought—again without success—to introduce the higher figures contained in the statements of just compensation sent to the Grantts and Ciccones.[137]

On appeal, the landowners renew their argument that these and like statements of just compensation are admissible, either as admissions or as' impeachment by a prior inconsistent statement. The Government counters with an array of arguments in support of the District Court's ruling excluding the statements. First, it contends that the statements were properly excluded under F.R.Evid. 408 as offers of compromise made during settlement negotiations.[138] Second, it points to the fact that the § 4651 guidelines and policies, including those concerning statements of just compensation, are not enforceable requirements.[139] Finally, it relies upon a decision of the Fourth Circuit, *Washington Metropolitan Area Transit Auth. v. One Parcel of*

*Land*, 4 Cir., 548 F.2d 1130, holding that a landowner who rejects a pre-condemnation offer made pursuant to § 4651 may not introduce that offer as proof of value in the subsequent compensation trial involving that property.[140]

We do not find any of these arguments sufficiently persuasive to justify excluding § 4651 statements of just compensation which, if sent to the landowner, presumably represent the appraised fair market value of the condemned property—precisely the question at issue in a compensation trial. We fully recognize that under 42 U.S.C. § 4602(a) the relevant federal agency cannot be *required* to provide such statements.[141] But § 4602(a) does not speak to the evidentiary competence of any statements that are prepared and sent to prospective condemnees.

Nor is F.R.Evid. 408 applicable. The objective of the § 4651 procedure—including the provision of statements of just compensation and any ensuing negotiations—is the acquisition by purchase of privately-owned lands *short* of condemnation. Technically, at the time the statements are provided, there is no disputed claim, and hence no

---

137. The record does not reveal whether the Government sent similar § 4651 statements to any of the other landowners. We presume that the Government did provide such statements, but if in fact it did not, its failure to do so has no legal ramifications. *See* note 134, *supra*.

138. F.R.Evid. 408 states that

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

139. *See* note 134, *supra*.

140. It appears from the Fourth Circuit opinion that it was an actual offer, and not the preliminary statement of just compensation, that the landowners attempted to introduce in that case. In upholding exclusion of the offer, the Fourth Circuit reasoned

The purpose of a pre-condemnation offer under the Act is to expedite acquisition and avoid litigation. The Act says that the offer must not be less than reasonable market value. If the offer is to serve its purpose, it must include something more than reasonable market value for usually the seller is not a willing one and the offer's purpose is the avoidance of delay and the expense or the condemnation proceedings. To permit the offer to be received in evidence in effect would put a floor on recoveries in condemnation proceedings. No amount of explanation would prevent the jury from giving the landowner at least that much. There would be *less* incentive to accept the offer, and the purpose of the Act would be frustrated.

548 F.2d at 1131.

141. *See* note 134, *supra*.

settlement negotiations of a disputed claim, to serve as the predicate of Rule 408. But even if Rule 408 is viewed to apply to the negotiations envisioned by § 4651, there is no reason to extend it to the statements of just compensation. For, under § 4651, they are simply "statements" of the "amount * * * established as just compensation" after an approved appraisal of the fair market value of the property; they are *not* "offers," which under § 4651 may well be for *more* than the appraised fair market value. In other words, they are statements of the amount which the Government believes the landowner is constitutionally entitled to should negotiations fail and condemnation proceedings be initiated. As such, the policy reasons for excluding offers of compromise, as identified by the Advisory Committee which drafted Rule 408,[142] are not applicable to these statements. First, unlike offers of compromise, there is no possibility that these statements are motivated by a desire to buy peace, irrespective of the merits. To repeat, the statements represent the bottom line—the sum which the Government believes the landowner is constitutionally entitled to. Second, there is no significant danger that admission of such statements will deter the negotiated acquisition of private lands. Insofar as the statements do represent the Government's appraised estimate of fair market value and just compensation, they represent what the Government believes it will have to pay in any event *after* incurring the costs of a condemnation proceeding. Governmental desire to avoid these costs should be sufficient incentive to attempt a negotiated and voluntary sale of the property, regardless of the admissibility of the statements. Finally, we point out that among the express purposes with which Congress enacted

§ 4651 were "to assure consistent treatment of owners" and "to promote public confidence in Federal land acquisition practices." [143] Against this background, we do not believe that Congress even entertained the notion that the statements of just compensation would be anything other than what they profess to be—a good faith assessment of what the owner is constitutionally due, made by one authorized by this statute to make that every statement. As the law of admissions is really the law of agency, not evidence, one can hardly imagine a statement more fitting the definition than this—a statement made by one acting within his authority asserting a position contrary to the one asserted at trial. *See Brown & Root, Inc. v. American Home Assurance Co.*, 5 Cir., 1965, 353 F.2d 113, 116, cert. denied, 1966, 384 U.S. 943, 86 S.Ct. 1465, 16 L.Ed.2d 541; *Compagnie De Navigation, etc. v. Mondial United Corp.*, 5 Cir., 1963, 316 F.2d 163, 171 n.10.

For these reasons we hold that if § 4651 statements of just compensation are provided a prospective condemnee, they are admissible at a subsequent compensation trial as an admission, once it becomes known that at trial the Government is valuing the property at a lower figure. Of course, as generally true of all admissions, the § 4651 statement is not binding, and the Government is free to explain why it now believes its earlier appraisal to be inaccurate. But the Government is not completely free to play fast and loose with landowners—telling them one thing in the office and something else in the courtroom.

### B. Exclusion of Landowners' Demonstrative Evidence

In each of the trials, the Government depicted the landowners' properties as muck

---

**142.** As a matter of general agreement, evidence of an offer to compromise a claim is not receivable in evidence as an admission of, as the case may be, the validity or invalidity of the claim. As with evidence of subsequent remedial measures, dealt with in Rule 407, exclusion may be based on two grounds. (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position. The validity of this position will

vary as the amount of the offer varies in relation to the size of the claim and may also be influenced by other circumstances. (2) A more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes. McCormick §§ 76, 251.
Advisory Committee's Note to Rule 408, as promulgated by the Supreme Court.

**143.** See note 135, *supra*.

and swamp, perpetually inundated by water. To support his description of the properties, the Government appraiser in Trial II introduced and published to the jury a series of large, color photographs taken in the general vicinity of some of the parcels. No land at all could be discerned in the photographs, but only dense stands of mangrove trees, their roots covered by brackish water.

On rebuttal, Earle tendered a movie made by one of the landowners, which showed an area of his property about 1600 square feet in size which had been cleared, was high and dry, and was being used by his family for camping. Earlier this owner had testified that he had been out to his property about 50 or 60 times, that he had never seen it under water, and that he had cleared a campsite on it which he used as a base for fishing expeditions in the area. In response to Earle's motion to show the movie to the jury, the Government volunteered to stipulate that this owner had cleared a portion of his property upon which he camped with his family. The Court then ruled that "[i]n view of the stipulation," the owner's movie was "cumulative" and the Court therefore excluded the movie from evidence.[144]

■■■ This was a clear abuse of discretion. Government witnesses had testified that the landowners' properties were, for the most part, swamp, muck, and water. The Government was allowed to introduce pictorial evidence of lands in the area that tended to corroborate this testimony. Many of the landowners, on the other hand, had testified that at least portions of their properties were high and dry. But without any corroborating pictorial evidence, and in the face of the Government's photographs, the jury might well have dismissed their testimony as self-serving lies. To exclude the owners' only demonstrative evidence that their properties were high and dry and useable was in these circumstances tantamount to instructing the jury that the lands were muck and swamp. The error is obvious, as is its prejudicial effect.[145]

## VIII. REMAND FOR TRIAL BY COMMISSION

Although this concludes, at least for the time being, our trek through the labyrinthine ways of the Everglades and just compensation law, it does not mark the end for the Government and the owners of the 52 tracts presently before us. Determination of the just compensation constitutionally due these owners must begin anew in the District Court. This will be no easy task.

Much of the burden will of course fall to the Court. For example, with respect to the scope of the project rule, it will be the Court's responsibility to decide the proper and just date as of which any alterations in value attributable to the Northwest Extension must be disregarded in setting the compensation award. And, with respect to the issue of highest and best use, the Court will have to decide whether the landowners can satisfy the threshold burden of demonstrating that cabins, boat docks, elevated boardwalks, etc., are both reasonably practicable and, in light of any regulatory restrictions found applicable, reasonably probable uses. Further, with respect to any existing structures, the Court will have to determine whether the owners must be compensated

144. Except for the clearing, the owner's land had not been improved, and the film did not depict any buildings or docks that would have violated the Court's ruling prohibiting evidence of any such structures. See Part VI, *supra.*

145. To be sure, some of the properties may have been as the Government described them. Indeed, although the record is inexplicably vague on this point, the photographs introduced by the Government may have included some of the actual properties being adjudicated. With respect to some of the properties, then, a movie depicting high and dry ground may have been just as misleading as would photos showing muck and swamp be with respect to other properties. The dissimilarities as among the condemned properties themselves highlights one of the problems inherent in lumping all the parcels together in one or two *jury* trials where it is impractical for the jury to view the subject properties personally. As we observe in the next Part, a commission on the other hand might be better able to consider each of the condemned parcels on an individual basis.

for their taking, and, if so, the appropriate standard of compensation.

These and any other preliminary factual and legal issues are the Court's responsibility under Rule 71A(h), whether trial is had before a jury or a commission.[146] But even after the Court has narrowed the issues by deciding these preliminary matters, the trial of the ultimate issue of just compensation will remain a formidable undertaking. In the first place, there are 52 tracts involved. And even if the Government is correct in contending that these properties are pretty much homogeneous, at the very least they differ substantially in size—ranging from 0.34 acres to 320 acres.[147] But despite the Government's position that once you've seen one coastal mangrove tract, you've seen them all, the record indicates that there are significant differences other than size alone—among them the extent to which the properties are high and dry,[148] the amount of waterfront footage,[149] and the location of the properties relative to easily traversed waterways such as the Wilderness Waterway and the Gulf of Mexico. As observed earlier,[150] these differences may mean that some of the properties are suitable (or at least sufficiently suitable that the landowners may introduce evidence on this point) for permanent structures, whereas others must be valued as undeveloped and unimprovable. But even if it develops that all the properties must be valued solely on the basis of their existing use, some will almost surely be better suited for camping and boating than others, thereby precluding valuation according to some mechanical formula pegged, for example, to size alone. To complicate matters further, the fact-finder will have to apply to each of these 52 parcels what may prove to be a rather sophisticated standard of just compensation—including some value due to the Northwest Extension, while disregarding any decrease or increase attributable to the project after the still-to-be-determined commitment date. And, of course, the standard may be even more complex for any properties upon which there are permanent structures which, although no longer legal, are nonetheless compensable.

All this suggests that the issue of just compensation should be decided on remand by a commission appointed by the District Court pursuant to F.R.Civ.P. 71A(h). As pointed out earlier,[151] the right to a jury trial in federal eminent domain proceedings is governed not by the Constitution, but by Rule 71A(h). That Rule gives the District Court the discretion to appoint a commission in lieu of a jury "because of the character, location, or quantity of property to be condemned, or for other reasons in the interest of justice."[152] Although other courts

146. See pp. 807–808, *supra.*

147. Even after Earle and the Government had agreed to try the four largest parcels separately in Trial I, the properties lumped together in Trials II and III included 10 acre parcels along with tracts not even ½ acre in size.

148. Measured both by portion of the property and by months of the year.

149. A few of the properties apparently have no direct access to navigable waters, and among those parcels that do front on the water, the amount of waterfront footage varies considerably.

150. See note 112, *supra.*

151. P. 807, *supra.*

152. The full text of Rule 71A(h) appears at note 95, *supra.* The provisions relating to a commission were not adopted unthinkingly. They were included in the Rule only after much consideration and after the Supreme Court had rejected a version of the Rule which required a jury trial on the issue of just compensation, if demanded, except where Congress had by statute designated a special tribunal. *See Georgia Power Co. v. 138.30 Acres of Land,* 5 Cir., 1979, 596 F.2d 644, 647–48; 12 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 3051.

The foremost advocate of the commission system, District Judge John Paul, later wrote: What the advocates of jury trials do not realize, or ignore, is that by far the greater number of the separate pieces of property condemned by the federal government are properties of comparatively small value. * * The entire project may involve many square miles of land but most of the individual properties making up this aggregate are usually of such small value that no landowner can afford to employ counsel and proceed to a place of holding court which may be several hundred miles from his home, for the pur-

have held that this discretion is quite broad,[153] in this Circuit we purport to adhere to the principle that a commission is to be used only for exceptional cases.[154] Nonetheless, we have previously recognized that among such exceptional cases are those involving "large areas held by many small landowners, or property too distant for a jury to view the premises," *United States v. Buhler, supra,* 254 F.2d at 880, and we have upheld the use of a commission in a project involving only sixteen parcels of land, *United States v. 2,477.79 Acres of Land,* 5 Cir., 1958, 259 F.2d 23.

■ In light of the number of parcels involved in these condemnation proceedings, the remoteness of these parcels from any federal courthouse in which a jury trial might be conducted, and the complexity of the issues, this certainly is one of those exceptional cases in which trial by a commission is not only appropriate, but is required "in the interest of justice." We therefore direct under 28 U.S.C. § 2106 that on remand the issue of just compensation is to be determined by a commission pursuant to the procedures outlined in Rule 71A(h) and the principles announced in this opinion.[155]

The judgments appealed from are VACATED and the cases REMANDED for further proceedings consistent with this opinion.

---

pose of trying the valuation of land which, at most, is worth only a few hundred dollars. * * * Thus where the landowner cannot afford to appear in court the government obtains the land at its own valuation, for the only evidence before the jury is that of the government's own paid appraisers whose valuation, in this writer's observation, is usually less than that of disinterested witnesses. One cannot escape the belief that it is such results that are at the bottom of the persistent efforts of the Lands Division of the Department of Justice to obtain jury trials in all cases and to have Rule 71A amended so as go give that right.
Paul, *Condemnation Procedure under Federal Rule 71A,* 43 Iowa L.Rev. 231, 236–37 (1958).

153. *E. g., United States v. Hall,* 9 Cir., 1960, 274 F.2d 856, *cert. denied,* 1960, 362 U.S. 990, 80 S.Ct. 1077, 4 L.Ed.2d 1022; *United States v. Delaware, L. & W. R.R.,* 3 Cir., 1959, 264 F.2d 112, 115, *cert. denied,* 1959, 361 U.S. 819, 80 S.Ct. 63, 4 L.Ed.2d 65; *United States v. Cunningham,* 4 Cir., 1957, 246 F.2d 330, 332–33; *United States v. Chamberlain Wholesale Grocery Co.,* 8 Cir., 1955, 226 F.2d 492, 497–98; *cf. United States v. 158.24 Acres of Land [Bee*

*County],* 5 Cir., 1975, 515 F.2d 230, 232 n.3. *See also* 12 C. Wright & A. Miller, *supra,* § 3051, at 125–26.

154. *United States v. Leavell & Ponder, Inc.,* 5 Cir., 1961, 286 F.2d 398, 407–08, *cert. denied,* 1961, 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855; *United States v. Buhler,* 5 Cir., 1958, 254 F.2d 876, 880.

155. At oral argument, the Government advised us that eminent domain proceedings are pending for 248 other privately owned properties within Everglades National Park. Absent some crucial distinguishing factor that we are not aware of, the trials of these 248 cases should be conducted according to the same principles and considerations that we have announced for the 52 cases before us on this appeal. Indeed, it may well be that the fairest and most efficient method of trying the remaining Everglades cases would be to consolidate them all and appoint one commission for the just compensation trial of the 52 cases hereby remanded as well as the 248 other pending cases.